ORIGINAL

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

FILED
NOV 30 2007
U.S. COURT OF FEDERAL CLAIMS

**GRAND ACADIAN, INC.,**

**Plaintiff,**

**v.**

CASE NO. 07-849 C

**THE UNITED STATES,**

**Defendant.**

---

## COMPLAINT

COMES NOW the Plaintiff, Grand Acadian, Inc. (hereinafter referred to as "GRAND ACADIAN"), and files this, its Complaint and shows unto the Court as follows:

## I.

## JURISDICTION

GRAND ACADIAN seeks review in this Court. Jurisdiction is founded upon 28 U.S.C. § 1491(a)(1), and involves claims made against the United States by and through the Federal Emergency Management Agency (hereinafter referred to as "FEMA") arising out of General Services Administration (hereinafter "GSA") Lease Number GS-07B-16028 (hereinafter referred to as "the LEASE") and appeals from an adverse Contracting Officer Final Decision (See Exhibit 1, Contracting Officer Final Decision).

## II.

## PARTIES

1. The Plaintiff, GRAND ACADIAN, is a Louisiana corporation whose main office is located at 3584 Sierra Circle, Sulphur, Calcasieu Parish, Louisiana, 70665,

2. The United States, through Gerald Rottinghaus, a Contracting Officer, for the Federal Emergency Management Agency, Acquisition Gulf Coast Recovery Office, DHS/FEMA, Crystal City Suite 600, Room 628, 500 C Street, SW, Washington, D.C., 20472, issued the Contracting Officer Final Decision on December 6, 2006 from which plaintiff appeals.

## III.

## SUMMARY

As a result of hurricanes Katrina and Rita, FEMA entered into an agreement with GRAND ACADIAN to lease approximately 30 acres of property that had been fully engineered as a premium RV park. FEMA contracted with FLUOR to develop the tract and create an infrastructure that would remain at the expiration of the lease. However, FEMA failed to properly administer FLUOR'S contract, permitting FLUOR to destroy, rather than improve the property. Then FEMA failed to restore and repair the property as required in the LEASE with GRAND ACADIAN. What remained was destruction and devastation instead of the $12,000,000.00 in infrastructure that was promised in return for the LEASE. The property that was once poised to become a premium RV park, now requires restoration and repair at costs that exceed $6,000,000.00. The destruction of the property prevented the construction of infrastructure that was promised to plaintiff in return for a lower rental rate.

## IV.

## FACTUAL BACKGROUND

3. After conducting extensive research, Pat McConnaughhay began to take steps towards his goal of owning and operating a premium RV park. He and two friends pooled their resources to form GRAND ACADIAN on November 12, 2004.

4. GRAND ACADIAN located an undeveloped wooded tract that was subsequently purchased on December 17, 2004, as the site for the premium RV park.

5. Measuring approximately sixty (60) acres, the tract is located at 1141 Mosswood Drive, Sulphur, Calcasieu Parish, Louisiana, 70665 (hereinafter referred to as "the SITE").

6. Preparing the SITE for the premium RV park required re-zoning the property, wetlands and environmental permitting, engineering and architectural planning, soil testing, and making agreements for water, sewage, and electricity. In addition, GRAND ACADIAN fine tuned its business plan, hired an answering service, and began to market the SITE as a premium RV park.

7. In September 2004, the re-zoning application was filed with Calcasieu Parish.

8. In October 2004, the wetlands permit application was submitted to the United States Army Corps of Engineers.

9. On June 7, 2005, Summit-Hudson issued a soil report to Pat McConnaughhay for the SITE. A subsequent report was prepared by CBK on July 25, 2005, which outlined the recommendations regarding the civil construction procedures that were specific to the GRAND ACADIAN project. (See Exhibit 2, Summit-Hudson soil report to GRAND ACADIAN, 1/7/05; Exhibit 2.1, CBK report to GRAND ACADIAN).

10. In April 2005, D.W. Jessen & Associates, LLC submitted site engineering plans, road, drainage, and utilities plans to GRAND ACADIAN, which were approved the next month. Lacy and Associates drafted the architectural plans for the anticipated structures on the SITE to include a retail store, pavilion, and bath house. These plans were approved by the fire marshal in May 2005. (See Exhibit 3, engineering plans for the SITE, 5/05; Exhibit 3.1, architectural plans for the SITE, 4 /05).

11. On or about June 15, 2005, GRAND ACADIAN obtained a wetlands permit from the United States Army Corp of Engineers to develop the SITE and construct its RV park.

12. On or about July 20, 2005, GRAND ACADIAN began clearing the SITE and substantially completed these efforts in late September 2005, two months before Hurricane Rita struck the region.

13. On or about July 25, 2005, CBK Soils Engineering, Inc. issued a soil report and determined that the SITE was suitable for development into a premium RV park. (See Exhibit 4, CBK soil report to GRAND ACADIAN, 7/05).

14. On August 28, 2005, Hurricane Katrina struck the New Orleans area and subsequently displaced hundreds of thousands of people. As a result, there was a need for emergency housing to establish temporary residences. Therefore, the hurricane effectively increased the value of the SITE, since it was already in development and permitted as a premium RV park.

15. Early September 2005, a "strike team" of various FEMA and GSA officials, as well as, representatives from FLUOR, inspected the SITE. Calcasieu Parish officials told Mr. McConnaughhay that FEMA was interested in leasing the SITE for emergency housing.

16. The SITE was well-suited as an emergency housing location because GRAND ACADIAN had already re-zoned it and obtained various permits, including the wetlands permit. Therefore, the SITE was valuable to FEMA because it could proceed with the emergency housing much sooner than would otherwise be possible.

17. On or about September 12, 2005, FLUOR photographed the SITE. (See Exhibit 5, photos of the SITE taken by FLUOR in September 2005).

18. On September 24, 2005, Hurricane Rita struck Sulphur and the surrounding areas; therefore, the need for emergency housing increased, which in turn, increased the value of the SITE.

19. After Hurricane Rita, FEMA grew more interested in leasing the SITE due to the urgency of establishing safe housing for the displaced citizens of the area. Therefore, lease negotiations for the SITE were commenced.

20. GSA acted as the broker for FEMA and was the lead agency in lease negotiations with GRAND ACADIAN.

21. During these early negotiations between GRAND ACADIAN and GSA, FLUOR was identified by FEMA as the contractor that would develop the SITE. Subsequently, FEMA and FLUOR enlisted parish officials to assist with identifying a potential emergency housing site.

22. In the event GRAND ACADIAN and FEMA reached an agreement, FLUOR could earn millions of dollars from its contract with FEMA.

23. In early October 2005, a survey of the SITE was conducted by Fred Koeffe, a FLUOR official.

24. Also in early October 2005, a field survey was completed by Hank Jarobe and Tom Cuddy of FEMA. Their report indicated that the SITE had been "heavily impacted by the previous construction activity," however, some trees remained, such as water oak, box elder and hackberry varieties. In addition, the report indicated that, as a result of the previous activity, the "remaining project would include minimal construction activity to finalize preparations [ ] for the trailers." Furthermore, the report stated that the "[c]onstruction contractor still must maintain good management practices to minimize

any sediment run-off … resulting from construction activities on the site during final preparations for trailer placement." (See Exhibit 6, FEMA field survey, "Trip Report," of the SITE).

25. On or about October 11, 2005, Aaron Clagget, a GSA official, contacted Mr. McConnaughhay by email and wrote that FEMA was in the process of determining what type of development was most needed for the SITE.

26. Mr. Clagget forwarded a sample lease document to Mr. McConnaughhay for his review. Mr. Clagget indicated that FEMA was interested in proceeding with the project as soon as possible. (See Exhibit 7, sample lease).

27. In addition, Mr. Clagget later indicated that the development would be an E.G. site (above ground utilities); however, Mr. McConnaughhay and GRAND ACADIAN were not interested in that type of development.

28. In mid-October 2005, Mr. McConnaughhay was contacted by a new GSA official, Garhett Gordon. Mr. Gordon stated that a Group site (under ground utilities) would be planned instead.

29. Soon after, Mr. McConnaughhay supplied GSA with copies of GRAND ACADIAN'S plans for the fully engineered RV park and other documents relating to the SITE. (See Exhibit 8, GRAND ACADIAN documents relating to the SITE).

30. In late October 2005, Mr. McConnaughhay met with Mr. Gordon in Lake Charles, Louisiana to further negotiate the lease terms for the sixty (60) acres. Initially, Mr. Gordon suggested a low figure and Mr. McConnaughhay responded with $1,000,000.00 per year for the entire sixty acres. Mr. Gordon stated that the government would not pay

$1,000,000.00 because GRAND ACADIAN would benefit from the infrastructure that would remain on the property at the end of the lease.

31. Since GRAND ACADIAN was concerned about the substance and value of the infrastructure, there was no finalization of an agreement at this time.

32. Immediately following the Lake Charles meeting, GRAND ACADIAN continued to supply GSA with documentation, such as, aerial photographs, surveys, and permits. (See Exhibit 8).

33. As negotiations continued, it was determined that the SITE would be divided into two 30 acre tracts. GRAND ACADIAN would utilize the eastern half to develop its original premium RV park (hereinafter referred to as "GRAND EAST-HALF") as it continued to negotiate with FEMA regarding the lease of the western half of the SITE (hereinafter referred to as "FEMA WEST-HALF").

34. GRAND ACADIAN hired D.W. Jessen & Associates, LLC to redesign the premium RV park to be situated on the GRAND EAST-HALF.

35. In early November 2005, Mr. McConnaughhay was contacted by a new GSA representative, Mr. Chris Townsend. Mr. Townsend was the third GSA official assigned to negotiate with Mr. McConnaughhay.

36. In negotiations with Mr. Townsend, GRAND ACADIAN agreed to lower the asking price subject to a review of FLUOR'S plans for development of the FEMA WEST-HALF.

37. As a result of Mr. McConnaughhay's persistence, FLUOR eventually contacted him and provided him with a copy of the plans for development, per FEMA'S request.

38. Soon after, a FLUOR representative, Mr. Scott Wiley, met with Mr. McConnaughhay and collaborated on the plans. FEMA wanted to get a lower rental rate and GRAND ACADIAN wanted its future needs to be met. (See Exhibit 9, FLUOR Action Log, p. FI 929, 10/21/05).

39. In order to induce GRAND ACADIAN to lease the FEMA WEST-HALF (hereinafter referred to as "FWF") to FEMA, on or about November 21, 2005, Mr. Wiley forwarded FLUOR'S plan for development to GRAND ACADIAN. (See Exhibit 10, FLUOR work plan/scope of work).

40. FLUOR emailed a "Work Plan" that outlined FLUOR'S strategy for developing the FWH. In addition, FLUOR forwarded quality control specifications, detailed drawings, procedures, terms and conditions, and other documents describing the improvements that FLUOR promised to make to the FWH. (See Exhibit 10).

41. In order to induce GRAND ACADIAN to lease the FWH to FEMA, FLUOR represented to GRAND ACADIAN that the planned infrastructure improvements were valued at ten to twelve million dollars ($10,000,000.00 to $12,000,000.00) and were to remain on the property at the expiration of the lease. (See Exhibit 10).

42. On or about November 27, 2005, after reviewing FLUOR'S development plans, particularly those regarding infrastructure and other improvements, GRAND ACADIAN and FLUOR came to an understanding as to the substance and value of the infrastructure to be included in the FEMA, FLUOR Prime Contract.

43. As a result of representations by FEMA and FLUOR regarding the substance and value of infrastructure, GRAND ACADIAN agreed to lease the FWH to FEMA and lower the lease rate from $500,000.00 per year for 30 acres to $252,000.00 per year, minus taxes,

insurance, and other incidental costs related to the FEMA development. GRAND ACADIAN agreed to such concessions because of the infrastructure and improvements that it would realize at the end of the lease. In return, FLUOR agreed to develop the FEMA WEST-HALF as described in the plans it forwarded by email. (See Exhibit 10).

44. FEMA entered into a specific contract with FLUOR to develop a mobile home park on the FEMA WEST-HALF which included detailed specifications, including FLUOR's previously proposed infrastructure.

45. On or about December 1, 2005, upon authorization of the Board of Directors of GRAND ACADIAN, Mr. McConnaughhay signed the LEASE for the FEMA WEST-HALF, commencing on December 7, 2005. (See Exhibit 11, the LEASE between GRAND ACADIAN and FEMA).

46. On December 1, 2005, GRAND ACADIAN commenced construction on the GRAND EAST-HALF.

47. Mid-December 2005, several subcontractors toured the FEMA WEST-HALF and gathered information essential to bid preparation for submission to FLUOR.

48. One such subcontractor, Mr. Adam Daigle, D&G Construction, submitted a bid to FLUOR for clearing and grubbing the FEMA WEST-HALF for a flat fee of three hundred thousand dollars ($300,000.00). However, Mr. Daigle was not awarded the contract because of the limited manpower in his workforce. (See Exhibit 12, Daigle Construction bid).

49. On or about January 6, 2006, FLUOR construction crews and subcontractors first entered the FEMA WEST-HALF.

50. According to FLUOR'S project specifications, sediment retention basins and storm water detention basins were to be constructed prior to any major site clearing or grading activity. But these specifications were not followed. Other specifications regarding separating soil types and debris, clearing, and grubbing were also ignored. (See Exhibit 10).

51. FLUOR'S work plan also stipulated that construction operations were to be scheduled and conducted in such a manner as to minimize erosion. (See Exhibit 10).

52. However, FLUOR failed to exercise reasonable care in the performance of the work and failed to follow its engineering plans, causing significant damage to the FEMA WEST-HALF.

53. FLUOR failed to timely perform soil testing, failed to provide for adequate drainage, and failed to dig drainage ditches or retention ponds on the site prior to employing heavy equipment on the raw land. (See Exhibit 13, FLUOR Daily Logs).

54. After the site became wet and saturated due to rain, FLUOR continued to operate heavy machinery on the land. As this heavy machinery tracked back and forth across the undrained site, it missed topsoil, surface debris, mud, clay, and other material. (See Exhibit 13).

55. FLUOR'S destructive activity created an unstable surface that is unable to support the proposed structures. (See Exhibit 13).

56. Rather than accept responsibility for destruction of the land, FLUOR blamed the land itself for its subsequent condition.

57. Contrary to FLUOR'S interpretation, photographs of the SITE, taken by FEMA on or about January 10, 2006, show both the destroyed FEMA WEST-HALF and the

developed GRAND EAST-HALF, which confirmed that if the dirt work on the FEMA WEST-HALF had been completed properly, then the land would have been suitable for development. (See Exhibit 14, FEMA photos of the SITE, on or about 1/10/06).

58. On January 15, 2006, SITE Engineering, Inc. issued a soil report to Mr. Robert Benton of D. Honore Construction. This report evidenced the condition of the land after it was destroyed by FLUOR. It indicated that the remaining unstable surface must be removed and replaced with more suitable soil prior to any development of the FEMA WEST-HALF. (See Exhibit 15, SITE Engineering, Inc. soil report, on or about 1/15/06). FLUOR falsely represented to FEMA that the 1/15/06 report showed the condition of the land when FLUOR first entered the property.

59. Mr. McConnaughhay witnessed the destruction and became very concerned. Accordingly, he began to seek answers from FEMA officials and FLUOR.

60. On January 30, 2006, approximately three weeks after FLUOR construction crews and subcontractors first entered the site; FEMA ordered FLUOR to halt all major work at the site.

61. However, FLUOR continued to work on the FEMA WEST-HALF, until it was halted again, on or about February 2, 2006. FEMA then ordered FLUOR to resume work on or about February 6, 2006.

62. On February 7, 2006, Ms. Ramona Van Cleve, a FEMA official, contacted Mr. McConnaughhay via email and informed him that the project was on hold due to the extra costs associated with the soil conditions. (See Exhibit 16, email exchange regarding status of the project, 2/7/06).

63. On or about February 10, 2006, Ms. Van Cleve and two other FEMA officials joined Mr. McConnaughhay at the GRAND EAST-HALF. The group inspected the site. Ms. Van Cleve then determined that the entire project would be cancelled and verbally stated that FEMA wanted to settle with GRAND ACADIAN for $3,000,000.00 for repairs and restoration. Ms. Van Cleve also stated that she intended to hold FLUOR accountable for the tax dollars that it had wasted. In addition, she indicated that normally, the government did not move quickly; however, under the circumstances, this matter would be handled quickly. Furthermore, Ms. Van Cleve and Mr. McConnaughhay agreed not to involve attorneys or the media while she was given an opportunity to finalize a deal. Subsequently, Ms. Van Cleve and Mr. McConnaughhay reached a verbal settlement and agreed that their word and handshake was sufficient to memorialize the deal.

64. In addition, Ms. Van Cleve stated that FEMA would address the issues regarding the FEMA WEST-HALF with FLUOR.

65. On or about February 11, 2006, FEMA issued FLUOR the final stop work order.

66. On or about February 15, 2006, Mr. McConnaughhay was contacted by Ray Barnard with GSA. Mr. Barnard stated that he, too, had inspected the FEMA WEST-HALF and admitted that the Government and its contractors had "screwed up." (See Exhibit 17, email exchange regarding a settlement).

67. Mr. Barnard conceded that the land was destroyed; therefore, the project was cancelled. The damage to the FEMA WEST-HALF was so severe that it was no longer suitable for construction of the mobile home park.

68. Mr. Barnard indicated that GSA wanted to settle in a timely manner, thus he proposed a settlement in line with Ms. Van Cleve's offer.

69. On February 20, 2006, GRAND ACADIAN submitted a settlement proposal to GSA in response to the negotiations between Mr. McConnaughhay and Ms. Van Cleve and then with Mr. Barnard. GRAND ACADIAN proposed to settle with the Government for $2,811,462.38. (See Exhibit 18, GRAND ACADIAN settlement proposal, 2/20/06).

70. On February 25, 2006, Mr. Ed Perez, a GSA official who indicated that he had not visited the FEMA WEST-HALF, telephoned Mr. McConnaughhay and said that the "land was not destroyed," that the "Government could do what it wanted to do with the land," and that GRAND ACADIAN'S agreement with FEMA had no bearing. The conversation resulted in a heated exchange.

71. On February 27, 2006, Mr. Perez emailed the LEASE termination notice, effective December 6, 2006, to Mr. McConnaughhay. (See Exhibit 19, LEASE termination notice).

72. The notice stated that prior to the termination date, the Government would "clean the land, finish grading as necessary and seed the land to prevent erosion." (See Exhibit 19).

73. On February 28, 2006, Mr. McConnaughhay contacted Mr. Perez via email, in response to the earlier telephone conversation and the termination notice. This email was copied to Steve DeBlasio, Ramona Van Cleve[1], and David Conner. (See Exhibit 20, email exchange from Mr. McConnaughhay regarding the LEASE termination notice, 2/28/06).

74. In the response, Mr. McConnaughhay pointed out that the rider to the LEASE (hereinafter referred to as "the RIDER") indicated that at the end of the lease term, GRAND ACADIAN could require the Government, at the Government's expense, to repair any alterations and restore the property to its pre-lease conditions. Mr. McConnaughhay also rejected Mr. Perez's settlement offer and informed him to add

[1] Ms. Van Cleve was transferred to Alaska during this time period.

$100,000.00 to the GRAND ACADIAN settlement proposal. (See Exhibit 20; see Exhibit 21, the LEASE Rider).

75. Mr. McConnaughhay followed up his response with a series of additional emails that expressed his sincere concern for the condition of the FEMA WEST-HALF. Several FEMA and GSA officials were copied on the communications, but the emails remained unanswered. (See Exhibit 22, email exchange from Mr. McConnaughhay).

76. These emails dealt with the lease settlement and restoration of the FEMA WEST-HALF, photos documenting the condition of the site, as well as safety concerns resulting from the destruction of the property. (See Exhibit 22).

77. In early March 2006, FEMA gave FLUOR guidelines for a FEMA WEST-HALF restoration bid.

78. On March 16, 2006, FLUOR submitted a restoration bid package to FEMA (hereinafter referred to as "the BID"). The BID was issued on the same day and was due March 30, 2006. (See Exhibit 23, FLUOR restoration bid of March 2006).

79. The BID did not include a provision for the repair and restoration of the land to its original condition, an item for which FLUOR previously bid approximately $2.8 million. In fact, the BID created additional alterations to the land. Consequently, the BID was rejected by FEMA. (See Exhibit 23).

80. In response to the BID, on March 27, 2006, Mr. McConnaughhay contacted David Conner and Ramona Van Cleve via email with additional questions, concerns, and suggestions regarding the restoration. Again, Mr. McConnaughhay received no response. (See Exhibit 24, emails from Mr. McConnaughhay regarding the BID, 3/27/06).

81. On April 12, 2006, Mr. McConnaughhay forwarded another email to Ms. Van Cleve and copied officials from GSA, FEMA, the DHS Office of the Inspector General, and the DHS Fraud Waste and Abuse Hotline. As in previous emails, this communication again asked GRAND ACADIAN'S unanswered questions. (See Exhibit 25, email exchange from Mr. McConnaughhay regarding unanswered questions and lack of communication, 4/12/06).

82. On April 13, 2006, Mr. McConnaughhay forwarded the April 12th communication to Robert Paulison, Gil Jamieson, Scott Wells and Stephen DeBlasio, all of FEMA. (See Exhibit 25).

83. In a letter dated April 13, 2006, Mr. McConnaughhay finally received a response from a Government official. Mr. Juan Gil, FEMA'S Director of Housing, acknowledged that the property was in need of restoration and indicated that FEMA intended to address Mr. McConnaughhay's issues and concerns. Mr. Gil stated that FEMA had received "widely varying estimates on the cost to restore the property," that FEMA "was in the process of contacting a third party contractor to assess the property" and provide a bid on the restoration. He stated that the estimate was expected within thirty (30) days, and he was specifically looking "at approximately four feet of topsoil" which he agreed was the main source of contention. Furthermore, Mr. Gil stated that only communications from him or authorized by him should be considered to be the position of FEMA. (See Exhibit 26, letter from FEMA, 4/13/06).

84. On April 21, 2006, Mr. McConnaughhay responded to Mr. Gil's letter via email. Mr. McConnaughhay questioned Mr. Gil's reference to "widely varied estimates" because he was aware of only three restoration estimates: FLUOR'S initial estimate of $2.8 million,

GRAND ACADIAN'S settlement proposal for $2.6 million, and FLUOR'S bid from March 2006 that failed to address all of the necessary repairs. (See Exhibit 27, email from Mr. McConnaughhay regarding restoration estimates, 4/21/06).

85. On April 24, 2006, Mr. McConnaughhay informed Mr. Gil that Group Contractors, LLC (hereinafter referred to as "GROUP CONTRACTORS"), a subcontractor on the FEMA WEST-HALF, told him that since they had not received payment for their services, totaling Eight hundred fifty-six thousand two hundred eighty-two dollars and 60/100 ($856,282.60), they intended to file a lien on the FEMA WEST-HALF in addition to the GRAND EAST-HALF. (See Exhibit 28, email from Mr. McConnaughhay regarding lien, 4/24/06).

86. Mr. Gil responded to Mr. McConnaughhay's email with a telephone call and stated that GROUP CONTRACTORS could not file a lien on the property

87. On April 25, 2006, Mr. McConnaughhay emailed Mr. Gil and asked him to follow up with him in writing. He also shared his concerns regarding Mr. Gil's failure to respond to his earlier letters and emails, in addition to the settlement proposal submitted by GRAND ACADIAN. (See Exhibit 29, email from Mr. McConnaughhay regarding settlement proposal, 4/25/06).

88. Later in the day, on April 25, 2006, Mr. McConnaughhay once again attempted to contact Mr. Gil via email and told him that he had been informed that GROUP CONTRACTORS was moving forward with the lien. (See Exhibit 30, email from Mr. McConnaughhay regarding lien, 4/25/06, 4/27/06; see Exhibit 30.1, lien documents, 4/28/06).

89. On April 26, 2006, Mr. McConnaughhay met with Ms. Van Cleve. Ms. Van Cleve assured Mr. McConnaughhay that Mr. Gil was new to the case, but would handle the case

fairly. As such, Mr. McConnaughhay emailed Mr. Gil and apologized for his strong language in his recent communication. (See Exhibit 31, email from Mr. McConnaughhay regarding apology, 4/26/06).

90. Later in the day, on April 26, 2006, Mr. McConnaughhay emailed Ms. Van Cleve and copied Mr. Conner and once again expressed his frustration with the failure to reach settlement. (See Exhibit 32, email from Mr. McConnaughhay to Ms. Van Cleve, regarding failure to reach a settlement).

91. On April 28, 2006, Mr. McConnaughhay again attempted to communicate with Mr. Gil and other FEMA and GSA officials. He suggested a face to face meeting to facilitate settlement negotiations. (See Exhibit 33, emails (2) from Mr. McConnaughhay to FEMA and GSA officials).

92. On May 1, 2006, Mr. McConnaughhay forwarded another email to Mr. Gil, since he still had not received a response. Once again, he proposed a meeting to discuss the mountain of issues and unanswered questions. (See Exhibit 34, email from Mr. McConnaughhay regarding lack of communication, resulting hardships, and lien, 5/1/06, 12:41 p.m.).

93. Later that day, Mr. McConnaughhay sent another email to Mr. Gil and the other officials again requesting a response. He indicated that the email was the tenth (10th) such request. In addition, he indicated that Mr. Dalton Mann at the JFO office had also received a copy of the lien. (See Exhibit 35, email from Mr. McConnaughhay, 5/1/06, 6:11 p.m.).

94. On May 3, 2006, Mr. McConnaughhay forwarded his eleventh (11th) request for information regarding the project to Mr. Gil and several other government officials. (See Exhibit 36, email from Mr. McConnaughhay, 11th request for response, 5/3/06).

95. Later that day, Ms. Van Cleve submitted a brief response to Mr. McConnaughhay's eleventh request and indicated that he should hear something soon. (See Exhibit 37, email from Ramona Van Cleve to Mr. McConnaughhay, 5/3/06).

96. On May 5, 2006, Mr. McConnaughhay forwarded a follow-up email to Mr. Gil to document and reaffirm the issues that were discussed in the phone call from Mr. Gil on the previous day. Such issues included, but were not limited to the effects of not being able to reach a settlement and the lien placed on the SITE. The email was copied to Gil Jamieson, David Conner, Scott Wells, and Ramona Van Cleve. (See Exhibit 38, email from Mr. McConnaughhay, 5/5/06).

97. On May 9, 2006, Mr. McConnaughhay forwarded a copy of the petition filed by GROUP CONTRACTORS, suit no. 543,098, against Dexter J. Honore, an individual, Dexter Honore Construction, and its entities, and FLUOR in Louisiana district court, to Ms. Van Cleve and Mr. Conner. (See Exhibit 39, emails from Mr. McConnaughhay, 5/9/06 3:30 p.m. and 4:13 p.m.).

98. GROUP CONTRACTORS filed the suit due to nonpayment. The petition sought a preliminary injunction to prevent FLUOR from making any future payments to Dexter Honore, the subcontractor, in connection with its project, in order to prevent the diversion of funds still owed to GROUP CONTRACTORS. (See Exhibit 39).

99. On May 11, 2006, Mr. McConnaughhay sent a lengthy email to Mr. Gil and several other government officials that summarized the events of the fifteen weeks that had passed since the project was cancelled. Once again, Mr. McConnaughhay pleaded for answers to his questions, unanswered for fifteen weeks. (See Exhibit 40, email from Mr. McConnaughhay, 5/11/06).

100. On May 12, 2006, Mr. McConnaughhay sent an email to Ramona Van Cleve asking if there were developments from her meeting earlier that day regarding the LEASE. He indicated that Mr. Gil was supposed to contact him that same day; however, Mr. Gil never called, even after Mr. McConnaughhay left him messages. (See Exhibit 41, email from Mr. McConnaughhay, 5/12/06).

101. On May 13, 2006, Ms. Van Cleve responded to Mr. McConnaughhay's email and indicated that she had met with Scott Wells, FEMA'S head officer in Louisiana, and Jim Stark, Mr. Well's successor, regarding FEMA'S transition issues, as well as Mr. McConnaughhay's issues. Also, she met with Bob Parker who indicated that a new appraisal was scheduled for May 15, 2006. Mr. Parker stated that David Conner would represent the Area Field Office at the site visit. (See Exhibit 42, email from Ms. Van Cleve, 5/13/2006).

102. On May 22, 2006, Mr. McConnaughhay sent an email to Gil Jamieson and copied Stephen Reams, Ramona Van Cleve, Mary Ann Strasser, Juan Gil, Jim Stark, Bob Parker, David Paulison, and David Conner. Mr. McConnaughhay stated that he recently learned that Mr. Gil was no longer his official contact; however, Mr. Gil had only called him twice and rarely responded to an email. Also, Mr. Gil failed to inform Mr. McConnaughhay that he would have a new contact. (See Exhibit 43, email from Mr. McConnaughhay regarding the third party evaluation, 5/22/06).

103. The email also addressed the fact that several representatives of Freese & Nichols, Inc. (hereinafter referred to as "FNI"), the firm conducting the third party evaluation of the FEMA WEST-HALF, indicated that it was given very negative information about the property prior to its arrival on site. However, once FNI reviewed geo-tech data and

actually made its own observations, it found that the many simple and basic standards for civil construction were not followed. (See Exhibit 43).

104. In its report, FNI estimated the restoration costs to be approximately $6,043,000. As of the end of May, 2006; however, FEMA and GSA had yet to share the report in it's entirety with Mr. McConnaughhay.

105. On June 2, 2006, Mr. McConnaughhay sent an email to Jim Stark, requesting an update on the settlement. He brought to Mr. Stark's attention that 122 days had passed since the project was cancelled. (See Exhibit 44, email from Mr. McConnaughhay regarding an update, 6/2/06).

106. On June 13, 2006, Mr. McConnaughhay sent an email to Mr. Stark informing him that he had still not heard from a contracting officer although Mr. Stark had indicated the previous week that a contracting officer would call. (See Exhibit 45, email from Mr. McConnaughhay regarding the immediate need to reach a settlement, 6/13/06).

107. On June 14, 2006, in accordance with the RIDER, paragraph 6, and the LEASE, paragraph 34 of the General Clauses, GRAND ACADIAN filed a claim against the United States of America for repair and restoration in accordance with the RIDER, paragraph 6. (See Exhibit 46, letter from GRAND ACADIAN to Mr. Quin Lucie of the FEMA Office of the General Counsel (hereinafter referred to "OGC").

108. On June 21, 2006, Mr. McConnaughhay sent an email to Jim Stark that addressed the Government's failure to communicate with him over the past several months, as well as the lien placed on the SITE by GROUP CONTRACTORS. (See Exhibit 47, email from Mr. McConnaughhay regarding the lack of communication and the lien, 6/21/06).

109. In a letter dated June 22, 2006, Tina M. Burnette, Director of Acquisition for FEMA, responded to the GRAND ACADIAN claim. FEMA indicated that GRAND ACADIAN must submit documentation with the claim. Apparently, reference to the FNI report submitted to the Government was not enough. In addition, a detailed itemization of the necessary actions for repair and restoration was requested. (See Exhibit 48, letter from FEMA to GRAND ACADIAN, 6/22/06).

110. In a letter dated July 5, 2006, GRAND ACADIAN re-submitted its claim against the United States for repairs and restoration and included documentation that Ms. Burnette directed it provide. The total claim was for $5,749,383. In addition, GRAND ACADIAN requested full and immediate payment of the balance of the LEASE. At this point, there had been no dispute as to whether or not repair and restoration was needed. (See Exhibit 49, letter from GRAND ACADIAN to FEMA, 7/5/06).

111. On July 17, 2006, Mr. McConnaughhay sent an email to David Conner and copied Ramona Van Cleve, as well as Louisiana government officials Karen Couch, Bill Croft, and Ronnie Johns. Mr. McConnaughhay was alarmed to learn that FLUOR was intending to "restore" the property in ways similar to FLUOR's rejected bid from March 2006. (See Exhibit 50, email from Mr. McConnaughhay, 7/17/06).

112. Later that day, Trudy McConnaughhay, Mr. McConnaughhay's wife, sent an email to David Conner that expressed her concern for her husband's health, as a result of GRAND ACADIAN'S six month battle with FEMA. (See Exhibit 51, email from Trudy McConnaughhay to Mr. Conner, 7/17/06).

113. Ms. Van Cleve responded to Mr. McConnaughhay's email and indicated that she would confer with Mr. Conner about FLUOR'S proposed restoration activity. (See Exhibit 52, email from Ms. Van Cleve to Mr. McConnaughhay, 7/18/06).

114. On July 21, 2006, Mr. McConnaughhay faxed a letter to Mr. Lucie and later forwarded a copy to Mr. Conner. The letter was a request for a response to the July 17, 2006, email, in addition to an invitation to discuss statements made by Ed Perez, GSA Contracting Officer, regarding his "version" of the LEASE. (See Exhibit 53, letter to Mr. Lucie, 7/21/06; see Exhibit 54, email from Mr. McConnaughhay to Mr. Conner).

115. On July 24, 2006, Mr. McConnaughhay sent an email to Mr. Conner requesting an update because he had yet to hear from Mr. Lucie from the OGC. Mr. McConnaughhay further requested that all communication to him be in writing. (See Exhibit 55, email from Mr. McConnaughhay regarding lack of communication, 7/24/06).

116. In a letter dated July 27, 2006, David C. Waishes, GSA Contracting Officer, contacted Mr. McConnaughhay to inform him that the LEASE, awarded by GSA on behalf of FEMA, was transferred to the Department of Homeland Security/Federal Emergency Management Agency Gulf Coast Recovery Office. As a result, FEMA would be authorized to "perform all functions related to lease contract administration." In addition, Mr. McConnaughhay was informed that Gerald M. Rottinghaus, FEMA Contracting Officer, was now the authorized government representative. (See Exhibit 56, letter from GSA regarding lease transfer and new government contact, 7/27/06).

117. On July 31, 2006, Gerald Rottinghaus emailed Mr. McConnaughhay to introduce himself and relay a projected response date. (See Exhibit 57, email from Mr. Rottinghaus to Mr. McConnaughhay, 7/31/06).

118. On August 2, 2006, Mr. McConnaughhay responded to Mr. Rottinghaus' email. Mr. McConnaughhay inquired as to the effects other government contracts could have on the Government's obligations under the LEASE. In addition, he summarized GRAND ACADIAN'S plans and activities before, during, and after the contract with FEMA. (See Exhibit 58, email from Mr. McConnaughhay to Mr. Rottinghaus regarding projected response date, 8/02/06).

119. On August 10, 2006, Mr. Rottinghaus responded to Mr. McConnaughhay's email dated August 2, 2006. He thanked Mr. McConnaughhay for the communication; however, he indicated that he was "unable to disclose any information at this time." (See Exhibit 59, email from Mr. Rottinghaus to Mr. McConnaughhay, 8/10/06).

120. Later that day, Mr. McConnaughhay sent an email to Mr. Rottinghaus requesting answers regarding the status of the case and asking whether or not the workers at the FEMA WEST-HALF had a contract for their scope of work currently being performed. (See Exhibit 60, email from Mr. McConnaughhay regarding update and contractor scope of work, 8/10/06).

121. Also on August 10, 2006, an email exchange took place between FLUOR and GSA officials which evidenced the fact that questionable work was being conducted on the SITE without proper notice or the consent of GRAND ACADIAN. (See Exhibit 61, email exchange between FLUOR and GSA officials, 8/10/06).

122. On August 19, 2006, Mr. McConnaughhay sent an email to Mr. Rottinghaus and copied Nancy Gunderson, Jill Igert, Stephen Reams, Tina Burnette, and David Conner, all from DHS. Mr. McConnaughhay informed Mr. Rottinghaus that he had been contacted by John Ward, FEMA Contracting Officer for FLUOR in Louisiana, who

wanted to meet to discuss settling the case. (See Exhibit 62, email from Mr. McConnaughhay regarding FEMA contracting officer for FLUOR'S site visit, 8/19/06).

123. Mr. McConnaughhay indicated that at the meeting and at the FEMA WEST-HALF site visit, Mr. Ward was accompanied by a male who he identified as his assistant. When McConnaughhay asserted that he was informed that Mr. Rottinghaus was his official contact and that the ongoing case could not be discussed, Mr. Ward implied that FEMA now wanted to settle the case. (See Exhibit 62).

124. After touring the FEMA WEST-HALF, Mr. Ward and his associate proceeded to question Mr. McConnaughhay in an "interrogation-like" manner, even when Mr. McConnaughhay told them that Mr. Rottinghaus had the claim. Approximately two weeks later, Mr. McConnaughhay would learn from FEMA that Mr. Ward's assistant was fired for treating a fellow FEMA employee in the same unprofessional and disrespectful manner shown to him. (See Exhibit 62).

125. Later, David Conner and George Smith joined Mr. Ward and his associate at the FEMA WEST-HALF. Mr. McConnaughhay proceeded to tell them that he was represented by counsel and gave them his attorney's contact information. (See Exhibit 62).

126. On Sunday, August 20, 2006, Mr. McConnaughhay emailed updated photos of the FEMA WEST-HALF to Mr. Rottinghaus to evidence the destruction to the property. (See Exhibit 63, email and photos of FEMA WEST-HALF, 8/20/06).

127. On or about August 27, 2006, Mr. Rottinghaus and FEMA sent a letter to FNI questioning some items in their third party evaluation. (See Exhibit 64, FEMA Request to FNI for additional information.).

128. On or about August 28, 2006, FLUOR issued its version of a timeline of events regarding the SITE for Ashby's letter to FEMA. (See Exhibit 65, FLUOR Timeline of Events).

129. On August 30, 2006, Mr. Rottinghaus met with GRAND ACADIAN at the FEMA WEST-HALF and toured the property.

130. In a letter dated August 31, 2006, through its counsel, Mr. Howell Roger Riggs, GRAND ACADIAN proposed a settlement offer to Mr. Rottinghaus in the amount of $5.7 million. (See Exhibit 66, settlement offer from Grand ACADIAN, 8/31/06).

131. In a letter dated September 14, 2006, Mr. Rottinghaus followed up telephone negotiations from September 12, 2006, with Mr. McConnaughhay. Prior to making his Contracting Officer's Final Decision, Mr. Rottinghaus proposed a counter-offer to GRAND ACADIAN in the amount of $2,618,642 to settle the claim, based on various assumptions. (See Exhibit 67, letter from Mr. Rottinghaus regarding proposed settlement offer, 9/14/06).

132. In a letter dated September 19, 2006, Mr. Riggs responded to the counter-offer submitted by Mr. Rottinghaus. Mr. McConnaughhay pointed out that during negotiations, Mr. Rottinghaus repeatedly stated that the FNI report did not contain cost estimates. However, Mr. McConnaughhay was denied access to the report. Nonetheless, the assumptions made by Mr. Rottinghaus regarding the settlement were based on reports to which GRAND ACADIAN was denied access and the contents of which materially misrepsented the facts. (See Exhibit 68, letter from Mr. McConnaughhay regarding response to counter-offer, 9/19/06).

133. In addition, Mr. McConnaughhay addressed each issue/assumption listed by Mr. Rottinghaus and provided a detailed explanation for each. Furthermore, in a show of good faith, Mr. McConnaughhay issued a counter to the counter-offer and proposed a discounted settlement of Five million six hundred twenty-four dollars and 00/100 ($5,000,624), and an agreement that the Government and GRAND ACADIAN would both be released from any and all claims. (See Exhibit 68).

134. On September 22, 2006, Mr. McConnaughhay sent an email to Mr. Rottinghaus and copied Tina Burnette and Jill Igert. He expressed that judging from past conversations and the lack of progress towards a resolution, settlement negotiations would best be handled through counsel. (See Exhibit 69, email from Mr. McConnaughhay regarding the lack of progress towards a settlement, 9/22/06).

135. In a letter dated September 27, 2006, Mr. Rottinghaus responded to Mr. McConnaughhay's email and counter to the FEMA Counter-offer. Mr. Rottinghaus used a negative tone as he addressed the previous email and counter. (See Exhibit 70, letter from Mr. Rottinghaus regarding email and GRAND ACADIAN counter to counter-offer, 9/27/06).

136. From September 28, 2006 to October 5, 2006, an email exchange between GRAND ACADIAN'S counsel and Mr. Rottinghaus transpired. Mr. Rottinghaus was notified that FLUOR was conducting a procurement to restore the FEMA WEST-HALF; however, GRAND ACADIAN felt the proposed actions would further damage the land rather than improve it. (See Exhibit 71, email exchange between Mr. Riggs and Mr. Rottinghaus).

137. In the exchange, Mr. Riggs indicated that Mr. McConnaughhay obtained a soil report that evidenced the soil's condition. Mr. Rottinghaus requested that Mr. McConnaughhay submit his documentation and subsequently, Rottinghaus would request an investigation. (See Exhibit 71).

138. In a letter dated September 29, 2006, GRAND ACADIAN'S counsel issued a supplemental claim to Mr. Rottinghaus. The supplemental claim included recovery for the loss of the improvements to the land, loss of revenue, increased construction costs, and increased borrowing costs. (See Exhibit 72, letter from GRAND ACADIAN regarding supplemental claim, 9/29/06).

139. In a letter dated October 5, 2006, Mr. Rottinghaus issued a response. He indicated that the date to issue his final decision on GRAND ACADIAN'S claim would be extended. In addition, he requested additional information from Mr. McConnaughhay regarding the supplemental claim. (See Exhibit 73, letter from Mr. Rottinghaus regarding extension of time for contracting officer's final decision and questions about supplemental claim, 10/5/06).

140. In a letter dated October 11, 2006, through counsel, GRAND ACADIAN presented Mr. Rottinghaus with a possible resolution to the July 5, 2006, restoration claim. Mr. Rottinghaus was reminded that GRAND ACADIAN offered to release the Government from the liabilities in the supplemental claim if a settlement could be reached in the restoration claim. (See Exhibit 74, letter from GRAND ACADIAN to Mr. Rottinghaus reviving settlement offer, 10/11/06).

141. Attachments to the October 11, 2006, letter included: a technical report from The Summit Group, providing the results of hand auger soil borings; a letter from Bill

Johnson, Program Manager at B & G Construction, reporting the work and conditions on the GRAND EAST-HALF; and a letter from Mark Fontenot of MSK Enterprises, Inc. reporting the work and conditions on the GRAND EAST-HALF and the destruction of the FEMA WEST-HALF that he witnessed first hand. (See Exhibit 74).

142. In a letter dated October 13, 2006, GRAND ACADIAN'S counsel provided Mr. Rottinghaus with important observations regarding the FLUOR test report dated January 15, 2006. FLUOR'S report was represented as having been completed prior to the damage of the FEMA WEST-HALF, but this was not true. (See Exhibit 75, letter from GRAND ACADIAN refuting representations made by FLUOR in its January 15, 2006 test report, 10/13/06).

143. In a letter dated October 16, 2006, Mr. Rottinghaus requested clarity regarding whether or not GRAND ACADIAN had chosen to withdraw the supplemental claim. He indicated that in the event the supplemental claim was not withdrawn, a response to the questions in his October 5, 2006 letter was required. (See Exhibit 76, letter to Mr. Riggs regarding the Government's release from supplemental claim liabilities, 10/16/06).

144. In a letter dated October 20, 2006, GRAND ACADIAN'S counsel responded to Mr. Rottinghaus' inquiry of his October 16, 2006 letter. (See Exhibit 77, letter from GRAND ACADIAN responding to Mr. Rottinghaus, 10/20/06).

145. In response, Mr. Rottinghaus submitted a letter dated October 23, 2006 in which he accused GRAND ACADIAN'S counsel of "continued disregard and non responses to his questions." Furthermore, Mr. Rottinghaus claimed that counsel's actions were "uncooperative" because he had not provided him with the necessary supporting documents. Mr. Rottinghaus concluded the letter with requests for several documents and

responses to several questions. (See Exhibit 78, letter from Mr. Rottinghaus to Mr. Riggs claiming Mr. Riggs was not cooperating with his investigation, 10/23/06).

146. On October 26, 2006, by email, GRAND ACADIAN'S counsel submitted a Freedom of Information Act (hereinafter referred to as "FOIA") request to GSA regarding the LEASE and any and all documents contained in the lease award file or contracting file pertaining to said lease. (See Exhibit 79, email from Mr. Riggs regarding the FOIA request as it pertains to the LEASE, 10/26/06).

147. GSA responded to the FOIA request in a letter dated November 13, 2006. It indicated that a copy of the LEASE was enclosed with portions referring to taxpayer identification and payment information withheld. In regards to other documents of the lease file, GSA stated that the file was transferred to FEMA as of July 27, 2006. (See Exhibit 80, letter from GSA to GRAND ACADIAN regarding FOIA request, 11/13/06).

148. On October 28, 2006, Bob Funkhouser, a FLUOR representative, emailed Mr. McConnaughhay, as a follow up to their conversation the previous day regarding FLUOR'S request for access to the GRAND EAST-HALF, the unleased portion of the property, to conduct work in support of their Storm Water Permit held for the FEMA WEST-HALF. Copies of the email were forwarded to Mark Ashby and Tom James, both from FLUOR. (See Exhibit 81, email from Mr. Funkhouser to Mr. McConnaughhay regarding consent to access the GRAND EAST-HALF with attachment, 10/28/06.).

149. In a letter to Mr. Rottinghaus, dated November 1, 2006, GRAND ACADIAN'S counsel informed him that FLUOR had requested access to the GRAND EAST-HALF stemming from its Louisiana Department of Environmental Quality (LDEQ) Storm Water Permit. FLUOR indicated that the work to be done was in support of FEMA. (See

Exhibit 82, letter from GRAND ACADIAN to Mr. Rottinghaus regarding FLUOR'S request for access to the GRAND EAST-HALF, 11/1/06).

150. GRAND ACADIAN indicated that it would grant FLUOR access if: FEMA would assume responsibility for any damage caused by its contractor; in the event of any damage to the property, FEMA would pay restoration costs; and FEMA would hold GRAND ACADIAN free from any liability arising from FLUOR'S actions in connection with the GRAND EAST-HALF. (See Exhibit 82).

151. GRAND ACADIAN'S counsel forwarded a follow-up letter, dated November 8, 2006, to Mr. Rottinghaus to inform him that FLUOR had made false statements to parish and state officials regarding FLUOR'S access to the GRAND EAST-HALF. FLUOR represented that GRAND ACADIAN denied it access, which was not accurate. GRAND ACADIAN reminded Mr. Rottinghaus that it would grant access to FLUOR if FEMA would enter into a "hold harmless" agreement with them. (See Exhibit 83, letter from GRAND ACADIAN to Mr. Rottinghaus regarding FLUOR'S false statements and "hold harmless" agreement, 11/8/06).

152. In a letter dated November 9, 2006, Mr. Rottinghaus responded to the two previous letters from GRAND ACADIAN regarding access to FLUOR. Mr. Rottinghaus indicated that as a federal government contractor, FLUOR had satisfied its requirement for proof of insurance. Therefore, in the event of damage to the GRAND EAST-HALF, subject to GRAND ACADIAN'S first filing a claim with FLUOR or its insurer, FEMA agreed to either (1) restore the damaged area or (2) at FEMA'S option, pay reasonable restoration costs to GRAND ACADIAN. In addition, FEMA proposed that the Government would hold harmless GRAND ACADIAN to the extent allowed by and

subject to the provisions of the Federal Tort Claims Act. (See Exhibit 84, letter from Mr. Rottinghaus to Mr. Riggs regarding FLUOR'S access to the GRAND EAST-HALF and liability issues, 11/9/06).

153. Furthermore, Mr. Rottinghaus stressed that "the work must proceed quickly" and asked for a response to his letter by the close of business November 10, 2006, the next day. (See Exhibit 84).

154. In a letter dated November 10, 2006, through counsel, GRAND ACADIAN informed Mr. Rottinghaus that it needed to review his proposed language, thus GRAND ACADIAN would issue a response by the close of business on November 14, 2006. GRAND ACADIAN also assured Mr. Rottinghaus that it intended to assist FEMA in the most economical method of silt removal, as well as, the protection of the GRAND EAST-HALF. (See Exhibit 85, letter from GRAND ACADIAN regarding response date, 11/10/06).

155. In a letter dated November 14, 2006, Mr. Rottinghaus responded to GRAND ACADIAN'S correspondence from November 1, 2006, regarding its July 5, 2006 claim and the Supplemental Claim. Mr. Rottinghaus stated that he would proceed with his final decision, but indicated that his requests for supporting documentation was not "leading [them] on a paper chase." (See Exhibit 86, letter from Mr. Rottinghaus regarding document requests and extension of Contracting Officer's Final Decision, 11/14/06)

156. Furthermore, Mr. Rottinghaus indicated that his personal observations of the conditions of the FEMA WEST-HALF did not relieve GRAND ACADIAN from providing documentation in support of the claimed amount. In addition, Mr. Rottinghaus

once again extended the date for the Contracting Officer's Final Decision. (See Exhibit 86).

157. However, Mr. Rottinghaus failed to acknowledge the fact that he already had access to the documentation relevant to GRAND ACADIAN'S claims. Seemingly, his intentions were to determine if GRAND ACADIAN would be able to prove its claim with its own set of documents, rather than whether or not the documentation in his possession substantiated GRAND ACADIAN'S claims.

158. From November 16, 2006 to November 17, 2006, an email exchange between Mr. Rottinghaus and Mr. McConnaughhay took place. On November 16, 2006, Mr. Rottinghaus emailed Mr. Riggs regarding access to the GRAND EAST-HALF. He indicated that the correspondence received from Mr. McConnaughhay did not address the issue of whether or not FLUOR would be granted access. (See Exhibit 87, email exchange between Mr. Rottinghaus and Mr. Riggs, 11/16/06).

159. On November 17, 2006, Mr. Riggs responded and informed Mr. Rottinghaus of the attachment regarding the silt conditions in the bayou. Also attached was a hold harmless agreement that FLUOR required of its subcontractors. GRAND ACADIAN requested that FLUOR sign the same document in regards to the GRAND EAST-HALF that they would require others to sign. (See Exhibit 87).

160. Later that day, Mr. Rottinghaus responded to Mr. Riggs and stated that he had still not received a response addressing the areas of concern mentioned in Mr. Riggs' November 10, 2006 letter on behalf of GRAND ACADIAN. Next, Mr. Rottinghaus went on to say that he was "unclear as to the relevance of the scanned copy of the hold harmless agreement" and the "intent of [Mr. Riggs'] statement that it seems only fair for

us to require Fluor to sign the very same thing they required others to sign." (See Exhibit 87).

161. It is important to note that even though it had been previously established that GRAND ACADIAN requested that FEMA hold it harmless in regards to FLUOR'S plans for work on the unleased property, in his letter, Mr. Rottinghaus acted as if this request was newly proposed. (See Exhibit 82; see Exhibit 83; see Exhibit 87).

162. In his letter, Mr. Rottinghaus also stated that he assumed GRAND ACADIAN was denying FLUOR the right to enter the unleased portion. (See Exhibit 87).

163. Mr. Riggs responded to Mr. Rottinghaus' reply and clearly stated that his assumption was incorrect and that FLUOR could enter the GRAND EAST-HALF "subject to the same conditions it enforced on others." (See Exhibit 87).

164. On November 27, 2006, Mr. Riggs emailed Mr. Rottinghaus to confirm Mr. Riggs' voice mail from that morning. Mr. Riggs reiterated his suggestion that the lease be extended for a maximum of 120 days, and that a right of way be added at fair compensation. (See Exhibit 88, email from Mr. Riggs to Mr. Rottinghaus regarding access to unleased property, 11/27/06).

165. After no response from Mr. Rottinghaus, on December 6, 2006, Mr. Riggs again emailed Mr. Rottinghaus to inquire about his thoughts on Mr. Riggs' suggestions regarding access to the unleased property. (See Exhibit 89, email exchange between Mr. Riggs and Mr. Rottinghaus, 12/6/06).

166. Mr. Rottinghaus eventually responded on December 7, 2006 and simply stated that "I do not intend to modify and extend the lease as you have suggested." (See Exhibit 89).

167. In a letter to Mr. Rottinghaus dated December 8, 2006, Mr. Riggs indicated that since the LEASE had expired at midnight, December 6, 2006, no FEMA representative or FLUOR could enter upon the SITE, except by the express, written consent of Mr. McConnaughhay. (See Exhibit 90, letter from Mr. Riggs to Mr. Rottinghaus regarding expiration of the lease and silt clean up, 12/8/06).

168. Furthermore, Mr. Riggs inquired as to whether or not there was a plan to remove the silt. (See Exhibit 90).

169. On December 11, 2006, as a reminder, Mr. Riggs emailed Mr. Rottinghaus information and photos documenting the condition of the bayou that were previously submitted. (See Exhibit 91, email from Mr. Riggs to Mr. Rottinghaus documenting the condition of the bayou on 11/16/06).

170. In a letter dated December 14, 2006, Mr. Rottinghaus issued the Contracting Officer's Final Decision under the LEASE. Mr. Rottinghaus rejected the validity of documentation submitted by GRAND ACADIAN, as well as evidence acquired from other sources that had been in his possession, to find that FEMA was not responsible for the destruction of the property and that the property was actually in better condition than prior to the LEASE. Therefore, GRAND ACADIAN was not entitled to compensation. (See Exhibit 1, Contracting Officer's Final Decision).

171. In a letter dated January 24, 2007, Tina M. Burnette responded to GRAND ACADIAN'S FOIA request dated September 14, 2006. She indicated that after legal review of the particular documents to which access was requested, counsel in the Office of General Law determined that access would be withheld because the documents were draft documents, thus "pre-decisional and part of the Deliberative process." (See Exhibit

92, letter from FEMA to Mr. Riggs regarding the September 14, 2006 FOIA request, 1/24/07).

V.

**COUNT ONE**

**BREACH OF GOOD FAITH AND FAIR DEALING**

172. The Plaintiff re-alleges all facts, as set forth in paragraphs 1 – 171, as if fully set out herein.

173. The UNITED STATES actively negotiated with GRAND ACADIAN to develop infrastructure that would remain on the property at the expiration of the lease. In return, the UNITED STATES would receive a reduced lease rate. The UNITED STATES' denial that it induced GRAND ACADIAN to enter the lease and its failure to fulfill its promise to GRAND ACADIAN are breaches of good faith and fair dealing. Therefore, the UNITED STATES is liable for the breach and the resulting damages.

**COUNT TWO:**

**MALADMINISTRATION**

174. The UNITED STATES failed to properly administer the execution of the contract with FLUOR by not requiring FLOUR to follow the contract specifications and to commit negligent acts which caused damage to plaintiffs. As a result, the contractor destroyed the property and failed to construct the promised 12 million dollar RV park which would remain the property of plaintiff at the end of the lease. Therefore, the UNITED STATES is liable for maladministration and the resulting damages.

**COUNT THREE:**

**BAD FAITH**

175. Mr. Gerald M. Rottinghaus, FEMA Contracting Officer, engaged in bad faith conduct in the settlement negotiations and in his Final Decision because he repeatedly requested documents from GRAND ACADIAN to support its claim which were already in his possession. He further, in order to extort a settlement, threatened criminal prosecution. His Contracting Officer's Final Decision failed to consider any evidence favorable to GRAND ACADIAN and based his decision on the fact that he had no evidence to support GRAND ACADIAN'S claims against the United States when such evidence was in his contract file. In addition, Mr. Rottinghaus had first hand knowledge of the destruction to the property, and had acknowledged, along with his superiors at FEMA, that the damage was the result of the FEMA subcontractor. Mr. Rottinghaus had a personal animus against the plaintiff's President and intended to injure plaintiff.

**VI.**

**RELIEF SOUGHT**

176. The Plaintiff sets forth all facts, as set forth in paragraphs 1 – 175, as if fully set out herein.

WHEREFORE, the Plaintiff, GRAND ACADIAN, INC., prays that:

That the Court hold a trial on the merits and award damages as follows:

177. The UNITED STATES is liable for the BREACH OF GOOD FAITH AND FAIR DEALING and damages for destruction to plaintiff's property in the sum of

$6,000,000.00, damages for the loss of infrastructure in the sum of $12,000,000.00, damages for loss of revenue, increased construction cost and increased cost of borrowing in the sum of $2,040,000.00. Damages for remediation of silt run-off into adjacent bayou caused by FLUOR'S failure to follow appropriate procedure.

178. The UNITED STATES is liable for MALADMINISTRATION and subsequent damages and damages for destruction to plaintiff's property in the sum of $6,000,000.00, damages for the loss of infrastructure in the sum of $12,000,000.00, damages for loss of revenue, increased construction cost and increased cost of borrowing in the sum of $2,040,000.00. Damages for remediation of silt run-off into adjacent bayou caused by FLUOR'S failure to follow appropriate procedure.

179. The UNITED STATES is liable for the BAD FAITH BY MR. GERALD M. ROTTINGHAUS, CONTRACTING OFFICER and subsequent damages and damages for destruction to plaintiff's property in the sum of $6,000,000.00, damages for the loss of infrastructure in the sum of $12,000,000.00, damages for loss of revenue, increased construction cost and increased cost of borrowing in the sum of $2,040,000.00. Damages for remediation of silt run-off into adjacent bayou caused by FLUOR'S failure to follow appropriate procedure.

180. Plaintiff seeks any other relief that may be granted upon the facts of this matter.

181. Plaintiff also seeks Attorney's Fees and costs pursuant to the Equal Access to Justice Act.

Respectfully submitted,

BY:

HOWELL ROGER RIGGS
PATRICK O. MILLER
Dick, Riggs, Miller & Stem, LLP
200 Clinton Avenue, Suite 1050
Huntsville, AL 35801
Phone: (256) 564-7317
Fax: (256) 564-319
Email: hriggs@drmslaw.net
pmiller@drmslaw.net
Attorneys for Plaintiff, Grand Acadian, Inc.