**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**GRAND ACADIAN, INC.,**

**Plaintiff,**

**v.** **CASE NO. 07 – 849 C**

**THE UNITED STATES,** **(Judge Hewitt)**

**Defendant.**

---

**FIRST AMENDED COMPLAINT**

COMES NOW the Plaintiff, Grand Acadian, Inc. (hereinafter referred to as "GRAND ACADIAN"), and files this, its First Amended Complaint and shows unto the Court as follows:

## I.

## JURISDICTION

GRAND ACADIAN seeks review in this Court. Jurisdiction is founded upon 28 U.S.C. § 1491(a)(1), and involves claims made against the United States by and through the Federal Emergency Management Agency (hereinafter referred to as "FEMA") arising out of General Services Administration (hereinafter "GSA") Lease Number GS-07B-16028 (hereinafter referred to as "the LEASE") and appeals from an adverse Contacting Officer Final Decision (See Exhibit 1, Contracting Officer Final Decision).

## II.

## PARTIES

1. The Plaintiff, GRAND ACADIAN, is a Louisiana corporation whose main office is

located at 3584 Siena Circle, Sulphur, Calcasieu Parish, Louisiana, 70665.

2. The United States, through Gerald Rottinghaus, a Contracting Officer, for the Federal Emergency Management Agency, Acquisition Gulf Coast Recovery Office, DHS/FEMA, Crystal City Suite 600, Room 628, 500 C Street, SW, Washington, D.C., 20472, issued the Contracting Officer Final Decision on December 6, 2006 from which plaintiff appeals.

**III.**

**SUMMARY**

As a result of hurricanes Katrina and Rita, FEMA entered into an agreement with GRAND ACADIAN to lease approximately 30 acres of property that had been fully engineered as a premium RV park. FEMA contracted with FLUOR to develop the tract and create an infrastructure that would remain at the expiration of the lease. However, FEMA failed to properly administer FLUOR'S contract, permitting FLUOR to destroy, rather than improve the property. Then, FEMA failed to restore and repair the property as required in the LEASE with GRAND ACADIAN. What remained was destruction and devastation instead of the $12,000,000.00 in infrastructure that was promised in return for the LEASE. The property that was once poised to become a premium RV park, now requires restoration and repair at costs that exceed $6,000,000.00. The destruction of the property prevented the construction of infrastructure that was promised to plaintiff in return for a lower rental rate.

**IV.**

**FACTUAL BACKGROUND**

3. After conducting extensive research, Pat McConnaughhay began to take steps towards his goal of owning and operating a premium RV park. On November 12, 2004, he and two friends pooled their resources to form GRAND ACADIAN.

4. GRAND ACADIAN located an undeveloped wooded tract that was subsequently purchased on December 17, 2004, as the site for the premium RV park.

5. Measuring approximately sixty (60) acres, the tract is located at 1141 Mosswood Drive, Sulphur, Calcasieu Parish, Louisiana, 70665 (hereinafter referred to as "the SITE").

6. Preparing the SITE for the premium RV park required re-zoning the property, wetlands and environmental permitting, engineering and architectural planning, soil testing, and agreements for water, sewage, and electricity. In addition, GRAND ACADIAN fine tuned its business plan, hired an answering service, and began to market the SITE as a premium RV park.

7. In September 2004, the re-zoning application was filed with Calcasieu Parish.

8. In October 2004, the wetlands permit application was submitted to the United States Army Corps of Engineers.

9. On June 7, 2005, Summit-Hudson issued a soil report to Pat McConnaughhay for the SITE. A subsequent report was prepared by CBK on July 25, 2005, which outlined the recommendations regarding the civil construction procedures that were specific to the GRAND ACADIAN project.

10. In April 2005, D. W. Jessen & Associates, LLC submitted site engineering plans, road, drainage, and utilities plans to GRAND ACADIAN, which were approved the next month. Lacy and Associates drafted the architectural plans for the anticipated structures on the SITE to include a retail store, pavilion, and bath house. These plans were approved by the fire marshal in May 2005.

11. On or about June 15, 2005, GRAND ACADIAN obtained a wetlands permit from the United States Army Corp of Engineers to develop the SITE and construct its RV park.

12. On or about July 20, 2005, GRAND ACADIAN began clearing the SITE and substantially completed these efforts in late September 2005, two months before Hurricane Rita struck the region.

13. On or about July 25, 2005, CBK Soils Engineering, Inc. issued a soil report and determined that the SITE was suitable for development into a premium RV park.

14. On August 28, 2005, Hurricane Katrina struck the New Orleans area and subsequently displaced hundreds of thousands of people. As a result, there was a need for emergency housing to establish temporary residences. Therefore, the hurricane effectively increased the value of the SITE, since it was already in development and permitted as a premium RV park.

15. Early September 2005, a "strike team" of various FEMA and GSA officials, as well as, representatives from FLUOR, inspected the SITE. Calcasieu Parish officials told Mr. McConnaughhay that FEMA was interested in leasing the SITE for emergency housing.

16. The SITE was well-suited as an emergency housing location because GRAND ACADIAN had already re-zoned it and obtained various permits, including the wetlands permit. Therefore, the SITE was valuable to FEMA because it could proceed with the emergency housing much sooner than would otherwise be possible.

17. On or about September 12, 2005, FLUOR photographed the SITE.

18. On September 24, 2005, Hurricane Rita struck Sulphur and the surrounding areas; therefore, the need for emergency housing increased, which in turn, increased the value of the SITE.

19. After Hurricane Rita, FEMA grew more interested in leasing the SITE due to the urgency of establishing safe housing for the displaced citizens of the area. Therefore, lease negotiations for the SITE were commenced.

20. GSA acted as the broker for FEMA and was the lead agency in lease negotiations with GRAND ACADIAN.

21. During these early negotiations between GRAND ACADIAN and GSA, FLUOR was identified by FEMA as the contractor that would develop the SITE. Subsequently, FEMA and FLUOR enlisted parish officials to assist with identifying a potential emergency housing site.

22. In the event GRAND ACADIAN and FEMA reached an agreement, FLUOR could earn millions of dollars from its contract with FEMA.

23. In early October 2005, a survey of the SITE was conducted by Fred Koeffe, a FLUOR official.

24. Also in early October 2005, a field survey was completed by Hank Jarobe and Tom Cuddy of FEMA. Their report indicated that the SITE had been "heavily impacted by the previous construction activity," however, some trees remained, such as water oak, box elder and hackberry varieties." In addition, the report indicated that, as a result of the previous activity, the "remaining project would include minimal construction activity to finalize preparations [ ] for the trailers." Furthermore, the report stated that the "[c]onstruction contractor still must maintain good management practices to minimize

any sediment run-off ... resulting from construction activities on the site during final preparations for trailer placement."

25. On or about October 11, 2005, Aaron Clagget, a GSA official, contacted Mr. McConnaughhay by email and wrote that FEMA was in the process of determining what type of development was most needed for the SITE.

26. Mr. Clagget forwarded a sample lease document to Mr. McConnaughhay for his review. Mr. Clagget indicated that FEMA was interested in proceeding with the project as soon as possible.

27. In addition, Mr. Clagget later indicated that the development would be an E.G. site (above ground utilities); however, Mr. McConnaughhay and GRAND ACADIAN were not interested in that type of development.

28. In mid-October 2005, Mr. McConnaughhay was contacted by a new GSA official, Garhett Gordon. Mr. Gordon stated that a Group site (under ground utilities) would be planned instead.

29. Soon after, Mr. McConnaughhay supplied GSA with copies of GRAND ACADIAN'S plans for the fully engineered RV park and other documents relating to the SITE.

30. In late October 2005, Mr. McConnaughhay met with Mr. Gordon in Lake Charles, Louisiana to further negotiate the lease terms for the sixty (60) acres. Initially, Mr. Gordon suggested a low figure and Mr. McConnaughhay responded with $1,000,000.00 per year for the entire sixty acres. Mr. Gordon stated that the government would not pay $1,000,000.00 because GRAND ACADIAN would benefit from the infrastructure that would remain on the property at the end of the lease.

31. Since GRAND ACADIAN was concerned about the substance and value of the infrastructure, there was no finalization of an agreement at this time.

32. Immediately following the Lake Charles meeting, GRAND ACADIAN continued to supply GSA with documentation, such as, aerial photographs, surveys, and permits.

33. As negotiations continued, it was determined that the SITE would be divided into two 30 acre tracts. GRAND ACADIAN would utilize the eastern half to develop its original premium RV park (hereinafter referred to as "GRAND EAST-HALF") as it continued to negotiate with FEMA regarding the lease of the western half of the SITE (hereinafter referred to as "FEMA WEST-HALF").

34. GRAND ACADIAN hired D. W. Jessen & Associates, LLC to redesign the premium RV park to be situated on the GRAND EAST-HALF.

35. In early November 2005, Mr. McConnaughhay was contacted by a new GSA representative, Mr. Chris Townsend. Mr. Townsend was the third GSA official assigned to negotiate with Mr. McConnaughhay.

36. In negotiations with Mr. Townsend, GRAND ACADIAN agreed to lower the asking price subject to a review of FLUOR'S plans for development of the FEMA WEST - HALF.

37. As a result of Mr. McConnaughhay's persistence, FLUOR eventually contacted him and provided him with a copy of the plans for development, per FEMA'S request.

38. Soon after, a FLUOR representative, Mr. Scott Wiley, met with Mr. McConnaughhay and collaborated on the plans. FEMA wanted to get a lower rental rate and GRAND ACADIAN wanted its future needs to be met.

39. In order to induce GRAND ACADIAN to lease the FEMA WEST-HALF (hereinafter referred to as "FWH") to FEMA, on or about November 21, 2005, Mr. Wiley forwarded FLUOR'S plan for development to GRAND ACADIAN.

40. FLUOR emailed a "Work Plan" that outlined FLUOR'S strategy for developing the FWH. In addition, FLUOR forwarded quality control specifications, detailed drawings,

procedures, terms and conditions, and other documents describing the improvements that FLUOR promised to make to the FWH.

41. In order to induce GRAND ACADIAN to lease the FWH to FEMA, FLUOR represented to GRAND ACADIAN that the planned infrastructure improvements were valued at ten to twelve million dollars ($10,000,000.00 to $12,000,000.00) and were to remain on the property at the expiration of the lease.

42. On or about November 27, 2005, after reviewing FLUOR'S development plans, particularly those regarding infrastructure and other improvements, GRAND ACADIAN and FLUOR came to an understanding as to the substance and value of the infrastructure to be included in the FEMA, FLUOR Prime Contract.

43. As a result of representations by FEMA and FLUOR regarding the substance and value of infrastructure, GRAND ACADIAN agreed to lease the FWH to FEMA and lower the lease rate from $500,000.00 per year for 30 acres to $252,000.00 per year, minus taxes, insurance, and other incidental costs related to the FEMA development. GRAND ACADIAN agreed to such concessions because of the infrastructure and improvements that it would realize at the end of the lease. In return, FLUOR agreed to develop the FWH as described in the plans it forwarded by email.

44. FEMA entered into a specific contract with FLUOR to develop a mobile home park on the FWH which included detailed specifications, including FLUOR's previously proposed infrastructure.

45. On or about December 1, 2005, upon authorization of the Board of Directors of GRAND ACADIAN, Mr. McConnaughhay signed the LEASE for the FWH, commencing on December 7, 2005.

46. On December 1, 2005, GRAND ACADIAN commenced construction on the

GRAND EAST-HALF.

47. Mid-December 2005, several subcontractors toured the FWH and gathered information essential to bid preparation for submission to FLUOR.

48. One such subcontractor, Mr. Adam Daigle, D&G Construction, submitted a bid to FLUOR for clearing and grubbing the FWH for a flat fee of three hundred thousand dollars ($300,000,00). However, Mr. Daigle was not awarded the contract because of the limited manpower in his workforce.

49. On or about January 6, 2006, FLUOR construction crews and subcontractors first entered the FWH.

50. According to FLUOR'S project specifications, sediment retention basins and storm water detention basins were to be constructed prior to any major site clearing or grading activity. But these specifications were not followed. Other specifications regarding separating soil types and debris, clearing, and grubbing were also ignored.

51. FLUOR'S work plan also stipulated that construction operations were to be scheduled and conducted in such a manner as to minimize erosion.

52. However, FLUOR failed to exercise reasonable care in the performance of the work and failed to follow its engineering plans, causing significant damage to the FWH.

53. FLUOR failed to timely perform soil testing, failed to provide for adequate drainage, and failed to dig drainage ditches or retention ponds on the site prior to employing heavy equipment on the raw land.

54. After the site became wet and saturated due to rain, FLUOR continued to operate heavy machinery on the land. As this heavy machinery tracked back and forth across the undrained site, it mixed topsoil, surface debris, mud, clay, and other material.

55. FLUOR'S destructive activity created an unstable surface that is unable to support the

proposed structures.

56. Rather than accept responsibility for destruction of the land, FLUOR blamed the land itself for its subsequent condition.

57. Contrary to FLUOR'S interpretation, photographs of the SITE, taken by FEMA on or about January 10, 2006, show both the destroyed FWH and the developed GRAND EAST-HALF, which confirmed that if the dirt work on the FWH had been completed properly, then the land would have been suitable for development.

58. On January 15, 2006, SITE Engineering, Inc. issued a soil report to Mr. Robert Benton of D. Honore Construction. This report evidenced the condition of the land after it was destroyed by FLUOR. It indicated that the remaining unstable surface must be removed and replaced with more suitable soil prior to any development of the FWH.

59. Mr. McConnaughhay witnessed the destruction and became very concerned. Accordingly, he began to seek answers from FEMA officials and FLUOR.

60. On January 30, 2006, approximately three weeks after FLUOR construction crews and subcontractors first entered the site, FEMA ordered FLUOR to halt all major work at the site.

61. However, FLUOR continued to work on the FWH, until it was halted again, on or about February 2, 2006. FEMA then ordered FLUOR to resume work on or about February 6, 2006.

62. On February 7, 2006, Ms. Ramona Van Cleve, a FEMA official, contacted Mr. McConnaughhay via email and informed him that the project was on hold due to the extra costs associated with the soil conditions.

63. On or about February 10, 2006, Ms. Van Cleve and two other FEMA officials joined Mr. McConnaughhay at the GRAND EAST-HALF. The group inspected the site. Ms.

Van Cleve then determined that the entire project would be cancelled and verbally stated that FEMA wanted to settle with GRAND ACADIAIN for $3,000,000.00 for repairs and restoration. Ms. Van Cleve also stated that she intended to hold FLUOR accountable for the tax dollars that it had wasted. In addition, she indicated that normally, the government did not move quickly; however, under the circumstances, this matter would be handled quickly. Furthermore, Ms. Van Cleve and Mr. McConnaughhay agreed not to involve attorneys or the media while she was given an opportunity to finalize a deal. Subsequently, Ms. Van Cleve and Mr. McConnaughhay reached a verbal settlement and agreed that their word and handshake was sufficient to memorialize the deal.

64. In addition, Ms. Van Cleve stated that FEMA would address the issues regarding the FWH with FLUOR.

65. On or about February 11, 2006, FEMA issued FLUOR the final stop work order.

66. On or about February 15, 2006, Mr. McConnaughhay was contacted by Ray Barnard with GSA. Mr. Barnard stated that he, too, had inspected the FWH and admitted that the Government and its contractors had "screwed up."

67. Mr. Barnard conceded that the land was destroyed; therefore, the project was cancelled. The damage to the FWH was so severe that it was no longer suitable for construction of the mobile home park.

68. Mr. Barnard indicated that GSA wanted to settle in a timely manner, thus he proposed a settlement in line with Ms. Van Cleve's offer.

69. On February 20, 2006, GRAND ACADIAN submitted a settlement proposal to GSA in response to the negotiations between Mr. McConnaughhay and Ms. Van Cleve and then with Mr. Barnard. GRAND ACADIAN proposed to settle with the Government

for $2,811,462.38.

70. On February 25, 2006, Mr. Ed Perez, a GSA official who indicated that he had not visited the FWH, telephoned Mr. McConnaughhay and said that the "land was not destroyed," that the "Government could do what it wanted to do with the land," and that GRAND ACADIAN'S agreement with FEMA had no bearing. The conversation resulted in a heated exchange.

71. On February 27, 2006, Mr. Perez emailed the LEASE termination notice, effective December 6, 2006, to Mr. McConnaughhay.

72. The notice stated that prior to the termination date, the Government would "clean the land, finish grading as necessary and seed the land to prevent erosion."

73. On February 28, 2006, Mr. McConnaughhay contacted Mr. Perez via email, in response to the earlier telephone conversation and the termination notice. This email was copied to Steve DeBlasio, Ramona Van Cleve[1], and David Conner.

74. In the response, Mr. McConnaughhay pointed out that the rider to the LEASE (hereinafter referred to as "the RIDER") indicated that at the end of the lease term, GRAND ACADIAN could require the Government, at the Government's expense, to repair any alterations and restore the property to its pre-lease conditions. Mr. McConnaughhay also rejected Mr. Perez's settlement offer and informed him to add $100,000.00 to the GRAND ACADIAN settlement proposal.

75. Mr. McConnaughhay followed up his response with a series of additional emails that expressed his sincere concern for the condition of the FWH. Several FEMA and GSA officials were copied on the communications, but the emails remained unanswered.

76. These emails dealt with the lease settlement and restoration of the FWH, photos

[1] Ms Van Cleve was transferred to Alaska during this time period.

documenting the condition of the site, as well as, safety concerns resulting from the destruction of the property.

77. In early March 2006, FEMA gave FLUOR guidelines for a FWH restoration bid.

78. On March 16, 2006, FLUOR submitted a restoration bid package to FEMA (hereinafter referred to as "the BID"). The BID was issued on the same day and was due March 30, 2006.

79. The BID did not include a provision for the repair and restoration of the land to its original condition, an item for which FLUOR previously bid approximately $2.8 million. In fact, the BID created additional alterations to the land. Consequently, the BID was rejected by FEMA.

80. In response to the BID, on March 27, 2006, Mr. McConnaughhay contacted David Conner and Ramona Van Cleve via email with additional questions, concerns, and suggestions regarding the restoration. Again, Mr. McConnaughhay received no response.

81. On April 12, 2006, Mr. McConnaughhay forwarded another email to Ms. Van Cleve and copied officials from GSA, FEMA, the DHS Office of the Inspector General, and the DHS Fraud Waste and Abuse Hotline. As in previous emails, this communication again asked GRAND ACADIAN'S unanswered questions.

82. On April 13, 2006, Mr. McConnaughhay forwarded the April 12th communication to Robert Paulison, Gil Jamieson, Scott Wells and Stephen DeBlasio, all of FEMA.

83. In a letter dated April 13, 2006, Mr. McConnaughhay finally received a response from a Government official. Mr. Juan Gil, FEMA'S Director of Housing, acknowledged that the property was in need of restoration and indicated that FEMA intended to address Mr. McConnaughhay's issues and concerns. Mr. Gil stated that FEMA had received "widely varying estimates on the cost to restore the property," that FEMA "was in the process of

contacting a third party contractor to assess the property" and provide a bid on the restoration. He stated that the estimate was expected within thirty (30) days, and he was specifically looking "at approximately four feet of topsoil" which he agreed was the main source of contention. Furthermore, Mr. Gil stated that only communications from him or authorized by him should be considered to be the position of FEMA.

84. On April 21, 2006, Mr. McConnaughhay responded to Mr. Gil's letter via email. Mr. McConnaughhay questioned Mr. Gil's reference to "widely varied estimates" because he was aware of only three restoration estimates: FLUOR'S initial estimate of $2.8 million, GRAND ACADIAN'S settlement proposal for $2.6 million, and FLUOR'S bid from March 2006 that failed to address all of the necessary repairs.

85. On April 24, 2006, Mr. McConnaughhay informed Mr. Gil that Group Contractors, LLC (hereinafter referred to as "GROUP CONTRACTORS"), a subcontractor on the FWH, told him that since they had not received payment for their services, totaling Eight hundred fifty-six thousand two hundred eighty-two dollars and 60/100 ($856,282.60), they intended to file a lien on the FWH in addition to the GRAND EAST-HALF.

86. Mr. Gil responded to Mr. McConnaughhay's email with a telephone call and stated that GROUP CONTRACTORS could not file a lien on the property

87. On April 25, 2006, Mr. McConnaughhay emailed Mr. Gil and asked him to follow up with him in writing. He also shared his concerns regarding Mr. Gil's failure to respond to his earlier letters and emails, in addition to the settlement proposal submitted by GRAND ACADIAN.

88. Later in the day, on April 25, 2006, Mr. McConnaughhay once again attempted to contact Mr. Gil via email and told him that he had been informed that GROUP CONTRACTORS was moving forward with the lien.

89. On April 26, 2006, Mr. McConnaughhay met with Ms. Van Cleve. Ms. Van Cleve assured Mr. McConnaughhay that Mr. Gil was new to the case, but would handle the case fairly. As such, Mr. McConnaughhay emailed Mr. Gil and apologized for his strong language in his recent communication.

90. Later in the day, on April 26, 2006, Mr. McConnaughhay emailed Ms. Van Cleve and copied Mr. Conner and once again expressed his frustration with the failure to reach settlement.

91. On April 28, 2006, Mr. McConnaughhay again attempted to communicate with Mr. Gil and other FEMA and GSA officials. He suggested a face to face meeting to facilitate settlement negotiations.

92. On May 1, 2006, Mr. McConnaughhay forwarded another email to Mr. Gil, since he still had not received a response. Once again, he proposed a meeting to discuss the mountain of issues and unanswered questions.

93. Later that day, Mr. McConnaughhay sent another email to Mr. Gil and the other officials again requesting a response. He indicated that the email was the tenth (10th) such request. In addition, he indicated that Mr. Dalton Mann at the JFO office had also received a copy of the lien.

94. On May 3, 2006, Mr. McConnaughhay forwarded his eleventh (11th) request for information regarding the project to Mr. Gil and several other government officials.

95. Later that day, Ms. Van Cleve submitted a brief response to Mr. McConnaughhay's eleventh (11th) request and indicated that he should hear something soon.

96. On May 5, 2006, Mr. McConnaughhay forwarded a follow-up email to Mr. Gil to document and reaffirm the issues that were discussed in the phone call from Mr. Gil on the previous day. Such issues included, but were not limited to the effects of not being

able to reach a settlement and the lien placed on the SITE. The email was copied to Gil Jamieson, David Conner, Scott Wells, and Ramona Van Cleve.

97. On May 9, 2006, Mr. McConnaughhay forwarded a copy of the petition filed by GROUP CONTRACTORS, suit no. 543,098, against Dexter J. Honore, an individual, Dexter Honore Construction, and its entities, and FLUOR in Louisiana district court, to Ms. Van Cleve and Mr. Conner.

98. GROUP CONTRACTORS filed the suit due to nonpayment. The petition sought a preliminary injunction to prevent FLUOR from making any future payments to Dexter Honore, the subcontractor, in connection with its project, in order to prevent the diversion of funds still owed to GROUP CONTRACTORS.

99. On May 11, 2006, Mr. McConnaughhay sent a lengthy email to Mr. Gil and several other government officials that summarized the events of the fifteen weeks that had passed since the project was cancelled. Once again, Mr. McConnaughhay pleaded for answers to his questions, unanswered for fifteen weeks.

100. On May 12, 2006, Mr. McConnaughhay sent an email to Ramona Van Cleve asking if there were developments from her meeting earlier that day regarding the LEASE. He indicated that Mr. Gil was supposed to contact hire that same day; however, Mr. Gil never called, even after Mr. McConnaughhay left him messages.

101. On May 13, 2006, Ms. Van Cleve responded to Mr. McConnaughhay's email and indicated that she had met with Scott Wells, FEMA'S head officer in Louisiana, and Jim Stark, Mr. Well's successor, regarding FEMA'S transition issues, as well as Mr. McConnaughhay's issues. Also, she met with Bob Parker who indicated that a new appraisal was scheduled for May 15, 2006. Mr. Parker stated that David Conner would represent the Area Field Office at the site visit.

102. On May 22, 2006, Mr. McConnaughhay sent an email to Gil Jamieson and copied Stephen Reams, Ramona Van Cleve, Mary Ann Strasser, Juan Gil, Jim Stark, Bob Parker, David Paulison, and David Conner. Mr. McConnaughhay stated that he recently learned that Mr. Gil was no longer his official contact; however, Mr. Gil had only called him twice and rarely responded to an email. Also, Mr. Gil failed to inform Mr. McConnaughhay that he would have a new contact.

103. The email also addressed the fact that several representatives of Freese & Nichols, Inc. (hereinafter referred to as "FNI"), the firm conducting the third party evaluation of the FWH, indicated that it was given very negative information about the property prior to its arrival on site. However, once FNI reviewed geo-tech data and actually made its own observations, it found that the many simple and basic standards for civil construction were not followed.

104. In its report, FNI estimated the restoration costs to be approximately $6,043,000. As of the end of May, 2006; however, FEMA and GSA had yet to share the report in it's entirety with Mr. McConnaughhay.

105. On June 2, 2006, Mr. McConnaughhay sent an email to Jim Stark, requesting an update on the settlement. He brought to Mr. Stark's attention that 122 days had passed since the project was cancelled.

106. On June 13, 2006, Mr. McConnaughhay sent an email to Mr. Stark informing him that he had still not heard from a contracting officer although Mr. Stark had indicated the previous week that a contracting officer would call.

107. On June 14, 2006, in accordance with the RIDER, paragraph 6, and the LEASE, paragraph 34 of the General Clauses, GRAND ACADIAN filed a claim against the United States of America for repair and restoration in accordance with the RIDER,

paragraph 6.

108. On June 21, 2006, Mr. McConnaughhay sent an email to Jim Stark that addressed the Government's failure to communicate with him over the past several months, as well as the lien placed on the SITE by GROUP CONTRACTORS.

109. In a letter dated June 22, 2006, Tina M. Burnette, Director of Acquisition for FEMA, responded to the GRAND ACADIAN claim. FEMA indicated that GRAND ACADIAN must submit documentation with the claim. Apparently, reference to the FNI report submitted to the Government was not enough. In addition, a detailed itemization of the necessary actions for repair and restoration was requested.

110. In a letter dated July 5, 2006, GRAND ACADIAN re-submitted its claim against the United States for repairs and restoration and included documentation that Ms. Burnette directed it provide. The total claim was for $5,749,383. In addition, GRAND ACADIAN requested full and immediate payment of the balance of the LEASE. At this point, there had been no dispute as to whether or not repair and restoration was needed.

111. On July 17, 2006, Mr. McConnaughhay sent an email to David Conner and copied Ramona Van Cleve, as well as, Louisiana government officials Karen Couch, Bill Croft, and Ronnie Johns. Mr. McConnaughhay was alarmed to learn that FLUOR was intending to "restore" the property in ways similar to FLUOR's rejected bid from March 2006.

112. Later that day, Trudy McConnaughhay, Mr. McConnaughhay's wife, sent an email to David Conner that expressed her concern for her husband's health, as a result of GRAND ACADIAN'S six month battle with FEMA.

113. Ms. Van Cleve responded to Mr. McConnaughhay's email and indicated that she would confer with Mr. Conner about FLUOR'S proposed restoration activity.

114. On July 21, 2006, Mr. McConnaughhay faxed a letter to Mr. Lucie and later forwarded a copy to Mr. Conner. The letter was a request for a response to the July 17, 2006, email, in addition to an invitation to discuss statements made by Ed Perez, GSA Contracting Officer, regarding his "version" of the LEASE.

115. On July 24, 2006, Mr. McConnaughhay sent an email to Mr. Conner requesting an update because he had yet to hear from Mr. Lucie from the OGC. Mr. McConnaughhay further requested that all communication to him be in writing.

116. In a letter dated July 27, 2006, David C. Waishes, GSA Contracting Officer, contacted Mr. McConnaughhay to inform him that the LEASE, awarded by GSA on behalf of FEMA, was transferred to the Department of Homeland Security/Federal Emergency Management Agency Gulf Coast Recovery Office. As a result, FEMA would be authorized to "perform all functions related to lease contract administration." In addition, Mr. McConnaughhay was informed that Gerald M. Rottinghaus, FEMA Contracting Officer, was now the authorized government representative.

117. On July 31, 2006, Gerald Rottinghaus emailed Mr. McConnaughhay to introduce himself and relay a projected response date.

118. On August 2, 2006, Mr. McConnaughhay responded to Mr. Rottinghaus' email. Mr. McConnaughhay inquired as to the effects other government contracts could have on the Government's obligations under the LEASE. In addition, he summarized GRAND ACADIAN'S plans and activities before, during, and after the contract with FEMA.

119. On August 10, 2006, Mr. Rottinghaus responded to Mr. McConnaughhay's email dated August 2, 2006. He thanked Mr. McConnaughhay for the communication; however, he indicated that he was "unable to disclose any information at this time."

120. Later that day, Mr. McConnaughhay sent an email to Mr. Rottinghaus

requesting answers regarding the status of the ease and asking whether or not the workers at the FWH had a contract for their scope of work currently being performed.

121. Also on August 10, 2006, an email exchange took place between FLUOR and GSA officials which evidenced the fact that questionable work was being conducted on the SITE without proper notice or the consent of GRAND ACADIAN.

122. On August 19, 2006, Mr. McConnaughhay sent an email to Mr. Rottinghaus and copied Nancy Gunderson, Jill Igert, Stephen Reams, Tina Burnette, and David Conner, all from DHS. Mr. McConnaughhay informed Mr. Rottinghaus that he had been contacted by John Ward, FEMA Contracting Officer for FLUOR in Louisiana, who wanted to meet to discuss settling the case.

123. Mr. McConnaughhay indicated that at the meeting and at the FWH site visit, Mr. Ward was accompanied by a male who he identified as his assistant. When Mr. McConnaughhay asserted that he was informed that Mr. Rottinghaus was his official contact and that the ongoing case could not be discussed, Mr. Ward implied that FEMA now wanted to settle the case.

124. After touring the FWH, Mr. Ward and his associate proceeded to question Mr. McConnaughhay in an "interrogation-like" manner, even when Mr. McConnaughhay told them that Mr. Rottinghaus had the claim. Approximately two weeks later, Mr. McConnaughhay would learn from FEMA that Mr. Ward's assistant was fired for treating a fellow FEMA employee in the same unprofessional and disrespectful manner shown to him.

125. Later, David Conner and George Smith joined Mr. Ward and his associate at the FWH. Mr. McConnaughhay proceeded to tell them that he was represented by counsel and gave them his attorney's contact information.

126. On Sunday, August 20, 2006, Mr. McConnaughhay emailed updated photos of the FWH to Mr. Rottinghaus to evidence the destruction to the property.

127. On or about August 27, 2006, Mr. Rottinghaus and FEMA sent a letter to FNI questioning some items in their third party evaluation.

128. On or about August 28, 2006, FLUOR issued its version of a timeline of events regarding the SITE for Ashby's letter to FEMA.

129. On August 30, 2006, Mr. Rottinghaus met with GRAND ACADIAN at the FWH and toured the property.

130. In a letter dated August 31, 2006, through its counsel, Mr. Howell Roger Riggs, GRAND ACADIAN proposed a settlement offer to Mr. Rottinghaus in the amount of $5.7 million.

131. In a letter dated September 14, 2006, Mr. Rottinghaus followed up telephone negotiations from September 12, 2006, with Mr. McConnaughhay. Prior to making his Contracting Officer's Final Decision, Mr. Rottinghaus proposed a counter-offer to GRAND ACADIAN in the amount of $2,618,642 to settle the claim, based on various assumptions.

132. In a letter dated September 19, 2006, Mr. Riggs responded to the counter-offer submitted by Mr. Rottinghaus. Mr. McConnaughhay pointed out that during negotiations, Mr. Rottinghaus repeatedly stated that the FNI report did not contain cost estimates. However, Mr. McConnaughhay was denied access to the report. Nonetheless, the assumptions made by Mr. Rottinghaus regarding the settlement were based on reports to which GRAND ACADIAN was denied access and the contents of which materially misrepsented the facts.

133. In addition, Mr. McConnaughhay addressed each issue/assumption listed by

Mr. Rottinghaus and provided a detailed explanation for each. Furthermore, in a show of good faith, Mr. McConnaughhay issued a counter to the counter-offer and proposed a discounted settlement of Five million six hundred twenty-four dollars and 00/100 ($5,000,624), and an agreement that the Government and GRAND ACADIAN would both be released from any and all claims.

134. On September 22, 2006, Mr. McConnaughhay sent an email to Mr. Rottinghaus and copied Tina Burnette and Jill Igert. He expressed that judging from past conversations and the lack of progress towards a resolution, settlement negotiations would best be handled through counsel.

135. In a letter dated September 27, 2006, Mr. Rottinghaus responded to Mr. McConnaughhay's email and counter to the FEMA Counter-offer. Mr. Rottinghaus used a negative tone as he addressed the previous email and counter.

136. From September 28, 2006 to October 5, 2006, an email exchange between GRAND ACADIAN'S counsel and Mr. Rottinghaus transpired. Mr. Rottinghaus was notified that FLUOR was conducting a procurement to restore the FWH; however, GRAND ACADIAN felt the proposed actions would further damage the land rather than improve it.

137. In the exchange, Mr. Riggs indicated that Mr. McConnaughhay obtained a soil report that evidenced the soil's condition. Mr. Rottinghaus requested that Mr. McConnaughhay submit his documentation and subsequently, Rottinghaus would request an investigation.

138. In a letter dated September 29, 2006, GRAND ACADIAN'S counsel issued a supplemental claim to Mr. Rottinghaus. The supplemental claim included recovery for the loss of the improvements to the land, loss of revenue, increased construction costs, and increased borrowing costs.

139. In a letter dated October 5, 2006, Mr. Rottinghaus issued a response. He indicated that the date to issue his final decision on GRAND ACADIAN'S claim would be extended. In addition, he requested additional information from Mr. McConnaughhay regarding the supplemental claim.

140. In a letter dated October 11, 2006, through counsel, GRAND ACADIAN presented Mr. Rottinghaus with a possible resolution to the July 5, 2006, restoration claim. Mr. Rottinghaus was reminded that GRAND ACADIAN offered to release the Government from the liabilities in the supplemental claim if a settlement could be reached in the restoration claim.

141. Attachments to the October 11, 2006, letter included: a technical report from The Summit Group, providing the results of hand auger soil borings; a letter from Bill Johnson, Program Manager at B & G Construction, reporting the work and conditions on the GRAND EAST-HALF; and a letter from Mark Fontenot of MSK Enterprises, Inc. reporting the work and conditions on the GRAND EAST-HALF and the destruction of the FWH that he witnessed first hand.

142. In a letter dated October 13, 2006, GRAND ACADIAN'S counsel provided Mr. Rottinghaus with important observations regarding the FLUOR test report dated January 15, 2006. FLUOR'S report was represented as having been completed prior to the damage of the FWH, but this was not true.

143. In a letter dated October 16, 2006, Mr. Rottinghaus requested clarity regarding whether or not GRAND ACADIAN had chosen to withdraw the supplemental claim. He indicated that in the event the supplemental claim was not withdrawn, a response to the questions in his October 5, 2006, letter was required.

144. In a letter dated October 20, 2006, GRAND ACADIAN'S counsel responded to

Mr. Rottinghaus' inquiry of his October 16, 2006 letter.

145. In response, Mr. Rottinghaus submitted a letter dated October 23, 2006, in which he accused GRAND ACADIAN'S counsel of "continued disregard and non responses to his questions." Furthermore, Mr. Rottinghaus claimed that counsel's actions were "uncooperative" because he had not provided him with the necessary supporting documents. Mr. Rottinghaus concluded the letter with requests for several documents and responses to several questions.

146. On October 26, 2006, by email, GRAND ACADIAN'S counsel submitted a Freedom of Information Act (hereinafter referred to as "FOIA") request to GSA regarding the LEASE and any and all documents contained in the lease award file or contracting file pertaining to said lease.

147. GSA responded to the FOIA request in a letter dated November 13, 2006. It indicated that a copy of the LEASE was enclosed with portions referring to taxpayer identification and payment information withheld. In regards to other documents of the lease file, GSA stated that the file was transferred to FEMA, as of July 27, 2006.

148. On October 28, 2006, Bob Funkhouser, a FLUOR representative, emailed Mr. McConnaughhay, as a follow up to their conversation the previous day regarding FLUOR'S request for access to the GRAND EAST-HALF, the unleased portion of the property, to conduct work in support of their Storm Water Permit held for the FWH. Copies of the email were forwarded to Mark Ashby and Torn James, both from FLUOR.

149. In a letter to Mr. Rottinghaus, dated November 1, 2006, GRAND ACADIAN'S counsel informed him that FLUOR had requested access to the GRAND EAST-HALF stemming from its Louisiana Department of Environmental Quality (LDEQ) Storm Water Permit. FLUOR indicated that the work to be done was in support of FEMA.

150. GRAND ACADIAN indicated that it would grant FLUOR access if: FEMA would assume responsibility for any damage caused by its contractor; in the event of any damage to the property, FEMA would pay restoration costs; and FEMA would hold GRAND ACADIAN free from any liability arising from FLUOR'S actions in connection with the GRAND EAST-HALF.

151. GRAND ACADIAN' S counsel forwarded a follow-up letter, dated November 8, 2006, to Mr. Rottinghaus to inform him that FLUOR had made false statements to parish and state officials regarding FLUOR'S access to the GRAND EAST-HALF. FLUOR represented that GRAND ACADIAN denied it access, which was not accurate. GRAND ACADIAN reminded Mr. Rottinghaus that it would grant access to FLUOR if FEMA would enter into a "hold harmless" agreement with them.

152. In a letter dated November 9, 2006, Mr. Rottinghaus responded to the two previous letters from GLAND ACADIAN regarding access to FLUOR. Mr. Rottinghaus indicated that as a federal government contractor, FLUOR had satisfied its requirement for proof of insurance. Therefore, in the event of damage to the GRAND EAST HALF, subject to GRAND ACADIAN'S first filing a claim with FLUOR or its insurer, FEMA agreed to either (1) restore the damaged area or (2) at FEMA'S option, pay reasonable restoration costs to GRAND ACADIAN. In addition, FEMA proposed that the Government would hold harmless GRAND ACADIAN to the extent allowed by and subject to the provisions of the Federal Tort Claims Act.

153. Furthermore, Mr. Rottinghaus stressed that "the work must proceed quickly" and asked for a response to his letter by the close of business November 10, 2006, the next day.

154. In a letter dated November 10, 2006, through counsel, GRAND ACADIAN

informed Mr. Rottinghaus that it needed to review his proposed language, thus GRAND ACADIAN would issue a response by the close of business on November 14, 2006. GRAND ACADIAN also assured Mr. Rottinghaus that it intended to assist FEMA in the most economical method of silt removal, as well as, the protection of the GRAND EAST-HALF.

155. In a letter dated November 14, 2006, Mr. Rottinghaus responded to GRAND ACADIAN'S correspondence from November 1, 2006, regarding its July 5, 2006, claim and the Supplemental Claim. Mr. Rottinghaus stated that he would proceed with his final decision, but indicated that his requests for supporting documentation was not "leading [them] on a paper chase."

156. Furthermore, Mr. Rottinghaus indicated that his personal observations of the conditions of the FWH did not relieve GRAND ACADIAN from providing documentation in support of the claimed amount. In addition, Mr. Rottinghaus once again extended the date for the Contracting Officer's Final Decision.

157. However, Mr. Rottinghaus failed to acknowledge the fact that he already had access to the documentation relevant to GRAND ACADIAN'S claims. Seemingly, his intentions were to determine if GRAND ACADIAN would be able to prove its claim with its own set of documents, rather than whether or not the documentation in his possession substantiated GRAND ACADIAN'S claims.

158. From November 16, 2006, to November 17, 2006, an email exchange between Mr. Rottinghaus and Mr. McConnaughhay took place. On November 16, 2006, Mr. Rottinghaus emailed Mr. Riggs regarding access to the GRAND EAST-HALF. He indicated that the correspondence received from Mr. McConnaughhay did not address the issue of whether or not FLUOR would be granted access.

159. On November 17, 2006, Mr. Riggs responded and informed Mr. Rottinghaus of the attachment regarding the silt conditions in the bayou. Also attached was a hold harmless agreement that FLUOR required of its subcontractors. GRAND ACADIAN requested that FLUOR sign the same document in regards to the GRAND EAST-HALF that they would require others to sign.

160. Later that day, Mr. Rottinghaus responded to Mr. Riggs and stated that he had still not received a response addressing the areas of concern mentioned in Mr. Riggs' November 10, 2006 letter on behalf of GRAND ACADIAN. Next, Mr. Rottinghaus went on to say that he was "unclear as to the relevance of the scanned copy of the hold harmless agreement" and the "intent of [Mr. Riggs'] statement that it seems only fair for us to require Fluor to sign the very same thing they required others to sign."

161. It is important to note that even though it had been previously established that GRAND ACADIAN requested that FEMA hold it harmless in regards to FLUOR'S plans for work on the unleased property, in his letter, Mr. Rottinghaus acted as if this request was newly proposed.

162. In his letter, Mr. Rottinghaus also stated that he assumed GRAND ACADIAN was denying FLUOR the right to enter the unleased portion.

163. Mr. Riggs responded to Mr. Rottinghaus' reply and clearly stated that his assumption was incorrect and that FLUOR could enter the GRAND EAST-HALF "subject to the same conditions it enforced on others."

164. On November 27, 2006, Mr. Riggs emailed Mr. Rottinghaus to confirm Mr. Riggs' voice mail from that morning. Mr. Riggs reiterated his suggestion that the lease be extended for a maximum of 120 days, and that a right of way be added at fair

compensation.

165. After no response from Mr. Rottinghaus, on December 6, 2006, Mr. Riggs again emailed Mr. Rottinghaus to inquire about his thoughts on Mr. Riggs' suggestions regarding access to the unleased property.

166. Mr. Rottinghaus eventually responded on December 7, 2006, and simply stated that "I do not intend to modify and extend the lease as you have suggested."

167. In a letter to Mr. Rottinghaus dated December 8, 2006, Mr. Riggs indicated that since the LEASE had expired at midnight, December 6, 2006, no FEMA representative or FLUOR could enter upon the SITE, except by the express, written consent of Mr. McConnaughhay.

168. Furthermore, Mr. Riggs inquired as to whether or not there was a plan to remove the silt.

169. On December 11, 2006, as a reminder, Mr. Riggs emailed Mr. Rottinghaus information and photos documenting the condition of the bayou that were previously submitted.

170. In a letter dated December 14, 2006, Mr. Rottinghaus issued the Contracting Officer's Final Decision under the LEASE. Mr. Rottinghaus rejected the validity of documentation submitted by GRAND ACADIAN, as well as, evidence acquired from other sources that had been in his possession, to find that FEMA was not responsible for the destruction of the property and that the property was actually in better condition than prior to the LEASE. Therefore, GRAND ACADIAN was not entitled to compensation. (See Exhibit 1) Plaintiff appeals the entirety of the Contracting Officer Final Decision.

**V.**

**COUNT ONE**

**BREACH OF CONTRACT**

171. The Plaintiff re-alleges all facts, as set forth in paragraphs 1 - 170, as if fully set out herein.

172. The UNITED STATES breached its contract with GRAND ACADIAN by its failure to repair and restore the property to the condition existing prior to the LEASE and its failure to develop and build the infrastructure that would remain on the property at the expiration of the lease term. As a result, GRAND ACADIAN suffered substantial harm.

175. The UNITED STATES actively negotiated with GRAND ACADIAN to develop infrastructure that would remain on the property at the expiration of the lease. In return, the UNITED STATES would receive a reduced lease rate. The UNITED STATES' denial that it induced GRAND ACADIAN to enter the lease and its failure to fulfill its promise to GRAND ACADIAN are breaches of contract.

176. The UNITED STATES failed to properly administer the performance of the contract with FLUOR by not requiring FLUOR to follow the contract specifications and to commit acts, which caused damage to plaintiffs. As a result, the contractor destroyed the property and failed to construct the promised 12 million dollar RV park which would remain the property of plaintiff at the end of the lease.

Therefore, the UNITED STATES is liable for breach of contract and the resulting damages.

**VI.**

**RELIEF SOUGHT**

177. The Plaintiff sets forth all facts, as set forth in paragraphs 1 - 176, as if fully set out herein.

WHEREFORE, the Plaintiff, GRAND ACADIAN, INC., prays that:

That the Court hold a trial on the merits and award damages as follows:

178. The UNITED STATES is liable for BREACH OF CONTRACT and subsequent damages and damages for destruction to plaintiff's property in the sum of $6,000,000.00, damages for the loss of infrastructure in the sum of $12,000,000.00, damages for loss of revenue, increased construction cost and increased cost of borrowing in the sum of $2,040,000.00. Damages for remediation of silt run-off into adjacent bayou caused by FLUOR'S failure to follow appropriate procedure in the sum of $1,000,000.00.

179. Plaintiff seeks any other relief that may be granted upon the facts of this matter.

180. Plaintiff also seeks Attorney's Fees and costs pursuant to the Equal Access to Justice Act.

Respectfully submitted, this 25th Day of January 2008

BY: S/Howell Roger Riggs

HOWELL ROGER RIGGS
PATRICK O. MILLER
Dick Riggs Miller LLP
200 Clinton Avenue, Suite 1050 Huntsville, AL 35801
Phone: (256) 564-7317
Fax: (256) 564-319
Email:hriggs@drmslaw.net
pmiller@drmslaw.net
Attorneys for Plaintiff, Grand Acadian, Inc.