# In the United States Court of Federal Claims

No. 07-849 C

(E-Filed:  May 29, 2009)

|  |  |
|---|---|
| GRAND ACADIAN, INC., | ) |
|  | ) |
|  | ) Cross-Motions for Summary |
| Plaintiff, | ) Judgment; RCFC 56; |
|  | ) Interpretation of Post-Katrina |
| v. | ) Lease by FEMA for |
|  | ) Undeveloped Property in |
|  | ) Louisiana |
| THE UNITED STATES, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

<u>Howell Roger Riggs</u>, Huntsville, AL, for plaintiff.  <u>Patrick O. Miller</u>, Huntsville, AL, of counsel.

<u>Douglas G. Edelschick</u>, with whom were <u>Michael F. Hertz</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Mark A. Melnick</u>, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.

OPINION

HEWITT, Chief Judge

     Plaintiff, Grand Acadian, Inc., filed a complaint at the United States Court of Federal Claims on November 30, 2007.  The Complaint (Complaint or Compl.) "involves claims made against the United States by and through the Federal Emergency Management Agency [(FEMA)] . . . arising out of General Services Administration [(GSA)] . . . Lease Number GS-07B-16028 [(the Lease)] . . . and appeals from an adverse Contracting Officer Final Decision."  Compl. 1.  On January 25, 2008, plaintiff filed its First Amended Complaint (First Amended Compl.).  Plaintiff alleges that defendant failed

to build infrastructure on the leased property and to restore the leased property – at the termination of the Lease term – as required by the Lease. First Amended Compl. 3. Defendant filed Defendant's Answer to the First Amended Complaint on May 20, 2008 and Defendant's Amended Answer and Affirmative Defense on October 14, 2008. Now before the court are the parties' cross-motions for summary judgment, filed December 1, 2008: Plaintiff's Motion for Summary Judgment (plaintiff's Motion or Pl.'s Mot.) and Defendant's Rule 56 Motion for Summary Judgment (defendant's Motion or Def.'s Mot.). On January 9, 2009 plaintiff filed Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment (plaintiff's Response or Pl.'s Resp.) and defendant filed Defendant's Response to Plaintiff's Motion for Partial Summary Judgment (defendant's Response or Def.'s Resp.). On January 26, 2009, defendant filed Defendant's Reply in Support of Motion for Summary Judgment (defendant's Reply or Def.'s Reply) and plaintiff filed Plaintiff's Reply to Defendant's Response to Plaintiff's Motion for Summary Judgment (plaintiff's Reply or Pl.'s Reply). On February 4, 2009, defendant filed, with the court's permission, Defendant's Sur-Reply to Newly Submitted Evidence in Plaintiff's Reply (defendant's Sur-Reply or Def.'s Sur-Reply).

For the following reasons, plaintiff's Motion is GRANTED-IN-PART and DENIED-IN-PART, and defendant's Motion is GRANTED-IN-PART and DENIED-IN-PART.

I.     Background

On December 7, 2005, following hurricanes Katrina and Rita, FEMA entered into an agreement with plaintiff to lease approximately thirty acres of property in Sulphur, Calcasieu Parish, Louisiana (the Property). First Amended Compl. 3; Pl.'s Mot. 2-3 (citing [Plaintiff's] Corrected Proposed Findings of Uncontroverted Fact (plaintiff's Facts or Pl.'s Facts), Exhibit (Ex.) D). The Lease commenced on December 7, 2005 and was for a term of three years, at an annual rent of $252,262.50, "subject to termination and renewal rights." Pl.'s Facts, Ex. D at 1, ¶¶ 2-3; Defendant's Proposed Findings of Uncontroverted Fact In Support of Rule 56 Motion For Summary Judgment (defendant's Facts or Def.'s Facts), Ex. 3 at 1, ¶¶ 2-3. On February 27, 2006, defendant sent a notice of lease termination to plaintiff. Def.'s Facts, Ex. 5; Pl.'s Facts, Ex. E (Notice of Lease Termination). The government terminated the Lease effective as of December 6, 2006. Notice of Lease Termination. Plaintiff complains that FEMA failed to construct certain improvements on the Property and, following the termination of the Lease, failed to restore the property. First Amended Compl. 3. Plaintiff seeks damages totaling some twenty-one million dollars. Id. ¶ 178. The United States contends that it was not required

to construct improvements on the Property, Def.'s Mot. 4, and that it is not liable for the costs of restoration plaintiff seeks, id. at 6-8.

II.     Legal Standards

   A.     Summary Judgment

   The grounds for summary judgment are set forth in Rule 56 of the Rules of the United States Court of Federal Claims (RCFC).  RCFC 56.  RCFC 56(c)(1) provides:

> A motion for summary judgment should be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law.

RCFC 56(c)(1); see also Mann v. United States (Mann), 334 F.3d 1048, 1050 (Fed. Cir. 2003) ("Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." (citing RCFC 56(c))). The moving party has the initial burden of demonstrating "the absence of any genuine issue of material fact and entitlement to judgment as a matter of law."  Crater Corp. v. Lucent Techs., Inc., 255 F.3d 1361,1366 (Fed. Cir. 2001) (citing Celotex Corp. v. Catrett (Celotex), 477 U.S. 317, 322-24 (1986)).[1]  This burden may be discharged by "pointing out . . . that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.  There is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim."  Id. at 323 (emphasis omitted).  However, the moving party must file with the court documentary evidence, such as declarations, that support its assertions that material facts are beyond genuine dispute, see RCFC 56(c)(2), unless it is basing its

_____

[1] The Rules of the United States Court of Federal Claims (RCFC) generally mirror the Federal Rules of Civil Procedure (FRCP).  RCFC 56 Rules Committee Notes ("The subdivision structure of RCFC 56 was reordered to more closely conform to FRCP 56."); see Flowers v. United States, 75 Fed. Cl. 615, 624 (2007) ("RCFC 56 is patterned on Rule 56 of the [FRCP] and is similar in language and effect."); Champagne v. United States, 35 Fed. Cl. 198, 205 n.5 (1996) ("In general, the rules of this court are closely pattered on the [FRCP].  Therefore, precedent under the [FRCP] is relevant to interpreting the rules of this court, including Rule 56."); see also C. Sanchez & Son, Inc. v. United States, 6 F.3d 1539, 1541 n.2 (Fed. Cir. 1993) ("The [RCFC] generally follow the [FRCP]. [RCFC] 56(c) is, in pertinent part, identical to [FRCP] 56(c)."). Therefore, this court relies on cases interpreting FRCP 56 as well as those interpreting RCFC 56.

motion for summary judgment on the "absence of evidence to support the nonmoving party's case," Celotex Corp., 477 U.S. at 325; see also Anchor Sav. Bank, FSB v. United States, 59 Fed. Cl. 126, 139-40 (2003). The adverse party then must "set out specific facts showing a genuine issue for trial." RCFC 56(e)(2). RCFC 56(e)(2) provides:

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

RCFC 56(e)(2). "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred." Celotex, 477 U.S. at 324. "The party opposing the motion must point to an evidentiary conflict created on the record; mere denials or conclusory statements are insufficient." SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1116 (Fed. Cir. 1985) (citing Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd., 731 F.2d 831, 836 (Fed. Cir. 1984)). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc. (Anderson), 477 U.S. 242, 247-48 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Id. at 248. An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250; see Matsushita Elec. Indus. Co. v. Zenith Radio Corp. (Matsushita), 475 U.S. 574, 587 (1986) (stating that there is no genuine issue "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party"). To demonstrate a genuine dispute over a material fact, the nonmoving party need not "produce evidence in a form that would be admissible at trial." Celotex Corp., 477 U.S. at 324. However, the non-movant must establish the existence of a material element on which the party will bear the burden of proof at trial. Id. at 322-23.

Under RCFC 56, the court must draw all inferences from the underlying facts in the light most favorable to the nonmoving party. Matsushita, 475 U.S. at 587; Mann, 334 F.3d at 1050 (citing Anderson, 477 U.S. at 255). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential

to that party's case, and on which that party will bear the burden of proof at trial."
Celotex, 477 U.S. at 322.

B.     Breach of Contract

"To recover for breach of contract, a party must allege and establish:  (1) a valid
contract between the parties, (2) an obligation or duty arising out of the contract, (3) a
breach of that duty, and (4) damages caused by the breach."  San Carlos Irrigation &
Drainage Dist. v. United States (San Carlos), 877 F.2d 957, 959 (Fed. Cir. 1989).  "A
government contractor bears the 'burden of establishing the fundamental facts of liability,
causation, and resultant injury.'"  Elec. & Missile Facilities, Inc. v. United States, 189 Ct.
Cl. 237, 253, 416 F.2d 1345, 1355 (1969) (quoting Wunderlich Contracting Co. v. United
States, 173 Ct. Cl. 180, 199, 351 F.2d 956, 968 (1965)).  "Whether a contract creates a
duty is a legal question of contract interpretation," San Carlos, 877 F.2d at 959, and
therefore amenable to summary judgment, see Varilease Tech. Group, Inc. v. United
States (Varilease), 289 F.3d 795, 798 (Fed. Cir. 2002) ("Contract interpretation is a
question of law generally amenable to summary judgment.").  "Contract interpretation
begins with the plain language of the agreement."  Gould, Inc. v. United States, 935 F.2d
1271, 1274 (Fed. Cir. 1991).  Contract terms are to be "accorded their plain and ordinary
meaning."  Keeter Trading Co. v. United States (Keeter), 79 Fed. Cl. 243, 256 (2007)
(citing Aleman Food Servs., Inc. v. United States, 994 F.2d 819, 822 (Fed. Cir. 1993)).
"The language of a contract . . . must be given the meaning that would be derived from
the contract by a 'reasonably intelligent person acquainted with the contemporaneous
circumstances.'"  Allied Tech. Group, Inc. v. United States, 39 Fed. Cl. 125, 138 (1997)
(quoting Hol-Gar Mfg. Corp. v. United States (Hol-Gar), 169 Ct. Cl. 384, 388, 351 F.2d
972, 975 (1965)).

"It is well settled that a contract must be interpreted when possible as a whole in a
manner which gives reasonable meaning to all its parts and avoids conflict or surplusage
of its provisions."  Granite Constr. Co. v. United States, 962 F.2d 998, 1003 (Fed. Cir.
1992); see United States v. Johnson Controls, Inc., 713 F.2d 1541, 1555 (Fed. Cir. 1983)
("[A]n interpretation that gives a reasonable meaning to all parts of the contract will be
preferred to one that leaves portions of the contract meaningless; nor should any
provision be construed as being in conflict with another unless no other reasonable
interpretation is possible.").  "[T]he court must attempt to read the contract's various
provisions as a harmonious, integrated whole, interpreting these provisions in their larger
contractual context, rather than in isolation."  Keeter, 79 Fed. Cl. at 257 (citing Hol-Gar,
169 Ct. Cl. at 394-96, 351 F.2d at 979).  The court "must interpret the contract in a
manner that gives meaning to all of its provisions and makes sense."  McAbee Constr.,

Inc. v. United States (McAbee), 97 F.3d 1431, 1435 (Fed. Cir. 1996) (citing Hughes
Commc'ns Galaxy, Inc. v. United States, 998 F.2d 953, 958 (Fed. Cir. 1993)).

The plain language of a contract is viewed as controlling and unambiguous if the
language is amenable to only one reasonable interpretation. Triax Pac., Inc. v. West, 130
F.3d 1469, 1473 (Fed. Cir. 1997). A contract will be deemed ambiguous if it is amenable
to two different reasonable interpretations. Cmty. Heating & Plumbing Co. v. Kelso, 987
F.2d 1575, 1579 (Fed. Cir. 1993). "However, contracts are not necessarily rendered
ambiguous by the mere fact that the parties disagree as to the meaning of their
provisions." Id. at 1578. When interpreting an ambiguous contract, the court looks to the
intent of the parties. Edward R. Marden Corp. v. United States, 803 F.2d 701, 705 (Fed.
Cir. 1986); see Highway Prods., Inc. v. United States, 208 Ct. Cl. 926, 938, 530 F.2d 911,
917 (1976) ("Where there is an ambiguity in the contract instrument, it is appropriate to
go outside the formal documents and ascertain the intent of the parties . . . .").

C.      Damages for Breach of Contract to Restore Property to Pre-Lease Condition

As the court finds, infra Part III.B.2, the Lease imposed a duty on the government
to restore the Property to its pre-Lease condition. Damages in this case turn on the
interpretation of a provision in the Lease concerning the restoration by defendant of the
Property to its pre-Lease condition. The court discusses the application of the measure of
damages below in Part III.C.

III.    Discussion

A.      The Lease Terms

The parties have included the Lease terms in defendant's Facts and plaintiff's
Facts respectively. Pages 1-46 of Exhibit D to plaintiff's Facts and pages 1-46 of Exhibit
3 to defendant's Facts contain a standard lease form and attachments incorporated into the
Lease by reference. The court will refer to pages 1-2 of the Lease as "the Standard Lease
Form." The Standard Lease Form identifies the leased Property, Standard Lease Form ¶
1, the duration of the Lease term, id. ¶ 2, the rental rate, id. ¶ 3, the ability of the
government to terminate the Lease after twelve months, id. ¶ 4, and four attachments to
be incorporated into the Lease, id. ¶ 6. The attachments consist of a Lease Rider, id. ¶
6(a), General Clauses, id. ¶ 6(b), Representations and Certifications, id. ¶ 6(c), and a Site
Plan, id. ¶ 6(d). The court will refer to pages 3-6 of the Lease as the "Lease Rider."
Whether defendant had a duty to build infrastructure on the Property and whether
defendant had a duty to restore the Property to its pre-Lease condition depend for their

resolution on the correct interpretation of certain provisions of the Lease Rider. The General Clauses are contained on pages 8-39 of the Lease. Relevant to this dispute are an integration clause, Pl.'s Facts, Ex. D at 12; Def.'s Facts, Ex. 3 at 12, and a right of entry clause, Pl.'s Facts, Ex. D at 14; Def.'s Facts, Ex. 3 at 14. The Representations and Certifications are contained on pages 40-46 of the Lease. The forms of the Lease submitted by the parties are identical except for a dispute, raised by plaintiff, over the contents of a "Site Plan" incorporated into the Lease by paragraph 6(d) of the Standard Lease Form. <u>Compare</u> Pl.'s Facts, Ex. D at 1-46, <u>with</u> Def.'s Facts, Ex. 3 at 1-46; <u>see</u> Pl.'s Mot. 5-6; Pl.'s Facts, Ex. D at 47-71.

>       B.      What Duties Arose Under the Lease

The court addresses first, whether defendant had a duty to build infrastructure on the Property and, second, whether defendant had a duty to restore the Property to its pre-Lease condition.

>       1.      The Duty to Build Infrastructure

According to plaintiff, "The [Lease] contains express terms which require the Government to construct infrastructure upon the leased premises." Pl.'s Mot. 4. Defendant, on the other hand, argues that "[t]he [i]nfrastructure claim fails because the contract does not impose upon the Government an affirmative duty to build Grand Acadian an RV park." Def.'s Mot. 4. Defendant argues that "paragraph 1 of the [Standard Lease Form] and paragraph 2 of the [Lease] Rider are consistent in providing the property shall be used as 'determined' by the Government." Def.'s Resp. 3. Paragraph 1 of the Standard Lease Form provides:

> The Lessor hereby leases to the Government the following described premises . . . to be used for such purposes as determined by [FEMA], and for those additional purposes by those agencies and entities described in the attached Rider.

Standard Lease Form ¶ 1. According to plaintiff, "paragraph 1 of the [Standard Lease Form] does not allocate any discretion to FEMA to deviate from the additional uses described in the Lease Rider[,] . . . which require the construction of infrastructure." Pl.'s

Reply 3.  Plaintiff argues that defendant's interpretation of the Lease "neglects to read the [Lease] contextually and as an integrated whole."[2]  Pl.'s Resp. 5.

The Lease Rider was incorporated into the Lease by paragraph 6(a) of the Lease. See Standard Lease Form ¶ 6(a).  The pertinent parts of the Lease Rider provide:

> 2)  <u>Use of Land</u>.  . . . .  Use of the property shall be for construction and establishment of temporary housing facilities for disaster assistance recipients and the construction of improvements (including, but not limited to utilities, roads or driveways, and trailer pads) as the Government determines necessary and/or expedient in connection with the establishment and operation of temporary housing facilities.
>
> 3)  <u>Lessor's Covenant to Grant Easements and to Cooperate</u>.  The parties acknowledge that the Government's use of the Property shall

---

[2] Plaintiff's use of the terms "contextually" and "as an integrated whole" is confusing. See Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment (plaintiff's Response or Pl.'s Resp.) 5.  The word "contextually" appears to point beyond the four corners of the document.  The words "as an integrated whole," however, invoke a doctrine, integration, which reads the written agreement as the final and exclusive statement of the parties' agreements. See McAbee Constr., Inc. v. United States (McAbee), 97 F.3d 1431, 1434 (Fed. Cir. 1996) (stating that where an agreement is fully integrated, the parties "agreed that all of its terms and conditions were 'expressly contained' within the four corners of the [agreement] itself"); Sylvania Elec. Prods., Inc. v. United States (Sylvania), 198 Ct. Cl. 127, 458 F.2d 994, 1006 (1972).  In this case, the parties agree that the Lease is a fully integrated agreement. See Defendant's Rule 56 Motion for Summary Judgment (defendant's Motion or Def.'s Mot.) 2 ("The contract is an 'integrated agreement.'"); Defendant's Response to Plaintiff's Motion for Partial Summary Judgment (defendant's Response or Def.'s Resp.) 8 (arguing that the "Right of Entry agreement is binding upon Grand Acadian notwithstanding that the lease contract is an integrated agreement"); Plaintiff's Reply to Defendant's Response to Plaintiff's Motion for Summary Judgment (plaintiff's Reply or Pl.'s Reply) 22 (stating that the Lease "is fully integrated").  Additionally, the general clauses incorporated into the Lease by paragraph 6(b) of the Lease include an integration clause.  [Plaintiff's] Corrected Proposed Findings of Uncontroverted Fact (plaintiff's Facts or Pl.'s Facts), Exhibit (Ex.) D at 1-2; Defendant's Proposed Findings of Uncontroverted Fact in Support of Rule 56 Motion For Summary Judgment (defendant's Facts or Def.'s Facts), Ex. 3 at 1-2 (Standard Lease Form) ¶ 6(b); Pl.'s Facts, Ex. D at 8, 12; Def.'s Facts, Ex. 3 at 8, 12; 48 C.F.R. § 522.270-27 (2009) ("This Lease, upon execution, contains the entire agreement of the parties and no prior written or oral agreement, express or implied, shall be admissible to contradict the provisions of the Lease.").

require construction and placement of improvements on the Property
to permit residential occupancy thereon by disaster assistance
recipients.  Such use shall also require the installation of sewer,
water, electrical utilities, and such other amenities as may be
necessary and/or convenient to establish and operate temporary
housing facilities.  Lessor agrees to reasonably cooperate with the
Government in order to accomplish the establishment and operation
of the temporary housing facilities, including, where required,
securing permits, sign-offs and/or other approvals and government
entitlements.  Lessor further agrees to grant such easements, rights of
way, and other rights of use and or access in and to any portion(s) of
Lessor's property (including property not included within the
demised premises leased to the Government under this Lease) as may
be necessary and/or convenient to accomplish the installation and
operation of utilities, roadways for ingress and egress, and other
amenities related to the temporary housing facilities, including, but
not limited to the grant of a blanket-easement to utility providers and
or other service providers.  Lessor also agrees to execute such other
and further documents, or perform such other acts, as may be
necessary to carry out the provisions of this section.

Lease Rider ¶¶ 2-3.

     The court notes at the outset that the Use of Land paragraph in the Lease Rider
contemplates the construction of improvements.  Lease Rider ¶ 2 ("Use of the property
shall be for construction and establishment of temporary housing facilities for disaster
assistance recipients and the construction of improvements . . . as the Government
determines necessary and/or expedient.").  Plaintiff argues that "[t]he phrase 'as the
Government determines necessary' does not alleviate [sic] the Government from its duty
to construct the temporary housing facility, (i.e.[,] infrastructure) it simply grants
deference to the wishes of the Government regarding how the construction is to be
accomplished."  Pl.'s Mot. 4; Pl.'s Resp. 6.  Plaintiff's argument is that the Lease "grants
the Government discretion in the means, but not the end."  Pl.'s Resp. 6.  Plaintiff argues
that the use of the word "require" in the first sentence of paragraph 3 of the Lease Rider
("The parties acknowledge that the Government's use of the Property shall require
construction and placement of improvements on the Property to permit residential
occupancy thereon by disaster assistance recipients") and "the absence of discretionary
language" in the Lease Rider "place[] an affirmative duty upon the Government to

construct infrastructure and improvements upon the leased premises." Id. at 7. Defendant, however, argues,

> Grand Acadian's strained interpretation would foreclose the Government's right to "determine" that is was not "necessary and/or expedient" to use the property. Once the Government makes a "determination" not to use the property and invokes its right to terminate the lease, Grand Acadian has no valid contractual expectation beyond the receipt of one year's rent, which was paid in full.

Def.'s Resp. 3 (relying on the final sentence of paragraph 2 of the Lease Rider).

Defendant also relies on paragraph 3 of the Lease Rider, titled "Lessor's Covenant to Grant Easements and to Cooperate." See Def.'s Resp. 3. According to defendant, paragraph 3 of the Lease Rider "imposes a duty upon Grand Acadian, as the lessor, to cooperate as needed to obtain permits and other approvals required to establish and operate temporary housing facilities." Id. According to plaintiff, however, "the fact that paragraph 3 places a duty upon [plaintiff], does not in any way detract from the express[] acknowledgment by both parties that the Government's use of the premises requires the construction of infrastructure." Pl.'s Reply 5 (emphasis omitted) (arguing that the duty to cooperate with construction and the duty to construct do not conflict). Plaintiff argues that this language "is neither vague nor ambiguous" and that "its terms can be completely understood given their plain and ordinary meaning." Pl.'s Mot. 5. Indeed, the first two sentences of paragraph 3 both describe the government's "use" of the Property as requiring construction. Lease Rider ¶ 3 ("[T]he Government's use of the Property shall require construction and placement of improvements on the Property to permit residential occupancy thereon by disaster assistance recipients. Such use shall also require the installation of sewer, water, electrical utilities, and such other amenities as may be necessary and/or convenient to establish and operate temporary housing facilities.").

The court agrees that the language contained in paragraph 3 of the Lease Rider states that the government's use of the Property would require the construction of certain infrastructure. However, the court does not agree with plaintiff that "[t]his language clearly places an affirmative duty upon the Government to construct and place improvements upon the leased premises." Pl.'s Mot. 5. The contemplated use of the Property required construction of improvements by the government and it appears that, without consent, the government could not have used the Property for some other purpose. See Lease Rider ¶ 2. The issue before the court, however, is whether the Lease required the government to consummate the use the Lease contemplated. Plaintiff

believes that, given what plaintiff contends are required undertakings by the government in paragraphs 2 and 3, the government must be held to an agreement to build improvements and must pay damages for its failure.  The court finds plaintiff's contention that it is owed money because the government did not improve the Property unsupported in the Lease.  The court is aware of the doctrines, cited and quoted above, see supra Part II.B, that require the court to give "reasonable meaning to all parts of the contract."  The court has in mind as well that the plain language of a contract is controlling only if the contract terms are amenable to only one reasonable interpretation.  See supra Part II.B. The Lease provides that the contemplated use was improving the Property to support temporary housing.  See Lease Rider ¶ 2.  The question before the court is whether, given the entirety of the Lease, the government was required to build improvements or pay damages for its having terminated the Lease without having done so.  Based on the relevant provisions of the Lease read together, the court is persuaded that the Lease does not require payment of damages in lieu of the construction of improvements when the Lease was terminated prior to the construction of improvements.

Notably, the Lease contains no time limit within which the government was required to use the Property or otherwise perform.  The Lease leaves entirely to the government decisions about the construction of improvements "as the [g]overnment determines necessary and/or expedient."  Lease Rider ¶ 2.  It is undisputed that the government did not perform the "construction and placement of improvements on the Property to permit residential occupancy by disaster assistance recipients," id. ¶ 3, and terminated the Lease after a year, see Notice of Lease Termination.  However, there is no suggestion in the Lease that plaintiff could collect damages for a termination in accordance with paragraph 4 of the Standard Lease Form before the completion of infrastructure work contemplated by paragraphs 2 and 3 of the Lease Rider.  Defendant argues that plaintiff "cannot impose duties upon the Government that do not appear in this standard Government lease contract."  Def.'s Mot. 5 (citing Holland v. United States, 74 Fed. Cl. 225, 262-63 (2006) (finding that the court cannot add alleged promises evidenced only by extrinsic evidence to an integrated contract) and Smelser v. United States, 53 Fed. Cl. 530, 542 (2002) ("And where a contract is not ambiguous, extrinsic evidence may not be used to vary the terms of the agreement."), aff'd without op., 69 F. App'x 466 (Fed. Cir. 2003) (per curiam)).  The court therefore agrees with defendant's contention that "Grand Acadian may have hoped that the Government would build improvements upon the property to its liking, but nowhere in the standard contract does it create an affirmative duty for the Government to build Grand Acadian a $12 million RV park, or any RV park at all."  Def.'s Mot. 5.

Defendant argues that the termination provisions of the Lease further support its contention that the government had no duty to build infrastructure on the Property.  Def.'s Resp. 4.  The Standard Lease Form provides:

> The Government may terminate this lease at any time after TWELVE (12) months following the effective date of the lease by giving at least thirty (30) days notice in writing to the Lessor and no rental shall accrue after the effective date of termination.

Standard Lease Form ¶ 4.  The Lease Rider provides:

> Upon termination there shall be no further rights or liabilities on the part of either Lessor or the Government.

Lease Rider ¶ 7.  Plaintiff argues that the termination clause contained in paragraph 7 of the Lease Rider "does [not] purport to limit pre-existing rights or liabilities."  Pl.'s Reply 5 ("Certainly, this language does not dictate that [Grand Acadian] must initiate and conclude any claim for breach of contract prior to the end of the [Lease].").  According to plaintiff, defendant's interpretation would deprive the requirement to restore the Property to its pre-Lease condition of all effect and meaning.  Id. at 6.

The termination clause contained in paragraph 7 of the Lease Rider does not affect duties imposed by the express language of the Lease, such as the duty to restore the Property.  See Lease Rider ¶ 6.  It does, however, limit the government's liability with respect to additional obligations beyond those set forth in the Lease.  Because the Lease contains no time frame within which the government was required to use the Property and, by the express terms of the Lease, the government had the ability to terminate the Lease after twelve months, see Standard Lease Form ¶ 4, the court finds that plaintiff cannot hold defendant liable for the failure to perform an activity that was not required by the Lease to be performed within any specific time.  If the parties had intended to impose such a duty on the government, they could have incorporated language detailing the obligation of a time within which construction was to be performed and explaining how the failure to construct infrastructure was to be remedied.

The interpretation that the government was not required to build infrastructure on the Property within any particular time and could terminate the Lease without performing construction receives support as well in paragraph 6 of the Lease Rider.  Paragraph 6 of the Lease Rider states:

6)     <u>Alterations and Improvements</u>.  Any physical additions or improvements to the Premises made by the Government will become the property of Lessor.  Lessor may require that the Government, at the end of the Term and at the Government's expense, remove any physical additions and improvements, repair any alterations, and restore the premises to the condition existing at the lease commencement date, normal wear excepted.  This provision does not apply to movable or mobile personal or other property such as mobile homes, travel trailers or similar units.

Lease Rider ¶ 6.  Paragraph 6 of the Lease Rider provides that any "physical additions or improvements" made to the Property would become the property of plaintiff, but paragraph 6 does not state that physical additions or improvements were required to be made nor even suggest that physical additions or improvements were expected to be made.  <u>See</u> <u>id.</u>  Further, the provision that plaintiff "may require that the Government . . . remove any physical additions and improvements, repair any alterations, and restore the premises to the condition existing at the lease commencement date, normal wear excepted," <u>id.</u>, is inconsistent with at least one of the arguments that plaintiff advanced in its Reply, through the affidavit of its president, that the construction of infrastructure was required in consideration for a lower rental rate, Pl.'s Reply 7; Pl.'s Reply, Ex. B (January 26, 2009 Affidavit of Pat McConnaughhay) (Jan. 2009 McConnaughhay Affidavit) ¶¶ 6-11.  Paragraph 6 of the Lease Rider is simply at odds with plaintiff's view that construction by the government was required.

Finally, plaintiff seeks support for its argument that the government had a duty to build infrastructure on the Property in the "specific depictions of the infrastructure which was to be constructed" contained in a site plan.  Pl.'s Mot. 5.  Paragraph 6(d) of the Standard Lease Form incorporates a site plan by reference (Site Plan).  <u>See</u> Standard Lease Form ¶ 6(d).  Plaintiff has attempted to create a dispute of fact regarding the contents of the Site Plan.  <u>See</u> Pl.'s Mot. 6; Def.'s Resp. 4.  Plaintiff includes twenty-five pages in Exhibit D to plaintiff's Facts (plaintiff's Drawings) which plaintiff claims to be the Site Plan incorporated into the Lease by paragraph 6(d) of the Standard Lease Form.  <u>See</u> Pl.'s Facts, Ex. D at 47-71.  Plaintiff's briefing claims that plaintiff's Drawings "clearly show[] infrastructure in the form of retention ponds, roads, trailer pads, buildings, landscaping, and other utilities which were supposed to be constructed."  Pl.'s Mot. 6; <u>see</u> Pl.'s Facts, Ex. D at 47-71.

The parties sharply dispute whether plaintiff's Drawings are in fact the Site Plan contemplated by paragraph 6(d) of the Standard Lease Form.  According to plaintiff, "By

attaching [plaintiff's Drawings] to the [Lease], and incorporating [them] into the [Lease] by reference, the Government has agreed to build the depicted infrastructure, or at least something similar, upon the leased premises." Pl.'s Mot. 6.  Defendant argues that the court should disregard plaintiff's Drawings "because [they are] not authenticated and the development plans are not part of the integrated lease contract," and have not been properly authenticated pursuant to RCFC 56(e).  Def.'s Resp. 4-5.  Defendant points to certain aspects of plaintiff's Drawings, such as the absence of signatures or initials, that suggest its lack of authenticity.  See id. at 5.  Plaintiff replies that Rule 901 of the Federal Rules of Evidence "does not require that all documents be signed in order to be authentic."[3]  Pl.'s Reply 7.  Plaintiff also argues that the incorporation by reference contained in paragraph 6(d) would be meaningless without a Site Plan.  Id. at 8; see Hol-Gar, 325 F.2d at 979 (articulating a maxim of contract interpretation that a contract be read so as to give meaning to all of its terms).  To complicate matters, defendant has not offered a document that it claims is the correct Site Plan.  However, the absence of a document does not mean that a proffered document – here, plaintiff's Drawings – must be the correct document, or that the parties cannot be found to have agreed on the contents of the Site Plan to the extent relevant to the dispute.

The authenticity of plaintiff's Drawings is not the issue.  The issue is what document or documents the parties intended to attach as a Site Plan.  Defendant addressed the issue directly, based on deposition testimony from plaintiff's president, Patrick McConnaughhay.  "Grand Acadian's president[, Patrick McConnaughhay,] admitted, under oath, that the contract he signed did not include any site plan, and during his sworn testimony he identified the lease as a 47-page document that does not include any site plan or development plans."  Def.'s Resp. 5 (citing Def.'s Facts, Ex. 11 (Oct. 28, 2008 Deposition of John Patrick McConnaughhay) (Oct. 2008 McConnaughhay Deposition) 75:17-77:18).  Plaintiff argues in its Reply that this is "a misrepresentation of McConnaughhay's testimony."  Pl.'s Reply 10.  However, in his October 28, 2008

---

[3] Rule 901 of the Federal Rules of Evidence provides:  "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  Fed. R. Evid. 901(a).  Rule 901(b) sets out examples of such authentication, including "[t]estimony that a matter is what it is claimed to be."  Fed. R. Evid. 901(b)(1).  Plaintiff argues that "[t]he incorporation by reference of the Site Plan in the authenticated [Standard Lease Form] is sufficient to support a finding that the Site Plan is what [plaintiff] claims, and thus, is sufficient to satisfy the authentication requirement of Rule 901."  Pl.'s Reply 7-8.  Rule 901(b)(4) provides that the "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances," are sufficient to conform to the requirements of the rule requiring authentication.  Fed. R. Evid. 901(b)(4).

Deposition, Mr. McConnaughhay stated that, at the time he signed the Lease, he did not object to any of the Lease provisions and that he understood that the site plan "would simply indicate the 30 acres" of leased Property. Oct. 2008 McConnaughhay Dep. 73:2-75:13.

> Q:     Between the time that you got this e-mail [from Mr. Townsend[4] containing the final lease] and the time that you actually signed the lease, did you object to any of the provisions in the documents - - the lease documents?
> A:     Not that I recall, no, sir.
> Q:     Do you see there where it says in the text of the e-mail, "We will attach a site plan to simply indicate the 30 acres." Do you see that there?
> A:     Yes, I do.
> Q:     Was it your understanding, then, that Mr. Townsend was going to attach a site plan that would simply indicate the 30 acres?
> A:     That's what he said. That would be my understanding, yes.

Id. at 74:22-75:13 (footnote added). Mr. McConnaughhay also stated that when he received "a copy of the fully executed lease" it did not contain Exhibit A, otherwise known as the Site Plan. Id. at 77:2-13. Mr. McConnaughhay testified as follows:

> Q:     As I understand it, you received a copy of the fully executed lease shortly after December the 7th, 2005; is that correct?
> A:     Yes.
> Q:     Within a week?
> A:     Yes.
> Q:     When this document was sent to you by the government, as you sit here today, can you recall whether there was an Exhibit A attached to that document?
> A:     I know that there wasn't - - was not, excuse me.
> Q:     At any other time has the government - - any representative of the government sent you a copy of the lease?
> A:     Of the lease no, I don't believe so - - executed lease.

---

[4] Mr. Townsend is a General Services Administration Realty Specialist. Def.'s Facts, Ex. 8 (Oct. 29, 2008 Deposition of Christian Townsend) (Oct. 2008 Townsend Deposition) 70:11.

Id. at 77:2-77:18.  After the contents of Mr. McConnaughhay's October 2008 Deposition were brought to the court's attention by defendant, plaintiff offered a different story.  In its Reply plaintiff represents that "[t]he Site Plan was provided to [plaintiff] prior to and separately from the [Lease], on twenty-five, 30 in x 21 in. pieces of paper, which could not be readily copied, scanned, faxed or emailed."  Pl.'s Reply 10.  In support of the arguments advanced in its Reply, plaintiff "offers the attached Affidavit of Pat McConnaughhay as direct evidence (1) authenticating the Site Plan and (2) confirming its inclusion by reference into the [Lease]."  Id. at 7; see Jan. 2009 McConnaughhay Aff.  Plaintiff also offers a deposition of Mr. McConnaughhay taken on July 22, 2008 in Grand Acadian, Inc. v. Fluor Corp., No. CV-07-0295 (W.D. LA) as evidence that Mr. McConnaughhay believed the Site Plan incorporated into the Lease as Exhibit A contained plans that Fluor had provided to him prior to the signing of the Lease.  See Pl.'s Reply, Ex. E (July 22, 2008 Deposition of Patrick McConnaughhay) (July 2008 McConnaughhay Deposition) 212:25-214:4.

In his January 26, 2009 Affidavit, Mr. McConnaughhay states that he has "reviewed the Site Plan attached to Grand Acadian's Proposed Findings of Uncontroverted Fact as part of Exhibit D, and declare[s] that it is a true and correct copy of the Site Plan provided to [him] by Fluor, and referenced in paragraph 6 of the Lease as Exhibit A."  Jan. 2009 McConnaughhay Aff. ¶ 12.  In his January 26, 2009 Affidavit, Mr. McConnaughhay appears to have remembered many more details about the Lease and documents he received than he did in his October 28, 2008 Deposition.  Compare Oct. 2008 McConnaughhay Dep. 72:12-74:9 (stating that after reviewing a final version of the Lease sent via e-mail on December 3, 2005, Mr. McConnaughhay signed and dated the Lease), and id. at 75:1-4 (stating that he did not object to any provisions in the Lease documents at the time he signed them), and id. at 75:9-13 (stating that it was his understanding that "Mr. Townsend was going to attach a site plan that would simply indicate the 30 acres"), and id. at 77:2-12 (stating that the Exhibit A Site Plan was not attached to the Lease he received after December 7, 2005), with Jan. 2009 McConnaughhay Aff. ¶¶ 6-11 (stating that he discussed a lower rental rate with the government as compensation for development of infrastructure on the property and that the Site Plan depicted the infrastructure to be built).

Although the Site Plan was not physically included in the Lease, it was incorporated by reference.  See Standard Lease Form ¶ 6(d).  The court agrees with plaintiff that "[t]here is a distinct factual difference between stating that the Site Plan was not provided simultaneously with the [Lease] and admitting that the Site Plan was not part of the [Lease]."  Pl.'s Reply 10.  However, the court is not persuaded that the plaintiff's Drawings are indeed the Site Plan intended to be incorporated into the Lease under

16

paragraph 6(d).  In his January 26, 2009 Affidavit, Mr. McConnaughhay states the following:

> 9.      On November 21, 2005, Fluor sent me a copy of the Site Plan for my review.  Around November 25, Fluor sent me a larger, full size Site Plan.  These Site Plans depicted the infrastructure to be built on the thirty acre tract of Gand Acadian property.

> 10.     I approved the Site Plan, and on or about November 26, 2005, I agreed to lease the land to GSA/FEMA based upon the understanding that the infrastructure depicted in the Site Plan for the West thirty acres would be constructed upon Grand Acadian's property, and ownership in said infrastructure would be retained by Grand Acadian at the end of the Lease.

Jan. 2009 McConnaughhay Aff. ¶¶ 9-10.  But, in his prior Deposition, October 28, 2008, Mr. McConnaughhay stated that the Exhibit A Site Plan was not attached to the "fully executed lease," Oct. 2008 McConnaughhay Dep. 77:2-12, and that he understood that the site plan Mr. Townsend was going to attach "would simply indicate the 30 acres," id. at 75:9-13.  Mr. McConnaughhay received an e-mail from Chris Townsend on December 3, 2005.  Id. at 73:4-5.  The e-mail stated that it contained the final lease for Mr. McConnaughhay to review before signing.  Id. at 73:9-21.  Mr. McConnaughhay confirmed that the e-mail also stated that the Site Plan would be attached "'to simply indicate the 30 acres'" leased to defendant.  Id. at 75:5-8.  In his October 29, 2008 Deposition, Chris Townsend stated that paragraph 6(d) of the Lease "was intended to attach a one-page document identifying the 30 acres that were being leased by FEMA." Def.'s Facts, Ex. 8 (October 29, 2008 Deposition of Christian Townsend) (Oct. 2008 Townsend Deposition) 70:8-10.  As noted above, paragraph 1 of the Lease states:

> 1.  The Lessor hereby leases to the Government the following described premises (the "Property"):

>> APPROXIMATELY 30 ACRES OF LAND LOCATED IN GRAND ACADIAN RV PARK AT 1141 MOSSWOOD DRIVE, SULPHER, LA 70665 AS SHOWN IN EXHIBIT "A", ATTACHED HERETO AND MADE A PART HEREOF; . . . .

Standard Lease Form ¶ 1 (emphasis omitted).  The court finds that the purpose of the Site Plan was not to indicate infrastructure that defendant was required to build, but was

instead incorporated into the Lease to reflect the location of the thirty acres leased to defendant.  If plaintiff discussed with defendant a requirement that infrastructure would be constructed on the property, see Jan. 2009 McConnaughhay Aff. ¶ 10, that agreement is not reflected in the document intended by both parties to serve as the Site Plan.

Defendant argues that the court should disregard Mr. McConnaughhay's January 26, 2009 Affidavit because it violates the "sham affidavit rule."  Def.'s Sur-Reply 2.  In his January 26, 2009 Affidavit, Mr. McConnaughhay never explains the statements he made in his October 28, 2008 Deposition that relate to his understanding that the Site Plan "would simply indicate the 30 acres" of leased property.  See Jan. 2009 McConnaughhay Aff. passim.  Mr. McConnaughhay's January 26, 2009 Affidavit raises for the first time an allegation of the existence of an unidentified GSA representative, present at the time of the signing of the Lease, who instructed Mr. McConnaughhay "that [Mr. McConnaughhay] was already in possession of the Site Plan referenced in the Lease."  Id. ¶ 11.

"A party cannot create an issue of fact by supplying an affidavit contradicting his prior deposition testimony, without explaining the contradiction or attempting to resolve the disparity."  Sinskey v. Pharmacia Ophthalmics, Inc. (Sinskey), 982 F.2d 494, 498 (Fed. Cir. 1992), abrogated in part on other grounds, Pfaff v. Wells Elecs., 525 U.S. 55, 67-68 (1998); see 11 James Wm. Moore, Moore's Federal Practice § 56.14[1][f], at 56-179 (3d ed. 2004) ("If a party's deposition and affidavit are in conflict, the affidavit is to be disregarded unless a legitimate reason can be given for the discrepancies.").  As the United States Court of Appeals for the Federal Circuit (Federal Circuit) stated in Sinskey,

> Where, as here, a party has been examined extensively at deposition and then seeks to create an issue of fact through a later, inconsistent declaration, he has the duty to provide a satisfactory explanation for the discrepancy at the time the declaration is filed. To allow him to preclude summary judgment simply by contradicting his own prior statements would seriously impair the utility of Federal Rule of Civil Procedure 56.  The trial court properly disregarded the declaration in assessing the existence of a genuine issue of fact.

Sinskey, 982 F.2d at 498.  "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."  Perma Research & Dev. Co. v. Sinder Co., 410 F.2d

572, 578 (2d Cir. 1969).  "Courts generally give a deposition more weight because there was an opportunity for cross-examination absent in an affidavit."  11 James Wm. Moore, Moore's Federal Practice § 56.14[1][f], at 56-179 (3d ed. 2004).

Mr. McConnaughhay's January 26, 2009 Affidavit was taken the same day plaintiff filed plaintiff's Reply and directly refutes defendant's argument that plaintiff's Drawings should be disregarded by the court.  See Jan. 2009 McConnaughhay Aff. ¶¶ 9-12; Def.'s Resp. 4-5.  The Affidavit never addresses, however, why such information was missing from Mr. McConnaughhay's October 28, 2008 Deposition.  See Jan. 2009 McConnaughhay Aff. passim.  A conflict between a deposition and an affidavit "may consist of a direct contradiction of factual statements, or may arise because an affiant, who professed a lack of knowledge at deposition, is able to provide detailed information in an affidavit in opposition to summary judgment."  11 James Wm. Moore, Moore's Federal Practice § 56.14[1][f], at 56-179.  Here, Mr. McConnaughhay stated in his October 28, 2008 Deposition that he understood that the Site Plan "would simply indicate the 30 acres," Oct. 2008 McConnaughhay Dep. 75:9-13, and stated that he did not recall objecting to any of the Lease provisions, id. at 75:1-4.  Later, in his January 26, 2009 Affidavit, Mr. McConnaughhay stated that the Site Plan "depicted the infrastructure to be built on the thirty acre tract of Grand Acadian property, Jan. 2009 McConnaughhay Aff. ¶ 9, and that he asked "specifically about the presence of the Site Plan referenced in paragraph 6 of the Lease," id. ¶ 11.  The court agrees that "the affidavit contains an uncorroborated allegation as to Grand Acadian's subjective understanding concerning 25 pages of development plans."  See Def.'s Sur-Reply 3.  Based on the foregoing, the court will disregard Mr. McConnaughhay's January 26, 2009 Affidavit.

Mr. McConnaughhay's July 2008 Deposition, taken in a different case, prior to both his October 2008 Deposition and his January 2009 Affidavit, states the following:

Q:     Okay.  Point the other areas out to me where the government is
        required to build infrastructure on the property.
A:     Let's see.  On page two.
Q:     Right.
A:     Do you see Exhibit A, the site plan?
Q:     No.  Page two.  Got you.  Okay.  And tell me how - - tell me what
        that means to you.
A:     That would mean the - - well, that's the plans that I was given.
Q:     Okay.  It's your argument that Exhibit A to the lease was a copy of
        the site plan on the FEMA-West half that would show where the

FEMA trailers would go in and generally what the site was going to look like?

A:    As I recall, GSA told me that plans that Fluor had provided me was the site plans, that I had all of the plans and that's the way we left it.

Q:    Okay.  So that Exhibit A also in your opinion meant that the government was going to have to construct this infrastructure on the FEMA-West half, correct?

A:    I meant I - - I asked - - we discussed Exhibit A.  They told me that it was the site plans, and I asked, and they said, "You already have them."  I said, "Correct.  I do have them I got them from Fluor.  Is that the ones?"  "Yes, that's the ones."  And that's the way I understood Exhibit A.

July 2008 McConnaughhay Dep. 212:25-214:4.  Like Mr. McConnaughhay's January 2009 Affidavit, his July 2008 Deposition contains an uncorroborated allegation as to his subjective understanding of the Site Plan.  It remains the case that in Mr. McConnaughhay's October 2008 deposition he confirmed that the Exhibit A Site Plan was not attached to the "fully executed lease," Oct. 2008 McConnaughhay Dep. 77:2-12, and that he understood that the site plan Mr. Townsend, a GSA Realty Specialist, was going to attach "would simply indicate the 30 acres," id. at 75:9-13.  Chris Townsend also stated that the Exhibit A Site Plan "was intended to attach a one-page document identifying the 30 acres that were being leased by FEMA."  Oct. 2008 Townsend Dep. 70:8-10.  Here, even in the absence of Exhibit A, there is no dispute of material fact that both parties understood and intended that the Site Plan consisted or would consist of a document simply showing the location of the Property.

Plaintiff has not shown that its contract with the government, the Lease, required defendant to build infrastructure on the Property.  The court therefore GRANTS defendant's Motion insofar as it requests the court to find that defendant did not have a duty to build improvements on the Property before it terminated the Lease.  The court DENIES plaintiff's Motion insofar as it requests the court to find that defendant did have a duty to build improvements on the Property before it terminated the Lease.  Because defendant had no duty to build infrastructure on the property leased from plaintiff, defendant was not in breach of a duty to build infrastructure.  Plaintiff's Motion is DENIED insofar as it seeks to impose liability on defendant for breach of a duty to build infrastructure.  Defendant's Motion is GRANTED insofar as it requests the court to find that defendant did not breach a contractual duty to build infrastructure on the leased property.

20

2.      The Duty to Restore the Property to its Pre-Lease Condition

Plaintiff argues that defendant had a duty to restore the Property to its pre-Lease condition.  Pl.'s Mot. 7.  Plaintiff draws the court's attention to paragraph 6 of the Lease Rider.  Id.  Paragraph 6 of the Lease Rider states:

> Lessor may require that the Government, at the end of the Term and at the Government's expense, remove any physical additions and improvements, repair any alterations, and restore the premises to the condition existing at the lease commencement date, normal wear expected.

Lease Rider ¶ 6.  Plaintiff argues that this language "is neither vague nor ambiguous" and that "its terms can be completely understood given their plain and ordinary meaning." Pl.'s Mot. 7.  The government terminated the Lease, effective December 6, 2006, pursuant to notice contained in a termination letter dated February 27, 2006.  Notice of Lease Termination.  The Notice of Lease Termination states:  "Prior to the effective date of lease termination, the Government will clean the land, finish grading as necessary and seed the land to prevent erosion."  Id.  According to plaintiff, "the Government's promise to conduct these corrective and preventative measures [in its Notice of Lease Termination] is an acknowledgment of its duty to restore the [Property] to its original condition."  Pl.'s Mot. 7.  Plaintiff also draws the court's attention to the testimony of David Waishes, the Contracting Officer for FEMA, to support its contention that the Government had a duty to restore the Property to its pre-Lease condition.  Id. at 8.  Mr. Waishes testified that "[t]here was restoration language in the lease," Pl.'s Facts, Ex. F (Deposition of David C. Waishes) 75:2-3, and that "the Government was required to abide by those terms in the lease with regard to restoration of the property," id. at 75:8-12. Mr. Waishes also testified that he understood "as a contract officer that if the lease was terminated pursuant to Paragraph 4, the Government would still have a duty to restore the property, normal wear and tear excepted."  Id. at 130:6-13.  Based on the plain language of the Lease, the Notice of Lease Termination, the deposition testimony of Mr. Waishes, and the lack of any challenge to that testimony in defendant's briefing, the court finds that the government entered into the Lease with the intent to restore the Property to its pre-Lease condition.

Notwithstanding the evidentiary base for the foregoing finding, defendant argues, however, that "Grand Acadian's claims are barred by a release that is contained in a 'Right of Entry' agreement."  Def.'s Resp. 8; see Def.'s Facts, Ex. 2 (Right-of-Entry). The Right-of-Entry, dated September 16, 2005, states,

> The Owner acknowledges that the activities authorized by this Right-of-Entry may cause damage to the Property, to associated personal property and/or to persons situated on the Property. The undersigned agrees to hold the Government harmless for damages or loss of any type whatsoever, either to the above described Property, any other real or personal property, or to persons situated thereon, and hereby releases, discharges, and waives any and all actions, either legal or equitable, which the Owner and his authorized representative, if any, has or may have arising out of this Right-of-Entry and/or activities of the Government on the Property.

Right-of-Entry ¶ 4. Defendant argues that "[t]he Right of Entry agreement is binding upon Grand Acadian notwithstanding that the lease contract is an integrated agreement." Def.'s Resp. 8. According to defendant, "'Evidence of a consistent additional term is admissible to supplement an integrated agreement . . . if the writing omits a consistent additional agreed term which is agreed to for separate consideration.'" Id. (quoting Restatement (Second) of Contracts § 216(a) (1981) and citing McAbee, 97 F.3d at 1434 and Sylvania Elec. Prods., Inc. v. United States (Sylvania), 198 Ct. Cl. 106, 125-27, 458 F.2d 994, 1005-06 (1972)) (emphasis omitted). Defendant argues that the Right of Entry was agreed to for the separate consideration of the government's "dispatching a 'strike team' of contractors to conduct a multifaceted assessment of the property." Id. at 9. The Right of Entry Agreement is located in exhibit 2 of defendant's Facts. According to plaintiff, when the Lease was signed on December 7, 2005 the applicability of the Right of Entry Agreement ended. Id. at 21. As further evidence of the inapplicability of the Right of Entry Agreement, plaintiff points to paragraph 6(b) of the Standard Lease Form, which incorporates by reference 48 C.F.R. § 552.270-27 (2009). Id.; see Standard Lease Form ¶ 6(b); Pl.'s Facts, Ex. D at 8, 12; Def.'s Facts, Ex. 3 at 8, 12. Section 552.270-27 of title 48 of the Code of Federal Regulations states: "This Lease, upon execution, contains the entire agreement of the parties and no prior written or oral agreement, express or implied, shall be admissible to contradict the provisions of the Lease." 48 C.F.R. § 552.270-27; Pl.'s Facts, Ex. D at 8, 12; Def.'s Facts, Ex. 3 at 8, 12. Plaintiff argues that "[t]he inclusion of an integration or merger clause in the [Lease] creates a strong presumption that the [Lease] was intended to be the full, final, and complete agreement between the parties." Pl.'s Reply 22 (citing McAbee, 97 F.3d at 1434).

The Federal Circuit has found that "[w]hen a document is completely integrated, no additional terms may be added, whether consistent or inconsistent, through parol evidence." Rumsfeld v. Freedom NY, Inc., 329 F.3d 1320, 1328 (Fed. Cir. 2003). The determination of whether a contract is fully integrated is a question of law. Id. (citing Sylvania, 198 Ct. Cl. at 128 n.9, 458 F.2d at 1006 n.9). "An agreement is not completely

integrated if the writing omits a consistent additional agreed term which is (a) agreed to for separate consideration, or (b) such a term as in the circumstances might naturally be omitted from the writing." Restatement (Second) of Contracts § 216(2) (1981). Attempting to add terms to a contract with an integration clause "carries an extremely heavy burden in overcoming this attestation to the document's finality and completeness." McAbee, 97 F.3d at 1434 (citing Campbell v. United States, 228 Ct. Cl. 661, 676, 661 F.2d 209, 218 (1981)).

The agreement at issue in McAbee contained an integration clause, "explicitly stat[ing] that the contract was fully integrated; that is, they agreed that all of its terms and conditions were 'expressly contained' within the four corners of the easement itself." Id. In McAbee, the Federal Circuit held that, because the parties had a fully integrated agreement, "the parol evidence rule prohibits the use of extrinsic evidence to add or to modify its terms." Id. The Federal Circuit further held that the agreement was unambiguous and should be given its plain meaning. Id. at 1435 ("Thus, if the 'provisions are clear and unambiguous, they must be given their plain and ordinary meaning,' and the court may not resort to extrinsic evidence to interpret them." (citations omitted)).

Here, the government has not argued that there are any ambiguous terms in the Lease with respect to the duty to restore. The government has also admitted that the Lease is a fully integrated agreement. See Def.'s Mot. 2; Def.'s Resp. 8. Defendant "should have requested that the integration clause be stricken or modified if the agreement did not expressly address all of the issues on which the parties had agreed." See McAbee, 97 F.3d at 1434. Under Sylvania, even a prior consistent agreement is superseded by the fully integrated Lease. See Sylvania, 198 Ct. Cl. at 127, 458 F.2d at 1006. Plaintiff also points to a provision in the Lease incorporating by reference section 552.270-9 of the Federal Acquisition Regulation, a separate Right of Entry provision. Pl.'s Reply 23; Standard Lease Form ¶ 6(b); Pl.'s Facts, Ex. D at 8, 14; Def.'s Facts, Ex. 3 at 8, 14. This provision, as plaintiff notes, does not free the government of all liability during its right of entry. See Pl.'s Reply 23; 48 C.F.R. § 552.270-9; Pl.'s Facts, Ex. D at 8, 14; Def.'s Facts, Ex. 3 at 8, 14. Plaintiff argues: "These separate and different Right of Entry provisions in the contract are evidence that the parties did not intend the previously created Right of Entry Agreement to have any effect upon the terms of the [Lease]." Pl.'s Reply 23. The court agrees with plaintiff. Even if the court had found that the Lease was not a completely integrated agreement, the release contained in the Right-of-Entry is not consistent with the duty to restore required by the Lease. Compare Right-of-Entry ¶ 4, with Lease Rider ¶ 6.

23

The court GRANTS plaintiff's Motion insofar as it requests the court to find that defendant had a duty to restore the Property to its pre-Lease condition. Defendant's Motion is DENIED insofar as it requests the court to find that defendant had no duty to restore the Property to its pre-Lease condition.

Even in cases where defendant has been found to have a duty to restore leased property to its pre-Lease condition, however, plaintiff has the burden of proving breach of the duty to restore. San Carlos, 877 F.2d at 959. Plaintiff argues that defendant has breached its duty to plaintiff because defendant "did not restore the [Property] to the condition existing at the [Lease] commencement date." Pl.'s Mot. 8. Defendant argues that "Grand Acadian has failed to support its motion with proper summary judgment evidence." Def.'s Resp. 7. Defendant argues that "genuine issues . . . preclude summary judgment upon the liability elements of the Restoration claim." Id. at 6. The court now addresses whether there are genuine issues of material fact regarding whether the Property was restored to its pre-Lease condition as required.

The Lease commenced on December 7, 2005. First Amended Compl. 3. Plaintiff contends that, prior to the commencement of the Lease, the Property was capable of supporting the construction of improvements. Pl.'s Mot. 8-9 (citing Pl.'s Facts, Ex. A (Dec. 1, 2008 Affidavit of Pat McConnaughhay (Dec. 2008 McConnaughhay Affidavit)) ¶¶ 6-7, Ex. B (July 2005 Report of CBK Soils Engineering, Inc. (July 2005 CBK Report)) 1, and Ex. C (May 2006 Site Restoration Evaluation of the Grand Acadian RV Resort (27.4 Acre Tract) in Sulphur, Louisiana Prepared for [FEMA] by Freese and Nichols (May 2006 Freese and Nichols Report)) 3, 16, 22). Documents and testimony by affidavit purporting to offer evidence of the condition of the Property prior to the commencement of the Lease, produced after December 7, 2005, are somewhat probative, but certainly not dispositive, of the condition of the Property prior to the commencement of the Lease.

The July 2005 CBK Report, produced prior to the commencement of the Lease term and reporting on the condition of the Property on an unspecified date, states that "[v]ariations in subsurface conditions between soil boring locations are possible" and that "[s]oil-cement may be constructed using the on site silty surface soils that are relatively free of organic matter." July 2005 CBK Report 2. The May 2006 Freese and Nichols Report, produced approximately five months into the Lease term and reporting on the condition of the Property in May 2006, found that "the site in its original condition was in a suitable condition for use as an RV Park if normal earthwork operations would have been taken." May 2006 Freese and Nichols Report I. Mr. McConnaughhay, in an affidavit signed on December 1, 2008, nearly two years after the termination of the Lease, and a year after the filing of plaintiff's complaint in this case, stated that "[o]n December

24

6, 2005, the subsurface soil on the entire Grand Acadian property, including the FEMA West Half, did not contain organic debris material rendering it unsuitable to support construction activities." Dec. 2008 McConnaughhay Aff. ¶ 7.

Freese and Nichols, Inc. prepared a second report in December 2006, which reported on the condition of the property on October 18, 2006. Pl.'s Facts, Ex. G (December 2006 Site Redevelopment Evaluation of the Grand Acadian RV Resort (27.4 Acre Tract) as an RV Park in Sulphur, Louisiana Prepared for WHC Consulting, LLC on Behalf of [FEMA] by Freese and Nichols (Dec. 2006 Freese and Nichols Report)) 1. The December 2006 Freese and Nichols Report is signed and dated December 12, 2006, after the termination of the Lease, and "supersedes" the May Freese and Nichols Report. Id. According to the December 2006 Freese and Nichols Report, "The degree to which the top two to three feet of soil was mixed with topsoil, clay, woody debris, and other vegetation on December 7, 2005 cannot be conclusively determined." Id. at 13, 15 ("Whether the mixing occurred by the landowner prior to December 7, 2005, by FEMA on or after that date, or by actions of both parties cannot be conclusively determined by [Freese and Nichols, Inc.]"). The December 2006 Freese and Nichols Report evaluates the cost of restoration assuming two original site conditions: (1) "that all of the soil mixing was conducted after December 7, 2005, and as a result, no appreciable occurrence of woody debris and other material was mixed in the soil in its original site condition," and (2) "that the soil was mixed essentially to its current condition prior to FEMA on-site activities." Id. at 15.[5]

---

[5] Defendant argues that the July 2005 Report of CBK Soils Engineering, Inc. (July 2005 CBK Report), the May 2006 Site Restoration Evaluation of the Grand Acadian RV Resort (27.4 Acre Tract) in Sulphur, Louisiana Prepared for [FEMA] by Freese and Nichols (May 2006 Freese and Nichols Report), and the December 2006 Site Redevelopment Evaluation of the Grand Acadian RV Resort (27.4 Acre Tract) as an RV Park in Sulphur, Louisiana Prepared for WHC Consulting, LLC on Behalf of [FEMA] by Freese and Nichols (Dec. 2006 Freese and Nichols Report) are "unsworn and conflicting hearsay opinions of non-testifying putative experts." Def.'s Resp. 7. The July 2005 CBK Report is a July 25, 2005 expert report from CBK Soils Engineering, Inc, July 2005 CBK Report 1, prepared by Ronald H. Jones, July 2005 CBK Report 5. Ronald H. Jones is a Professional Civil Engineer, registered and licensed by the State of Louisiana, and an employee of CBK Soils Engineering, Inc. Pl.'s Reply 14; see July 2005 CBK Report 5. Plaintiff has provided the court with the October 7, 2008 deposition testimony of Mr. Jones in Grand Acadian, Inc. v. Fluor Corp., et al., Case No. 07-CV-295, a case in the United States District Court for the Western District of Louisiana. See Pl.'s Reply, Ex. F (Jones Deposition). Mr. Jones testified that he has a Bachelor of Science degree and a Masters degree in Civil Engineering. Jones Declaration 9:6-9. He also stated that he is "a licensed engineer in

(continued...)

According to defendant, there is a dispute regarding whether organic debris was present in the soil prior to the Lease.  Def.'s Resp. 7.  Defendant points to evidence rebutting plaintiff's assertion in paragraph 4 of plaintiff's Facts that "[o]n December 6, 2005, the . . . [P]roperty . . . was suitable for construction and did not contain organic debris."  Pl.'s Facts ¶ 4; see Def.'s Resp. 7; Defendant's Response to Plaintiff's Proposed Findings of Uncontroverted Fact (defendant's Response to plaintiff's Facts or Def.'s Resp. to Pl.'s Facts) Ex. 1 (Declaration of Scott Rothkamm, Ex. A (attached statement made on November 6, 2006)) (2006 Rothkamm Decl., Ex. A) ¶¶ 4-9; Def.'s Resp. to Pl.'s Facts Ex. 3 (July 22, 2008 Deposition of Patrick McConnaughhay) (July 2008 McConnaughhay Deposition) 151:16-24.  Scott Rothkamm was Fluor's Site Manager at the Grand Acadian Property at the time of the execution of the Lease.  2006 Rothkamm Decl., Ex. A. at ¶ 1.  Mr. Rothkamm testified:

> the site contained a substantial amount of trees, limbs, woody debris, trunks, stumps, and roots as well as vegetation and standing water in some areas. The substantially woody material was found throughout the entire site both above ground and below ground.  This condition at the time of the GSA Lease was the result of the harvesting activity of the landowner and the impact of Hurricane Rita and prior to any FEMA work being done.

---

[5](...continued)
Louisiana and Texas and a licensed environmental engineer in Louisiana."  Id. at 9:10-11.  He worked as an engineer for the Coast Guard and Soil Testing Engineers, Inc. before starting CBK Soils Engineering.  Id. at 9:12-19.  Plaintiff argues that "based upon his testimony and his registration as a Professional Engineer by the State of Louisiana, Mr. Jones is not a 'putative' expert, but is, in fact, well qualified to give expert opinion as to the condition of the soil at the [Grand Acadian] property."  Pl.'s Reply 15.  According to plaintiff, Mr. Jones is not a "non-testifying" expert because "there is no reason to think that he will not testify at the trial of this matter."  Id.  The May 2006 Freese and Nichols report was prepared by Tony Boseker.  See May 2006 Freese and Nichols Report.  Mr. Boseker is a Professional Engineer, registered and licensed in the State of Texas, and an employee of Freese and Nichols.  See May 2006 Freese and Nichols Report; Pl.'s Reply, Ex. G (Deposition of Anthony Bosecker) (Bosecker Deposition) 8:7, 9:21-22.  Plaintiff has provided the court with the October 17, 2008 deposition testimony of Mr. Boseker in Grand Acadian, Inc. v. Fluor Corp., et al., Case No. 07-CV-295, identifying and confirming the contents of his May 2006 report.  See Bosecker Deposition.  Plaintiff argues that, not only is Mr. Boseker not a putative non-testifying expert, he was hired by the government to give the opinion contained in his May 2006 report.  Pl.'s Reply 15; see May 2006 Freese and Nichols Report.

Id. ¶ 9.  Plaintiff argues that these facts are neither "material, nor disputed."  Pl.'s Reply
17.  According to plaintiff, "[Grand Acadian's] claim is that the Government failed to
remove the debris existing on the property prior to its operation of heavy machinery, and
in doing so, exacerbated the situation by grinding this debris into the surface layer of the
soil, rendering it unstable."[6]  Id.  Plaintiff argues that the evidence provided by defendant
is not sufficient evidence of the existence of a genuine issue of material fact.  Id. at 16.
Plaintiff contends that the photographic evidence verified by Mr. McConnaughhay's
December 2008 Affidavit is sufficient to support a grant to plaintiff of summary
judgment.  Id. at 14.  These photographs, however, were taken on January 10, 2006, after
the commencement of the Lease term.  Dec. 2008 McConnaughhay Aff. ¶ 9.

Plaintiff also attempts to marshal the first of two reports prepared for defendant by
Freese and Nichols, Inc., as establishing, beyond dispute, the condition of the Property in
December 2005 and the cost of restoring it to its December 2005 condition upon the
effective date of termination, December 6, 2006.  It is true that the May 2006 Freese and
Nichols Report gives some indication of the state of the property prior to the
commencement of the Lease and estimates the probable cost of construction to restore the
property "to its developable condition prior to FEMA site activities" to be $6,034,600.
May 2006 Freese and Nichols Report ii.  The May 2006 Freese and Nichols Report
estimates the probable cost of construction to "reestablish forest cover but not to restore
the developable conditions" to be $785,000.  Id. (emphasis omitted).  (The December
2006 Freese and Nichols Report, however, did not present conclusive evidence.  See Dec.
2006 Freese and Nichols Report 28-29.)  Based on the December 2006 Freese and
Nichols Report, plaintiff has not, as it claims, "demonstrated substantial evidence of the

---

[6] Plaintiff queries:  "If the Government contends that Mr. Rothkamm's layman opinion as
to the state of the soil is admissible evidence, how then can it contend that [Mr.]
McConnaughhay's opinion is not entitled to the same treatment?"  Pl.'s Reply 13.  The court
agrees that plaintiff's arguments against Mr. Rothkamm are difficult to distinguish from
defendant's arguments against Mr. McConnaughhay.  Both Mr. Rothkamm and Mr.
McConnaughhay satisfy the competence requirement of RCFC 56(e) because both have first-
hand knowledge by virtue of their first-hand observations of the property.  Plaintiff also contends
that the declaration of Mr. Rothkamm "is not credible."  Id. at 16-17 ("Rothkamm, and his
employer, Fluor, have a vested interest in the outcome of this action due to the fact that they face
liability for the same circumstances in the United States District Court for the Western District of
Louisiana.").  Of course, as plaintiff does not mention, Mr. McConnaughhay also has "a vested
interest" in the outcome of this action.  The court is certainly not in a position, by summary
judgment, to make a credibility determination regarding either Mr. McConnaughhay's or Mr.
Rothkamm's testimony based on their observations of the Property.

actual cost of the restoration efforts necessary to cure the Government's breach." Pl.'s Resp. 15.

Other evidence further complicates a determination of the condition of the Property at the commencement of the Lease. The July 2005 CBK Report appears to suggest that the soil was not immediately available for construction, but instead had to be stabilized by "soil-cement." See July 2005 CBK Report 2. The condition of the soil is a material fact because under the terms of the contract defendant had a duty to restore the Property to its pre-Lease condition. Supra Part III.B.2. Without knowledge of the condition of the Property prior to the commencement of the Lease, the court is unable to determine whether defendant breached its duty to restore. Based on the evidence currently before the court, disputes of material fact exist regarding the condition of the Property at the time the Lease term commenced.

Disputes of material fact similarly exist with respect to the condition of the Property when the Lease terminated. As plaintiff points out, defendant has only "presented evidence which speaks generally about the effects of organic debris in the soil and the general effect of rain upon silty soil." Id. Plaintiff contends that by December 6, 2006, the date termination of the Lease was effective, the Property was "unsuitable for construction." Pl.'s Mot. 9. Plaintiff points to evidence produced during the Lease term and evidence produced after the termination of the Lease to support its claim that the Property was in a worse condition following the Lease term than it was in prior to the commencement of the Lease. See May 2006 Freese and Nichols Report; Dec. 2006 Freese and Nichols Report; Dec. 2008 McConnaughhay Aff. ¶ 10.

The May 2006 Freese and Nichols Report states that "the current site soil conditions of the subject property are unsuitable for mobile home park development," May 2006 Freese and Nichols Report I, because, based on observations made on May 18, 2006, "the site was 80 to 90 percent covered with spoil material that consisted of silt, clay, organics, tree branches and roots, woody debris, and charred/burned wood and branches," id. at 12, 18. The May 2006 Freese and Nichols Report also states that the soil conditions were "a result of FEMA's activities and not as a result of conditions prior to FEMA involvement in the subject property." Id. at I. According to the December 2006 Freese and Nichols Report, "As of the October [18,] 2006 site visit, [less than two months before the termination of the Lease,] several small burn piles consisting of trees and other woody debris remained along the southwest area of the site. Other burn piles observed during the May 2006 site visit were no longer present." Dec. 2006 Freese and Nichols Report 20. In addition, Mr. McConnaughhay testified by affidavit that "[o]n December 6, 2006, after the Lease was terminated by the Government, the soil on the [Property]

contained organic debris rendering it unsuitable to support construction activities." Dec. 2008 McConnaughhay Aff. ¶ 10. According to defendant, "[Mr. McConnaughhay's December 2008 Affidavit] is a self-serving affidavit of Grand Acadian's president that attests to geotechnical matters beyond his expertise." Def.'s Resp. 6. Plaintiff argues that "[Mr.] McConnaughhay's [December 2008] Affidavit simply recites his observation that the sub-surface soil on the [Grand Acadian] property did not contain . . . the same quality of destructive, organic debris prior to the [Lease] as it did after the [Lease]." Pl.'s Reply 13. Plaintiff also submits the January 8, 2009 Declaration of Pat McConnaughhay, photographs, and a site inspection video as evidence of defendant's breach of its restoration obligation. Pl.'s Resp., Ex. C (January 8, 2009 Declaration of Pat McConnaughhay) (Jan. 2009 McConnaughhay Declaration).[7]

Defendant relies on the declaration of Jesse Arnold, a geotechnical engineering expert, to dispute plaintiff's contention, based largely on the Freese and Nichols reports, that defendant had rendered the Property unsuitable for development. Def.'s Resp 7-8. Mr. Arnold testified that "there was a negligible amount of organic debris in the soil . . . , which is consistent with the amount of organic debris that normally occurs in nature at similar sites," and that "[t]he presence of some organic debris in the soil does not render the soil unstable and unsuitable to support construction activities." Def.'s Resp. to Pl.'s Facts Ex. 2 (Declaration of Jesse Arnold) ¶¶ 6, 7. Mr. Arnold also testified that "[t]he near surface soil conditions on the FEMA Half are classified as surficial silts, which are moisture sensitive. The soils may appear firm when relatively dry, but become unstable and unsuitable to support construction activities after significant rain events." Id. ¶ 8. Plaintiff states that it "does not dispute any of the paragraphs of [Mr.] Arnold's declaration." Pl.'s Reply 17. The court agrees with plaintiff that the value of Mr. Arnold's testimony, notwithstanding his credentials, is severely limited by the fact that neither the date of his inspection of the Property nor the scope of that inspection appear in his declaration. Id. (arguing that "the paragraphs of [Mr.] Arnold's declaration are so devoid of detail as to render them meaningless").

The evidence proffered by the parties concerning the condition of the Property would be better presented through live testimony subject to cross-examination. The court finds that there are genuine issues of material fact as to the condition of the Property at the commencement of the Lease and as to the condition of the Property at the termination of the Lease. Therefore, plaintiff's Motion is DENIED insofar as it requests the court to find that defendant breached its duty to restore the Property to its pre-Lease condition.

---

[7] Photographs and video of the Property require presentation through a witness after voir dire examination.

Defendant's Motion is DENIED insofar as it requests the court to deny plaintiff's restoration claim.

C.    Damages for Breach of Contract to Restore Property to Pre-Lease Condition

Plaintiff argues that it has suffered damage as a result of defendant's breach.  Pl.'s Mot. 10 ("[Plaintiff] has suffered pecuniary harm in that it must now bear the financial burden of restoring the property to its pre-Lease condition.").  According to plaintiff, "damages include amounts intended to compensate [plaintiff] for destruction/restoration of the [Property], loss of infrastructure,[8] increased construction costs, increased credit costs, and remediation of silt run-off."[9]  Id.

"The general rule in common law breach of contract cases is to award damages that will place the injured party in as good a position as he or she would have been in had the breaching party fully performed."  Estate of Berg v. United States, 231 Ct. Cl. 466, 469, 687 F.2d 377, 379 (1982).  Defendant argues that "Grand Acadian cannot recover $7 million in damages for 'destruction' and 'remediation' of the property because these restoration damages, even if proven, would far exceed any diminution in the property's

_____

[8] The court has determined, see supra Part III.B.1, that the government did not have a duty to build infrastructure on the leased premises.

[9] Plaintiff argues that "[a]s a result of the Government's various breaches of the terms of the [Lease, plaintiff] has suffered other damages in the form of increased construction costs, increased credit costs, and remediation of silt run-off."  Plaintiff's Motion For Summary Judgment (plaintiff's Motion or Pl.'s Mot.) 16.  Plaintiff claims that defendant's breach delayed plaintiff's development of the property, causing plaintiff to proceed at a different price than if defendant had never breached the Lease.  Id. at 17-18 ("This delay has resulted in increased costs associated with labor, construction materials, and financing expenses.").  According to plaintiff, the damages caused by this delay were foreseeable.  Id. at 17 ("Nothing is more foreseeable than the passage of time.").  Plaintiff argues that "[a]s a proximate result of the Government's failure to restore [the property] to the condition in which it existed prior to the [Lease], silt has been washed from the [property] onto neighboring properties," requiring "remediation at substantial cost to [plaintiff]."  Id. at 18.  According to plaintiff, remediation costs were foreseeable "because at the time of [the Lease] formation the Government (including FEMA and the GSA) was well aware of the conservation regulations prohibiting silt run-off, and the necessary steps to avoid such environmental trespass."  Id.  Defendant does not address plaintiff's allegations of consequential damages in defendant's Response.  Because there is inadequate briefing on the issue of causation, beyond mere conclusory statements, and because the court will decide the amount of damages issues in further proceedings, the court does not address the issue of consequential damages at this time.

fair market value." Def.'s Mot. 6. Plaintiff "concedes that its claim for its actual damages exceeds the entire fair market value of the leased premises," but argues that "there exists at law an exception to the diminution in fair market value rule . . . which would properly apply to [plaintiff's] restoration claim." Pl.'s Resp. 11.

The case law governing damages for breach of a duty to restore appears to the court generally to support defendant's position. "It is well-settled that, 'where there has been a breach of an obligation to restore leased premises to the original condition, [a] plaintiff is entitled to recover the damages [it] actually suffers.'" Banisadr Bldg. Joint Venture v. United States (Banisadr), 38 Fed. Cl. 392, 395 (1997) (quoting San Nicolas v. United States (San Nicolas), 223 Ct. Cl. 223, 229, 617 F.2d 246, 249 (1980)). "Generally, such damages are measured by the cost of restoration." Id. "When, however, the costs of restoration exceeds the diminution in fair market value of the premises, damages are limited to the diminution in fair market value caused by the defendant's breach." Id.; see Missouri Baptist Hosp. v. United States (Missouri Baptist), 213 Ct. Cl. 505, 507-08, 555 F.2d 290, 291-92 (1977) ("We hold that where the cost of repair of leased premises exceeds the diminution of the leasehold's fair market value, it is error to apply as the measure of damages owed the lessor, the 'cost of repair' standard rather than the diminution in value standard."). Plaintiff carries the burden of proof "to show not only the cost of repairs, but also the diminution in fair market value, so as adequately to prove his true damages." Missouri Baptist, 213 Ct. Cl. at 508, 555 F.2d at 292. The purpose of this rule "is to avoid windfall recoveries." Id. at 511, 555 F.2d at 294.

In San Nicolas, the United States Navy leased property from the plaintiff and breached a duty to restore the premises to its pre-lease condition. San Nicolas, 223 Ct. Cl. at 225, 617 F.2d at 247. In regard to appropriate damages, the San Nicolas court stated, "Damages measured by the cost of restoration generally are adequate to place a plaintiff in the position he would have been in had the lease contract not been breached. In order to avoid windfall recoveries, however, the measure of plaintiff's damage is not the cost of restoration where such cost exceeds the diminution in market value of the premises." Id. at 229, 617 F.2d at 249. Furthermore, "[p]laintiff has the burden to establish by a preponderance of the evidence that the fair market value of the property in the condition which the defendant had covenanted to restore it was greater than the property's fair market value in an unrestored state at the termination of the lease." Id. at 230, 617 F.2d at 249. The San Nicolas court recognized that without restoration the land in question could not be suitable "for its highest and best usage." Id. at 230, 617 F.2d at 250. The court awarded $35,447 in damages. Id. at 237, 716 F.2d at 254. The San Nicolas court stated, "In this case, the diminution in fair market value has limited application. Plaintiff's property was unimproved land on which rubbish and construction

31

waste were dumped.  We are not confronted with the problems of replacing damaged structures or removing improvements."  Id. at 230, 617 F.2d at 249-50.  The San Nichols court recognized that given the unimproved state of the land, plaintiff had "little opportunity for a windfall," and that "[t]he effect of defendant's failure to remove the dumped materials renders plaintiff's property unsuitable for its highest and best usage, as a recreational beach."  Id. at 230, 617 F.2d at 250.

In Banisadr, the United States leased land, subject to a lease containing a restoration clause.  Banisadr, 38 Fed. Cl. at 393.  During defendant's occupation of the land, "alterations were made to, and improvements installed at, the buildings located on the subject property," which were approved by plaintiff.  Id.  After the expiration of the lease, the Banisadr plaintiff sold the property and the buildings were destroyed.  Id. at 394-95.  The plaintiff in Banisadr "incurred no actual restoration costs and, . . . [sought] reimbursement for the alleged diminution in fair market value of the subject property allegedly due to defendant's failure to restore."  Id. at 395.  The plaintiff failed to demonstrate that it suffered any damage as a result of the alleged breach.  Id. at 397.  The court found that the reports submitted by plaintiff did not show that any failure to restore caused any damage to the property in question or that "the fair market value of the subject property was diminished due to the actions of defendant."  Id. at 396.  The plaintiff in Banisadr sold the property, after the expiration of the lease term, with the knowledge that the buildings were to be destroyed.  Id.  Given this information, the court found that there was no interest in the restoration of the property.  Id.  Finally, in finding that the Banisadr plaintiff "proffered no evidence to indicate that it could have obtained a higher price for the subject property had the buildings been restored by defendant," the court noted that "plaintiff's own expert utilized the same per-square-foot market rent in calculating the value of the subject property, with and without restoration."  Id. at 397.

Generally then, plaintiff carries a dual burden to prove its damages.  First, it must "show what the cost of restoration . . . is," second, it must "show that the diminution is fair market value exceeds the cost of [restoration]."  Missouri Baptist, 213 Ct. Cl. at 515, 555 F.2d at 296; but see WDC W. Carthage Assocs. v. United States (WDC), 324 F.3d 1359, 1362-63 (Fed. Cir. 2003) (rejecting as inapplicable in that case the diminution in fair market value standard raised in Missouri Baptist).  The WDC court distinguished Missouri Baptist on the ground that the case before it concerned the sole issue of the amount of damages and relied on the lease contract language to determine the amount of damages to which the landlord was entitled.  WDC, 324 F.3d at 1362-63.  WDC involved a lease providing that if the government, as tenant, caused damage to the property, "beyond normal wear and tear," the damage would be repaired by plaintiff and the cost billed to the government.  Id. at 1360.  After initially paying full price for replacement

carpeting at the leased housing units, the government announced it would be prorating the replacement costs for depreciation caused by normal wear and tear.  Id. at 1361.  The WDC plaintiff then filed suit for breach of contract.  Id.  The government argued that failing to account for depreciation resulted in a windfall to plaintiff.  Id. at 1363.  The court found, however, that "it is not th[e] court's duty to rewrite the terms of the leases agreed to by the parties because one of those terms benefits [plaintiff]."  Id.

Plaintiff argues that the "limitation of restoration damages does not apply here because [plaintiff's] property was new (i.e.[,] undeveloped) at the time of the lease, and therefore, allowing [plaintiff] to recover its restoration costs would not result in a windfall."  Pl.'s Mot. 13.  Plaintiff argues that San Nicolas "recognized an exception to the diminution in fair market value rule[,] . . . and allows the application of the general rule of contract damages for a plaintiff claiming restoration damages for unimproved real property."  Pl.'s Resp. 11-12 (emphasis omitted).  According to plaintiff, "The striking similarity between [plaintiff's] restoration claim and the one presented in San Nicolas makes the exception recognized by the San Nicolas decision persuasive authority."  Id. at 13.  Plaintiff argues that the Property in this case "has been left by the Government in such an unsuitable state . . . . [that] [w]ithout restorative efforts or without accounting for their costs, [plaintiff] will not be able to use its property."  Id. at 15.  Defendant, however, argues that the facts of San Nicolas are not as similar to plaintiff's case as plaintiff suggests.  Def.'s Reply 6.  Defendant describes the $35,447 in damages awarded by the San Nicolas court as "significantly less than the plaintiff's appraised diminution in fair market value, which was $246,000."  Id.  The $246,000 estimate, however, was not the appraised diminution in fair market value, it was the plaintiff's initial estimation, which was later reduced, of restoration costs.  See San Nicolas, 223 Ct. Cl. at 235, 617 F.2d at 252.  The court in San Nicolas did not specifically award damages in excess of the diminution in the fair market value of the property; it simply chose not to require an analysis of the fair market value of the property in light of the absence of any structures on the land.  See id. at 230, 617 F.2d at 249-50.

While the general rule provides that "recovery based on the cost of [restoration] is subject to an absolute ceiling of 'diminution in fair market value,'" Missouri Baptist, 213 Ct. Cl. at 516, 555 F.2d at 296, the court finds the situation in this case analogous to WDC, even more than to San Nicolas.  Here, the dispute involves a breach of a duty by the government to restore undeveloped land and a contract specifically permitting the plaintiff to "require that the Government . . . restore the premises to the condition existing at the lease commencement date, normal wear excepted."  Lease Rider ¶ 6.  What distinguishes this case is the particularity of the focus of paragraph 6 of the Lease Rider, which provides:

33

6)   <u>Alterations and Improvements</u>.  Any physical additions or improvements to the Premises made by the Government will become the property of Lessor.  <u>Lessor may require that the Government, at the end of the Term and at the Government's expense</u>, remove any physical additions and improvements, repair any alterations, and <u>restore the premises to the condition existing at the lease commencement date</u>, normal wear excepted.  This provision does not apply to movable or mobile personal or other property such as mobile homes, travel trailers or similar units.

<u>Id.</u> (emphasis added).  The parties were clearly focused on the condition of the Property at the end of the Lease term.  The provision is not boilerplate.  It has been specifically tailored to put into plaintiff's hands the right to choose how the Property will be returned to it:  either with certain improvements or in its pre-Lease condition.  The court, like the court in <u>WDC</u>, does not view its duty as "rewrit[ing] the terms of the lease[] agreed to by the parties because one of those terms benefits [plaintiff]."  <u>See</u> <u>WDC</u> 324 F.3d at 1363.  The Lease requires defendant to restore the Property to its condition at the commencement of the Lease, "normal wear excepted."  The court concludes that, if the proven conditions at the beginning and the termination of the Lease term show that restoration is required, plaintiff is entitled to damages for the cost of that restoration.[10]

IV.   Conclusion

For the foregoing reasons, plaintiff's Motion for Summary Judgment is GRANTED insofar as the court finds that defendant had a duty to restore the Property to its pre-Lease condition and DENIED in all other respects.  Defendant's Motion for Summary Judgment is GRANTED insofar as the court finds that defendant had no duty to construct infrastructure on the Property.  Defendant's Motion for Summary Judgment is DENIED in all other respects.  The issues remaining for trial include the condition of the Property both at the commencement of the Lease and at the termination of the Lease, and, if restoration is required, the cost to restore the Property to its pre-Lease condition, "normal wear excepted."  The parties shall discuss with one another the issues remaining for trial and shall file a Joint Status Report (JSR) with the court on or before Friday, June

---

[10] Defendant argues that plaintiff "does not cite to <u>any</u> evidence, much less undisputed facts, that would demonstrate the existence of . . . damages."  Def.'s Resp. 9-10.  This argument misses the mark because it is based on defendant's assumption that plaintiff's recovery would be limited to the diminution in fair market value and the assumption that the failure to present evidence of such diminution would entitle defendant to summary judgment.  The court disagrees.

19, 2009.  The JSR shall discuss any possibilities for settlement and shall also set forth the issues remaining for trial.

IT IS SO ORDERED.

s/ Emily C. Hewitt_____
EMILY C. HEWITT
Chief Judge