# In the United States Court of Federal Claims

No. 07-849 C

(E-Filed:  March 17, 2011)

|  |  |
|---|---|
| GRAND ACADIAN, INC., | ) |
|  | ) |
| Plaintiff, | ) Motion for Summary Judgment; |
|  | ) RCFC 56; Government's Duties |
| v. | ) Under Restoration Clause of |
|  | ) Lease; Normal Wear and Tear; |
| THE UNITED STATES, | ) Implied Covenant Against Waste |
|  | ) |
| Defendant. | ) |
|  | ) |

Howell Roger Riggs, Huntsville, AL, for plaintiff.

Douglas G. Edelschick, with whom were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, and Mark A. Melnick, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.  Jean Hardin, Office of Chief Counsel, General Law Division, Federal Emergency Management Agency, Washington, DC, of counsel.

## OPINION

HEWITT, Chief Judge

Grand Acadian, Inc. (plaintiff or Grand Acadian) filed its Complaint at the United States Court of Federal Claims on November 30, 2007.  Docket Number (Dkt. No.) 1.  On January 25, 2008 Grand Acadian filed its First Amended Complaint (Complaint or Compl.), Dkt. No. 8.  The government filed Defendant's Answer on May 20, 2008, Dkt. No. 15, and Defendant's Amended Answer and Affirmative Defense on October 14, 2008, Dkt. No. 25.

Currently before the court are the government's second motion for summary judgment, titled Defendant's Motion for Summary Judgment Concerning Restoration (defendant's Motion or Def.'s Mot.), filed October 6, 2010, Dkt. No. 82; Plaintiff's Response in Opposition to Defendant's Second Motion for Summary Judgment (Pl.'s Resp.), filed November 10, 2010, Dkt. No. 88; and Defendant's Reply in Support of

Motion for Summary Judgment Concerning Restoration, filed December 7, 2010, Dkt. No. 90.

I.     Background

This case arises from a cancelled construction project on leased property where the United States government (defendant or the government), acting through the Federal Emergency Management Agency (FEMA), had sought to create a recreational vehicle (RV) park as emergency housing for victims of hurricanes Katrina and Rita.  May 29, 2009 Opinion, Dkt. No. 51, <u>Grand Acadian, Inc. v. United States</u> (2009 Opinion or <u>Grand Acadian I</u>), 87 Fed. Cl. 193, 195-96 (2009).

In December 2005 the government entered into an agreement, General Services Administration Lease Number GS-07B-16028 (the Lease), with Grand Acadian to lease approximately thirty acres of property in Sulphur, Louisiana (the Property).  Def.'s Ex.[1] (DX) 3 (Lease); <u>see also</u> Compl. Summ. 3; Def.'s Mot. 2.

---

[1]Because the parties rely on exhibits and proposed findings of uncontroverted fact that are located in a number of different filings, the court here provides a brief explanation of where Plaintiff's Exhibits (PX), Defendant's Exhibits (DX) and the proposed findings of uncontroverted fact may be found in the record.

In an apparent effort to avoid duplicating its exhibits and proposed findings of uncontroverted fact, the government relies in part on exhibits and proposed findings of uncontroverted fact that the government filed in support of its first motion for summary judgment, titled Defendant's Rule 56 Motion for Summary Judgment, Docket Number (Dkt. No.) 32.  <u>See</u> Def.'s Mot. for Summ. J. Concerning Restoration (defendant's Motion of Def.'s Mot.), Dkt. No. 82, at 1 (stating that the government "incorporates by reference" the proposed findings of uncontroverted fact and exhibits that it submitted in support of its first motion for summary judgment).  In its current Motion, the government continues with the numbering system for exhibits and proposed findings of uncontroverted fact that it began previously.  <u>See</u> Def.'s Proposed Findings of Uncontroverted Fact in Supp. of Mot. for Summ. J. Concerning Restoration (defendant's Facts or Def.'s Facts), Dkt. No. 83, at 1 (beginning its numbering of proposed facts with ¶ 8); Def.'s Facts Exhibit List (beginning its numbering of exhibits with DX 13).  Accordingly, defendant's Facts and its attachments consist of DX 13-29 and proposed findings of uncontroverted fact 8-34.  <u>See</u> Def.'s Facts <u>passim</u>.

The government's previous exhibits and proposed findings of uncontroverted fact were assigned Docket Number 33.  They consist of DX 1-12 and proposed findings of uncontroverted fact 1-7.  Def.'s Proposed Findings of Uncontroverted Fact in Supp. of Rule 56 Mot. for Summ. J., Dkt. No. 33, <u>passim</u>.  Because the exhibits being reused do not appear to be in dispute, and because Grand Acadian has not objected to their use, the court relies on them rather than requiring the government to file the exhibits a second time.

The court refers to the first two pages of the Lease as the "Standard Form Lease."[2] The Standard Form Lease incorporates four documents by reference: a rider (Lease Rider), DX 3 (Lease) 3-6; a list of general clauses (General Clauses), DX 3 (Lease) 8-39; a list of representations and certifications, DX 3 (Lease) 40-46; and a site plan (Site Plan).[3] Standard Form Lease ¶ 6. The Lease commenced on December 7, 2005 for a term of three years at an annual rent of $252,262.50 "subject to termination and renewal rights." Id. ¶¶ 2-3. At issue in defendant's Motion is the interpretation of the restoration clause (Restoration Clause) contained in the Lease Rider, which reads, in relevant part:

> Alterations and Improvements. Any physical additions or improvements to the Premises made by the Government will become the property of Lessor. Lessor may require that the Government, at the end of the Term and at the Government's expense, remove any physical additions and improvements, repair any alterations, and restore the premises to the condition existing at the lease commencement date, normal wear excepted.

---

Grand Acadian filed its exhibits as attachments to Plaintiff's Response in Opposition to Defendant's Second Motion for Summary Judgment (plaintiff's Response or Pl.'s Resp.), Dkt. No. 88. The copy of PX 5 (Nov. 11, 2009 Dep. of Billy Prochaska) that Grand Acadian originally filed was missing several pages to which Grand Acadian had cited. Dec. 27, 2010 Order, Dkt. No. 92. At the court's direction, id., Grand Acadian re-filed a complete copy of PX 5 (Nov. 11, 2009 Dep. of Billy Prochaska), see Corrected Exhibit 5 - Prochaska Dep., Dkt. No. 93.

[2]The title on the first page of the Standard Lease Form reads "U.S. GOVERNMENT LEASE FOR REAL PROPERTY." DX 3 (Standard Form Lease) 1. The document is identified in a legend in the upper left-hand corner as:

STANDARD FORM 2
FEBRUARY 1965 EDITION
GENERAL SERVICES
ADMINISTRATION
FPR (41 CFR) 1-16.601
SF2 FEMA HAC 10 9 05

Id.

[3]The parties dispute the actual contents of the site plan (Site Plan). May 29, 2009 Opinion, Dkt. No. 51, Grand Acadian, Inc. v. United States (2009 Opinion or Grand Acadian I), 87 Fed. Cl. 193, 203 (2009). As the court stated in its 2009 Opinion, which addressed the parties' first cross-motions for summary judgment, "the court is not persuaded that" certain drawings offered by Grand Acadian constitute the Site Plan. Id. at 205. The court also noted that the government had not offered a document that it claimed is the correct Site Plan. Id. at 203.

Lease Rider ¶ 6.

On February 27, 2006 the government sent Grand Acadian notice that it was terminating the Lease, effective as of December 6, 2006.  DX 5 (Notice of Termination) 2.

The parties agree that in January 2006, as it began construction activities on the Property, the government's contractor, Fluor Corp.,[4] cleared or knocked down all of the trees on the Property, Pl.'s Resp. in Opp'n to Def.'s Proposed Findings of Uncontroverted Fact in Supp. of Def.'s Second Mot. for Summ. J.[5] (plaintiff's Response to Defendant's Facts or Pl.'s Resp. to Def.'s Facts), Dkt. No. 88-1, ¶ 22; dug a pond (Grand Acadian claims that owing to poor construction techniques, the pond is better described as a "mud hole") in the southeast corner of the Property, id. ¶ 23; and dug drainage ditches along the east side of the Property (the East Ditch), id. ¶ 24, and the south edge of the Property (the South Ditch), id. ¶ 25.  The South Ditch continued through a non-leased portion of Grand Acadian's property and emptied into a bayou outside of Grand Acadian's property.  Id. ¶ 26.

In or around September 2006 Fluor filled in the portion of the South Ditch that was on the leased Property.  Id. ¶ 27.  The government contends that Fluor also

---

[4]Because it is not clear from the parties' briefing exactly which of Fluor's corporate entities and/or which of its subcontractors and/or their subcontractors performed any particular aspect of the construction work, the court will, for simplicity, refer to Fluor when discussing construction companies working on the site.  The District Court for the Western District of Louisiana has resolved a similar ambiguity in separate litigation in which Grand Acadian is pursuing its claims against the various construction companies.  See Dec. 8, 2009 Order, Dkt. No. 368, Grand Acadian, Inc. v. Fluor Corp. (Fluor), No. 2:07 CV 295 (W.D. La.) (dismissing claims against seven "Uninvolved Fluor Entities"); Jan. 13, 2010 Order, Dkt. No. 424, Fluor, No. 2:07 CV 295 (W.D. La.) (dismissing claims against a number of "non-Fluor parties").  The issue is irrelevant to Grand Acadian's claims against the government.

[5]The government's proposed findings of uncontroverted fact were set out with each finding contained in a numbered paragraph.  See Def.'s Facts passim.  In its response, Grand Acadian maintained the government's format and added its responses in bold after each individual proposed finding of uncontroverted fact.  See Pl.'s Resp. in Opp'n to Def.'s Proposed Findings of Uncontroverted Fact in Supp. of Def.'s Second Mot. for Summ. J. (plaintiff's Response to Defendant's Facts or Pl.'s Resp. to Def.'s Facts), Dkt. No. 88-1, passim.  Grand Acadian appears to have mistakenly numbered several of the paragraphs as paragraph 18.  See id. ¶¶ 11-14, 16-17.  Grand Acadian does, however, refer to the correct number of each paragraph when stating its response to that proposed finding of fact.  See, e.g., id. ¶ 11 ("[Grand Acadian] agrees with the Government's eleventh proposed finding of uncontroverted fact as written.").  Because it appears to the court that Grand Acadian intended to follow the government's numbering, the court uses the government's numbering when referring to the government's proposed findings of uncontroverted fact and to Grand Acadian's responses.

"performed cleaning and grading work upon the leased property."  Def.'s Proposed Findings of Uncontroverted Fact in Supp. of Mot. for Summ. J. Concerning Restoration (defendant's Facts or Def.'s Facts), Dkt. No. 83, ¶ 27.  Grand Acadian argues that Fluor did not fill the ditch in the manner required by the Lease.  Pl.'s Resp. to Def.'s Facts ¶ 27.  The Restoration Clause of the Lease states that Grand Acadian "may require that the Government, at the end of the Term and at the Government's expense, remove any physical additions and improvements, repair any alterations, and restore the premises to the condition existing at the lease commencement date, normal wear excepted."  Lease Rider ¶ 6.  Grand Acadian alleges that Fluor "simply pushed dirt and organic debris into the ditch and covered it up, exacerbating the unstable soil conditions."  Pl.'s Resp. to Def.'s Facts ¶ 27.  Grand Acadian further contends that Fluor did not clean or grade the fill material.  Id.

The parties agree that when the Lease term began, "ruts, downed trees, tree stumps, and other debris were scattered across the property."  Id. ¶ 19.  Grand Acadian alleges that, despite Fluor's engineering plan to the contrary, Fluor failed to clear this material or to provide adequate drainage prior to employing heavy equipment on the Property.  Compl. ¶¶ 50-53; see also Pl.'s Resp. to Def.'s Facts ¶ 25 ("construction of the drainage ditch was not initiated until . . . well after construction had already begun"); Pl.'s Ex. (PX) 2 (Nov. 10, 2010 Decl. of Pat McConnaughhay) ¶ 11 (stating that "the Government knocked down all of the trees . . . and drove on top of many [of] them with heavy machinery, forcing them down into the sub-surface soils").  Grand Acadian alleges that "[a]s this heavy machinery tracked back and forth across the undrained site, it mixed topsoil, surface debris, mud, clay, and other material," Compl. ¶ 54, creating "an unstable surface that is unable to support the proposed structures," id. ¶ 55; PX 2 (Nov. 10, 2010 Decl. of Pat McConnaughhay) ¶ 14 (stating that construction "cannot be undertaken today on [the Property] due to the excessive amount of debris mixed with the soil, mixture of soil types and alterations to the clay base").

The parties dispute what remedial measures, if any, are required to restore the soil to its condition at the beginning of the Lease term.  See Pl.'s Resp. to Def.'s Facts ¶¶ 33-34.  Grand Acadian argues that it "cannot develop the leased property today in the same manner in which it developed the neighboring tract."  Id. ¶ 33 (citing PX 2 (Nov. 10, 2010 Decl. of Pat McConnaughhay) ¶ 14).  The government contends that the Property in its current condition is no less suitable for development than at the beginning of the Lease term and that, if necessary, "organic debris can be removed from the soil using a common procedure known as 'root raking,'" which would cost approximately $100,000.  Def.'s Reply 1 (citation omitted).  According to the government, Grand Acadian unnecessarily claims "the exorbitant cost of removing more than 4.6 million cubic feet of the pre-existing silty soil and replacing it with new compacted structural fill material" at a cost of approximately $3.5 million.  Id.

On December 1, 2008 the parties filed an initial set of cross-motions for summary judgment. Grand Acadian I, 87 Fed. Cl. at 195. Grand Acadian sought summary judgment on its claims that the government failed to construct certain improvements on the Property and to restore the Property to its pre-Lease condition at the termination of the Lease term. Id. at 196 (citing Compl. Summ. 3). Grand Acadian sought approximately twenty-one million dollars in damages. Id. (citing Compl. ¶ 178). The government sought summary judgment on the grounds that it was not required to construct improvements on the Property and that and that it was not liable for the costs of restoration that Grand Acadian sought. Id. (citation omitted). The court granted both motions in part and denied both in part, finding that the government had no duty to construct infrastructure on the Property, but that, if restoration is required, then the government has a duty under the Lease to restore the Property in accordance with the Restoration Clause--that is, to its pre-Lease condition, "normal wear excepted." Id. at 216-17. The court did not address the meaning of the phrase "normal wear." See id. passim.

The court determined that genuine issues of material fact remained as to the condition of the soil on the Property at the beginning and at the end of the Lease term. Id. at 213. After considering the conflicting evidence presented by the parties on the amount of organic matter in the soil and the suitability of the soil for development at the beginning and at the end of the Lease term, the court concluded that "[t]he evidence proffered by the parties concerning the condition of the Property would be better presented through live testimony subject to cross-examination." Id.

The government argues in its current Motion that Grand Acadian's restoration claim "is without merit" because it would result in a "windfall of nearly $7 million -- under the guise of restoration -- for construction of new improvements to develop the leased property, for off-site conditions, and for normal wear of the leased property." Def.'s Mot. 1.

For the following reasons, defendant's Motion is GRANTED-IN-PART as to $150,000 of Grand Acadian's claimed damages because the court concludes, as a matter of law, that the Lease does not require the government to pay the cost of planting new trees on the Property. The Motion is otherwise DENIED.

II.     Legal Standards

    A.     Summary Judgment

The grounds for summary judgment are set forth in Rule 56 of the Rules of the United States Court of Federal Claims (RCFC). RCFC 56. RCFC 56(c)(1) provides, in relevant part:

> A motion for summary judgment should be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

RCFC 56(c)(1); see also Mann v. United States, 334 F.3d 1048, 1050 (Fed. Cir. 2003) ("Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.") (citing RCFC 56(c)).  The moving party has the initial burden of demonstrating "the absence of any genuine issue of material fact and entitlement to judgment as a matter of law."  Crater Corp. v. Lucent Techs., Inc., 255 F.3d 1361, 1366 (Fed. Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986)).[6]  This burden may be discharged by "pointing out . . . that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp., 477 U.S. at 325.  There is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim."  Id. at 323 (emphasis omitted).  However, the moving party must file with the court documentary evidence, such as declarations, that support its assertions that material facts are beyond genuine dispute, see RCFC 56(c)(2), unless it is basing its motion for summary judgment on the "absence of evidence to support the nonmoving party's case," Celotex Corp., 477 U.S. at 325.  The adverse party then must "set out specific facts showing a genuine issue for trial."  RCFC 56(e)(2).  RCFC 56(e)(2) provides:

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must — by affidavits or as otherwise provided in this rule — set out specific facts showing a genuine issue for trial.  If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

---

[6]The Rules of the United States Court of Federal Claims (RCFC) generally mirror the Federal Rules of Civil Procedure (FRCP).  See RCFC 56, 2008 Rules Committee Note ("The language of RCFC 56 has been amended to conform to the general restyling of the FRCP."); Flowers v. United States, 75 Fed. Cl. 615, 624 (2007) ("RCFC 56 is patterned on Rule 56 of the [FRCP] and is similar in language and effect."); Champagne v. United States, 35 Fed. Cl. 198, 205 n.5 (1996) ("In general, the rules of this court are closely pattered on the [FRCP]. Therefore, precedent under the [FRCP] is relevant to interpreting the rules of this court, including Rule 56."); see also C. Sanchez & Son, Inc. v. United States, 6 F.3d 1539, 1541 n.2 (Fed. Cir. 1993) ("The [RCFC] generally follow the [FRCP]. [RCFC] 56(c) is, in pertinent part, identical to [FRCP] 56(c).").  Therefore, this court relies on cases interpreting FRCP 56 as well as those interpreting RCFC 56.

RCFC 56(e)(2).  "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred."  Celotex Corp., 477 U.S. at 324.  "The party opposing the motion must point to an evidentiary conflict created on the record; mere denials or conclusory statements are insufficient."  SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1116 (Fed. Cir. 1985) (citing Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd., 731 F.2d 831, 836 (Fed. Cir. 1984)).

Under RCFC 56, the court must draw all inferences from the underlying facts in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Mann, 334 F.3d at 1050 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).  "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp., 477 U.S. at 322.

B.     Lease Interpretation, Generally

As the United States Court of Appeals for the Federal Circuit has stated, leases are subject to the general rules of contract interpretation.  "Leases are not sufficiently different from other federal contracts to call for an independent set of analytical principles and rules."  Prudential Ins. Co. of Am. v. United States, 801 F.2d 1295, 1298 (Fed. Cir. 1986).  "Whether a contract creates a duty is a legal question of contract interpretation," San Carlos Irrigation & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989), and is therefore amenable to summary judgment, see Varilease Tech. Group, Inc. v. United States, 289 F.3d 795, 798 (Fed. Cir. 2002) ("Contract interpretation is a question of law generally amenable to summary judgment.").  "Contract interpretation begins with the plain language of the agreement."  Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991).  Contract terms are to be "accorded their plain and ordinary meaning."  Keeter Trading Co. v. United States, 79 Fed. Cl. 243, 256 (2007) (citing Aleman Food Servs., Inc. v. United States, 994 F.2d 819, 822 (Fed. Cir. 1993)).  "The language of a contract . . . must be given the meaning that would be derived from the contract by a 'reasonably intelligent person acquainted with the contemporaneous circumstances.'"  Allied Tech. Group, Inc. v. United States, 39 Fed. Cl. 125, 138 (1997) (quoting Hol-Gar Mfg. Corp. v. United States, 169 Ct. Cl. 384, 388, 351 F.2d 972, 975 (1965)).  "It is well settled that a contract must be interpreted when possible as a whole in a manner which gives reasonable meaning to all its parts and avoids conflict or surplusage of its provisions."  Granite Constr. Co. v. United States, 962 F.2d 998, 1003 (Fed. Cir. 1992); see United States v. Johnson Controls, Inc., 713 F.2d 1541, 1555 (Fed. Cir. 1983) ("[A]n interpretation that gives a reasonable meaning to all

parts of the contract will be preferred to one that leaves portions of the contract meaningless; nor should any provision be construed as being in conflict with another unless no other reasonable interpretation is possible.").

C.    Normal Wear[7]

"There is no fixed rule of law or of fact, which enables a court to distinguish" what is and what is not ordinary wear and tear.  Davenport v. United States, 26 Ct. Cl. 338, 344 (1891); accord A&B Ltd. P'ship v. Gen. Servs. Admin., GSBCA No. 15208, 04-1 BCA ¶ 32439 (2003) ("[T]here is no fixed rule of law or fact which enables a tribunal to distinguish between what is normal wear and tear and what is not."). Moreover, because most federal cases on the subject relate to the normal wear of established buildings, see, e.g., Brooklyn Waterfront Term. Corp. v. United States (Brooklyn Waterfront), 117 Ct. Cl. 62, 63, 90 F. Supp. 943, 944 (1950) (commercial warehouse); Spodek v. United States, 73 Fed. Cl. 1, 2 (2006) (building used as post office), rather than undeveloped land, the cases often focus on harm such as nail holes left in walls and damage done to carpets, see, e.g., Desciose v. United States, 34 Fed. Cl. 606, 608 (1995) (concluding that nail holes and minor damage to carpet and walls constitute normal wear).

Although fewer in number, there are applicable precedents addressing normal wear for undeveloped land.  Other cases set out principles applicable both to buildings and undeveloped land.  Damage to a property that necessarily results from the purposes for which the property was leased is normal wear.  See Mount Manresa v. United States, 70 Ct. Cl. 144, 150 (1930) (stating that damage to a property that was necessary "for the proper utilization of the premises for the purposes for which they were leased" did not violate an obligation to return the property in as good condition as when received, "reasonable wear and tear, and damages by the elements excepted") (citing United States v. Bostwick, 94 U.S. 53, 66 (1876)).  The specific purpose for which a property is leased is central to the determination of what constitutes normal wear.  See Riverside Military Acad. v. United States (Riverside), 122 Ct. Cl. 756, 783 (1952) ("There would necessarily have been considerable wear and tear and essential repairs to the premises [of a boys' school, which] is not exactly a lace-curtain affair."); 49 Am. Jur. 2d Landlord and Tenant § 743 (2010) ("In determining what constitutes necessary wear and tear in a particular case, it is useful to consider the character of the specific rights granted in the lease; the lessor may be considered to have given his assent to the wear and tear normally

---

[7]Courts use several terms to refer to normal wear.  Some use the term "normal wear and tear."  See, e.g., Spodek v. United States, 73 Fed. Cl. 1, 28 (2006).  Other courts use the terms "ordinary wear and tear" or "reasonable wear and tear."  See, e.g., Mount Manresa v. United States, 70 Ct. Cl. 144, 149 (1930) (using the terms "ordinary wear and tear" and "reasonable wear and tear" interchangeably); Desciose v. United States, 34 Fed. Cl. 606, 607-08 (1995) (using the terms "normal wear and tear" and "ordinary wear and tear" interchangeably).

involved with exercising the rights granted."). Whether sufficient precautions were taken to protect a leased property is also a relevant consideration when determining whether damage to the property constitutes normal wear. See Consol. Laundries Corp. v. United States, 128 Ct. Cl. 675, 680, 121 F. Supp. 516, 518-19 (1954) (concluding, given the government's expenditure of $18,000 to "condition[]" leased washing machines and its employment of a full-time maintenance crew on the leased premises, that any damage to the washing machines constituted ordinary wear and tear).

Much of the federal precedent defining the scope of normal wear is contained in cases brought under the implied covenant that a tenant will not commit waste while in possession of a leased property.[8]  The government argues that the implied covenant against waste and the Restoration Clause are effectively co-extensive. Def.'s Reply 10. This is incorrect. A lessor's obligations under the implied covenant against waste differ from the government's obligations under the Restoration Clause. The United States Court of Claims has concluded that under the implied covenant against waste, improvements that are necessary to the lessee's use of a property and that do not "constitute[] a menace" to the property--such as sewer and water pipes, manholes, roads and drainage culverts--may be left in place at the end of a lease. Pearson v. United States, 75 Ct. Cl. 375, 380-81 (1932).[9]  In contrast, the Restoration Clause in the Lease provides Grand Acadian the right to require the government to "remove any physical additions and improvements [and] repair any alterations." Lease Rider ¶ 6.

The Restoration Clause does, however, incorporate language often used in cases brought under the implied covenant against waste. Compare Lease Rider ¶ 6 (requiring that the government "restore the premises to the condition existing at the lease commencement date, normal wear excepted"), with Brooklyn Waterfront, 117 Ct. Cl. at 85, 90 F. Supp. at 949 (stating that the implied covenant against waste "requires restoration of the premises to the lessor in the same condition as when received, reasonable wear and tear excepted"), and Mount Manresa, 70 Ct. Cl. at 149 ("There is an implied covenant in every lease that the tenant will surrender the premises at the end of

---

[8]The implied covenant against waste requires the lessee of property "to use the property as not unnecessarily to injure it." United States v. Bostwick, 94 U.S. 53, 65-66, 68 (1876); accord Prudential Ins. Co. of Am. v. United States, 801 F.2d 1295, 1299-1300 (Fed. Cir. 1986) (quoting Bostwick, 94 U.S. at 65-66). This covenant exists regardless of whether the express language creates it because the duty "results from the relation of landlord and tenant between the parties which the contract creates." Bostwick, 94 U.S. at 66. "It is not a covenant to repair generally, but to so use the property as to avoid the necessity for repairs, as far as possible." Id.

[9]The United States Court of Claims (Court of Claims) is the predecessor court to this court and a predecessor to the United States Court of Appeals for the Federal Circuit. When acting in its appellate capacity, the Court of Claims created precedent that is binding on this court. South Corp. v. United States, 690 F.2d 1368, 1369 (Fed. Cir. 1982) (en banc).

the term in as good condition as they were at the commencement of lease, reasonable wear and tear and damages by the elements excepted.").

The court disagrees with Grand Acadian's contention that cases brought under the implied covenant against waste are not relevant to interpretation of the Lease because the Lease contains an express restoration clause.  See Pl.'s Resp. 11.[10]  Cases brought under the implied covenant against waste often require courts to determine whether damage to property constitutes "normal wear."  See, e.g., Mount Manresa, 70 Ct. Cl. at 149 (finding that, as result of the exception for normal wear under the implied covenant against waste, "[t]he defendant is not required to make good any loss which necessarily resulted from the use of the premises leased from the plaintiff, but is required to make good any loss or damage resulting from a want of reasonable care of the property in its use"); Davenport, 26 Ct. Cl. at 344 (distinguishing between "repairs which would have been needed because of the ordinary wear and tear and those needed because of improper use by the defendants").  The court therefore relies on several cases brought under the implied covenant against waste for assistance in interpreting the term "normal wear."

III.    Lease Interpretation:  The Government's Obligation to Restore

The government attempts in its Motion to narrow its liability under the Restoration Clause by advancing three legal theories.[11]  First, the government argues that the term

---

[10]Grand Acadian has elected to pursue its claims under the Restoration Clause of the Lease rather than the implied covenant not to commit waste.  See Pl.'s Resp. 11 (arguing that the covenant against voluntary waste "is implied in the absence of a written restoration agreement," and that "the implied covenant against voluntary waste . . . is not applicable when there exists an express, written agreement on the subject of restoration").  Grand Acadian's election not to pursue its claims under the implied covenant against waste may be due in part to the fact that such claims are limited to the diminution in fair market value of the property leased.  San Nicolas v. United States, 223 Ct. Cl. 223, 230, 617 F.2d 246, 249 (1980) (per curiam) (citing, inter alia, Bostwick, 94 U.S. at 66).

[11]Grand Acadian argues that, pursuant to the doctrine of judicial estoppel, the court should refuse to hear the merits of the government's Motion.  Pl.'s Resp. 3.  Grand Acadian alleges that, in its opposition to Grand Acadian's motion for summary judgment, the government had previously argued that "the existence of genuine issues of material fact in relation to the condition of the premises both before and after the Lease precluded summary judgment on the issue of restoration liability."  Id.  This is the second time that Grand Acadian has contended that the doctrine of judicial estoppel should bar the government from raising an argument.  See Oct. 9, 2008 Order, Dkt. No. 24, at 3.  As the court explained when Grand Acadian first raised this contention, "The doctrine of judicial estoppel posits that 'where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position.'"  Id. (quoting Davis v. Wakelee, 156 U.S. 680, 689 (1895)).  The court agrees with the government that, rather than contradicting its previous argument that genuine issues of material fact remain as to the condition

"normal wear" in the Restoration Clause must be defined broadly, with the result that the government's responsibility to restore is limited.  See infra Parts III.A-B.  Second, relying on the requirement in the Lease that it "restore the premises," Lease Rider ¶ 6, the government argues that it is not responsible for repairs outside of the leased Property, in particular, removal of the portion of the South Ditch extending from the Property onto a non-leased portion of Grand Acadian's land and remediation of runoff of silt into a bayou bordering on Grand Acadian's land, see infra Part III.C.  Third, the government argues that it is not responsible for any repairs that would leave the Property in better condition than at the beginning of the Lease term.  See infra Part III.D.

The government lists eight categories of expenses that, it maintains, constitute Grand Acadian's restoration claim:[12]

1.    Undercut east ditch by one foot ($8,050) and backfill with 8,048 cubic yards (217,296 cubic feet) of compacted material ($104,624)

2.    Undercut south ditch by one foot ($5,992) and backfill with 6,845 cubic yards (184,815 cubic feet) of compacted material ($88,985)

3.    Undercut pond by one foot ($9,219) and backfill with 14,463 cubic yards (390,501 cubic feet) of compacted material ($188,019)

4.    Remove 171,689 cubic yards (4,635,603 cubic feet) from upper four feet of soil ($1,201,823) and backfill with 171,689 cubic yards of compacted material ($2,231,957)

5.    Replace 150 trees ($150,000)

6.    Hydroseed 30 acres of grass ($120,000)

7.    Dewater soil with a three man crew at $45 per hour ($225,000)

---

of the Property at the beginning and end of the Lease term, the government's Motion instead "raises new legal issues and addresses new uncontested facts that were not briefed previously." Def.'s Reply in Supp. of Mot. for Summ. J. Concerning Restoration (Def.'s Reply), Dkt. No. 90, at 6.  The government's Motion does relate to liability under the Restoration Clause, but it focuses on the extent of its duty to restore rather than the condition of the Property.  See Def.'s Mot. 1 (stating that Grand Acadian's claims would result in a "windfall of nearly $7 million – under the guise of restoration – for construction of new improvements to develop the leased property, for off-site conditions, and for normal wear to the leased property").

[12]The court does not here consider whether the government has accurately characterized the amount of Grand Acadian's claims because defendant's Motion pertains instead to the categories of restoration expenses the Lease requires the government to pay.

       8.      Remove silt from the bayou ($1,000,000)

Def.'s Mot. 5-6 (citing, inter alia, DX 13-G (Second Certified Claim)).[13]  Defendant's Motion "asks the Court to interpret the lease to determine, as a matter of law and based upon undisputed facts, whether the Government owes Grand Acadian a duty with respect to any of the eight categories of projected construction costs."[14]  Id. at 6.

      A.      The Exception for Normal Wear in the Restoration Clause

In an attempt to narrow its liability under the Restoration Clause, the government first argues that several of the alterations it made pursuant to the Lease are "normal wear," which the Restoration Clause does not obligate the government to remedy.  See Def.'s Mot. 10.  Here, the government relies on its broad interpretation of the term "normal wear" and the fact that "the lease expressly stipulates that 'normal wear' is excluded from the Government's duty to restore the leased property."  Id. (citing Lease Rider ¶ 6).  Specifically, the government argues that its "removal of the trees and its creation of two drainage ditches and a pond are all normal wear that is excluded from the Government's contractual obligation to restore."  Id.  Grand Acadian responds that under the government's interpretation of the Restoration Clause, "every single alteration authorized by the Lease would be exempt from the restoration clause," depriving Grand Acadian of its right to require the government to "remove, repair, and restore any of the alterations authorized by the Lease."  Pl.'s Reply 11.

---

[13]Before the commencement of this action, Grand Acadian filed three certified claims with the government.  Pl.'s Resp. to Def.'s Facts ¶¶ 29-31; see also DX 13-D (First Certified Claim); DX 13-G (Second Certified Claim); DX 13-G (Supplemental Claim).  In June 2006, Grand Acadian submitted its First Certified Claim for "repairs and restoration" of the property.  Pl.'s Resp. to Def.'s Facts ¶ 29.  In July 2006, Grand Acadian submitted its Second Certified Claim, which is a revised version of Grand Acadian's First Certified Claim.  Id. ¶ 30.  In September 2006, Grand Acadian added to its Second Certified Claim a Supplemental Claim, which included damages for, inter alia, remediation of the runoff of silt from the Property.  Id. ¶ 31.

[14]According to the government, each of its arguments addresses several categories of restoration expenses.  The government's argument that the exception in the Restoration Clause for normal wear narrows its liability applies to the cost of "(a) filling two drainage ditches; (b) filling a pond; and (c) replanting trees."  Def.'s Mot. 10.  The government's argument that it has no duties with respect to off-site conditions applies to the cost of "(a) filling a ditch upon the non-leased property; and (b) removing silt from a bayou near the non-leased property."  Id. at 8.  The government's argument that it is not responsible for repairs that would leave the Property in better condition than at the beginning of the Lease term applies to the cost of "(a) replacing . . . existing soil with new compacted material across the upper four feet of the leased property; (b) installing . . . new compacted material in two drainage ditches and a pond; (c) planting grass on the site; and (d) drying out the soil."  Id. at 6-7.

The disputed sentence of the Restoration Clause states:

Lessor may require that the Government, at the end of the Term and at the Government's expense, remove any physical additions and improvements, repair any alterations, and restore the premises to the condition existing at the lease commencement date, underline normal wear excepted.

Lease Rider ¶ 6 (emphasis added).

According to the government, because the parties understood when signing the Lease that the government intended to make certain alterations, those alterations "are all normal wear that is excluded from the Government's contractual obligation to restore." Def.'s Mot. 10; see also Def.'s Reply 9 (stating that "in the context of real property leased for construction purposes, 'normal wear' means those expected alterations that result from the intended use of the property") (citation omitted).  The government argues that the removal of trees and the construction of drainage ditches and a pond constitute normal wear that the government is not obligated to remedy because "the parties understood at the time of the lease that these alterations would be made as part of the intended use of the leased property."  Def.'s Mot. 10; see Def.'s Reply 9 (stating that "normal wear covers Grand Acadian's claims for the cost of filling ditches and a pond and the cost of replacing trees") (citing Def.'s Facts ¶ 30 & DX 13-G (Second Certified Claim) 3).[15]  However, the government's interpretation fails because it would convert into normal wear all planned and non-negligently constructed additions, improvements and alterations, rendering surplusage the requirement that the government "remove any physical additions and improvements, [and] repair any alterations" at Grand Acadian's election.  Lease Rider ¶ 6; see Granite Constr. Co., 962 F.2d at 1003 (stating that contracts must be interpreted in a manner that avoids conflict between provisions or renders some provisions surplusage).

---

[15]The parties agree that before the Lease was signed, the government sent Grand Acadian design drawings (Design Drawings) and work plans (Work Plans) for the site.  Pl.'s Resp. to Def.'s Facts ¶ 12.  The parties further agree that they understood when the Lease was signed that the Design Drawings "provided for a pond to be located on the south-eastern portion of the leased property."  Id. ¶ 15.  However, genuine issues of material fact remain with regard to whether both parties understood that the government planned to build drainage ditches.  In support of its position that Grand Acadian knew that the government intended to build the drainage ditches, the government provides the affidavit of a Fluor employee and a copy of the Design Drawings which, it contends, show the drainage ditches.  Def.'s Facts ¶¶ 13-14 (citing DX 17 (July 27, 2010 Decl. of Scott Wiley) ¶ 4 & DX 14-A (Design Drawings) 2412-14).  Grand Acadian responds that the Design Drawings do not show the drainage ditches.  Pl.'s Resp. to Def.'s Facts ¶¶ 13-14 (citing DX 14-A (Design Drawings) 2412-14).  The Design Drawings, as submitted to the court, are not dispositive as to whether or where possible drainage ditches were proposed to be built.  See DX 14-A (Design Drawings) 2412-14.  In addition, explanatory text on the Design Drawings is illegible in the copies provided to the court.  See id.

The Court of Claims reached a similar conclusion in <u>Garrett v. United States</u>, 68 Ct. Cl. 452, 456-57 (1929), holding that the exception for normal wear in a lease did not relieve the government of its obligation to remove all structures it had created on the property. The restoration clause at issue in <u>Garrett</u> stated that: "[t]he lessee agrees . . . to remove all structures placed by it on the said 27-acre tract and restore the same to the condition in which it was when possession was first taken under said original lease, ordinary wear and tear excepted." <u>Id.</u> at 454, 457. At the end of the lease term, the government removed the buildings it had placed on the property but left their foundations and cellars in place. <u>Id.</u> at 455, 457. The Court of Claims determined that, despite the exception for normal wear and tear, the lease required the government to remove the foundations and cellars of the buildings and to fill and grade the resulting ditches. <u>Id.</u> at 455-57.

Although the government in this case cancelled the project before completing all planned additions, improvements and alterations, <u>compare</u> Lease Rider ¶ 2 (stating that the property would be used "for the construction and establishment of temporary housing facilities"), <u>with</u> DX 29 (Dec. 2006 Aerial Photos) <u>passim</u> (showing no temporary housing facilities), the government did construct drainage ditches and a pond, Pl.'s Resp. to Def.'s Facts ¶¶ 23-25. As the government concedes, the drainage ditches and pond are alterations.[16] <u>See</u> Def.'s Mot. 10 (referring to the drainage ditches and pond as "alterations"); Def.'s Reply 9 (same). Because the court holds that the planned additions, improvements and alterations are not themselves normal wear, <u>see</u> <u>Colton v. United States</u>, 71 Ct. Cl. 138, 143-44 (1930) (finding that large, unfilled ditches left on a property did not constitute normal wear); <u>Pearson</u>, 75 Ct. Cl. at 378 (finding that "defendant committed unnecessary waste and damage to the plaintiffs' property by leaving . . . an open trench approximately 8,912 feet long"), the court concludes that the requirement under the Lease that the government, at Grand Acadian's election, "remove any physical additions and improvements [and] repair any alterations" applies to the drainage ditches and pond. These alterations are not themselves normal wear, although some quantity of normal wear can be expected as a result of their construction. Therefore, insofar as the government's Motion requests summary judgment that it had no duty to fill and grade the drainage ditches and pond, the Motion is DENIED.

The Lease requires the government, at Grand Acadian's election, to remove any addition or improvement, to repair any alteration it has made and to restore the Property to its condition at the commencement of the Lease term. Although the government has no duty to remedy normal wear incidental to the use for which the Property was leased, to the extent the government's Motion asks the court to find that planned alterations to the

---

[16]The court does not address the question of whether the drainage ditches and pond are property categorized as additions, improvements or repairs. The parties have not argued that the distinction is relevant to Grand Acadian's claims. <u>See</u> Def.'s Mot. <u>passim</u>; Pl.'s Resp. <u>passim</u>; Def.'s Reply <u>passim</u>.

Property themselves constitute normal wear, which the government is not obligated to remedy, see Def.'s Mot. 10, the Motion is DENIED.

      B.     Determining What Constitutes Normal Wear to Grand Acadian's Property

The Lease does not require the government to remedy normal wear to the Property. However, determining whether the damage, if any, done to Grand Acadian's Property constitutes normal wear will require the court to resolve several genuine issues of material fact. Specifically, the court must determine the condition of the Property at the beginning and at the end of the Lease term, and whether damage to the Property was necessary to the purpose for which the Property was leased--including whether proper precautions were taken to prevent unnecessary damage.

Damage to a property that necessarily results from the purposes for which the property was leased is normal wear. See Mount Manresa, 70 Ct. Cl. at 150 (citing Bostwick, 94 U.S. at 66). Courts examine closely the purpose for which a property was leased when determining whether damage to the property amounts to normal wear. See, e.g., Riverside, 122 Ct. Cl. at 783 (determining that significant wear to a property leased for use as a boys' school could be expected). The Lease states the purpose for which the Property was leased: the construction and operation of temporary housing facilities for disaster assistance recipients. Lease Rider ¶ 2. Defendant's Facts do not address, however, the extent of normal wear that would be expected from this type of construction project, including any amount of additional wear that could be expected as a result of the haste with which the housing was to be constructed in the wake of the hurricanes. See Def.'s Facts passim.

Further, although the purpose for which the Property was leased is not in dispute, the parties do contest the extent of the damage done. The government concedes that "if Grand Acadian were able to prove at trial that additional organic debris existed in the soil after the lease" that was not a result of normal wear, then Grand Acadian would "arguably" be entitled to the cost of removing the debris. Def.'s Reply 11. The court agrees. See, e.g., Mount Manresa, 70 Ct. Cl. at 150 (finding that damage that included mixing building materials and other foreign matter into the soil was not normal wear); San Nicolas v. United States, 223 Ct. Cl. 223, 227-29, 617 F.2d, 246, 248-49 (1980) (per curiam) (finding that merely spreading a layer of dirt over "construction spoil and debris" violated a lease requirement to "restore the premises to the same conditions as that existing at the time of entering this lease, reasonable wear and tear by the elements excepted"). As the court determined in its 2009 Opinion, disputes of material fact remained as to the condition of the soil on the Property at the beginning and at the end of the term of the Lease. Grand Acadian I, 87 Fed. Cl. at 213. No additional facts have been presented to the court that permit the resolution of this issue.

Because genuine issues of material fact remain as to what, if any, damage was done to the Property, genuine issues also remain as to whether any damage done was the

result of normal wear for which the government is not liable under the Lease. Some measure of damage would necessarily result from construction activities on the Property, even if the government "had been most careful in [its] use of the premises during the entire length of the tenancy." Davenport, 26 Ct. Cl. at 344. Installing drainage and clearing trees and underbrush, for instance, may be necessary for a construction project, see Pearson, 75 Ct. Cl. at 379, and may unavoidably create some amount of wear on the soil and on the Property as a whole. Due to the exception in the Restoration Clause for normal wear, "Whatever damages would necessarily result from a use for the same purpose by a good tenant must fall upon [the landlord]." Bostwick, 94 U.S. at 66.

Genuine disputes of material fact also exist as to whether the government followed correct construction techniques, an inquiry that is relevant to the issue of whether damage to the Property necessarily resulted from the planned construction activities. See Consol. Laundries, 128 Ct. Cl. at 680, 121 F. Supp. at 518-19 (considering the precautions taken to protect leased property). Grand Acadian contends that, rather than properly clearing trees from the Property, the government "knocked down some of the trees and drove on top of them with heavy machinery, forcing them down into the sub-surface soils." Pl.'s Resp. to Def.'s Facts ¶ 22 (citing PX 2 (Nov. 10, 2010 Decl. of Pat McConnaughhay) ¶ 11). Grand Acadian also contends that the government failed to follow proper procedures to prevent runoff of silt, Compl. ¶ 178; see PX 6 (Nov. 10, 2010 Decl. of Billy Prochaska) 2, failed to conduct proper soil testing, Compl. ¶ 53, and failed to construct adequate drainage prior to employing heavy equipment on the land, Compl. ¶ 53; see PX 5 (Nov. 11, 2009 Dep. of Billy Prochaska) 38:11-39:12.

Because determining whether the foregoing complaints of damage to the Property constitute normal wear will require the resolution of disputes of material fact, these issues are not appropriate for summary judgment. Insofar as the government's Motion asks the court to determine the extent of normal wear to the Property, the Motion is DENIED.

However, there is no genuine issue of material fact as to whether the Lease requires the government to pay the cost of re-planting trees. Removing trees from a property when necessary to perform the construction for which the property was leased is normal wear. Bostwick, 94 U.S. at 69 (stating that the destruction of ornamental trees to build a hospital was waste "except to the extent that the same necessarily resulted from the use of the premises"); Pearson, 75 Ct. Cl. at 379 ("It was necessary to clear the thick growth of trees . . . to permit the erection of the various buildings . . . ."); Mount Manresa, 70 Ct. Cl. at 149-50 ("[P]laintiff knew and understood at the time of the execution of the lease that the use of the premises by the defendant . . . would necessarily require the removal of a part or all of the trees."). The parties agree that, before signing the Lease, Grand Acadian received Work Plans, Pl.'s Resp. to Def.'s Facts ¶ 12, that "provided for [the] 'clearing' [of] the 'few remaining trees' from the leased property," id. ¶ 16. Because the parties understood that clearing or knocking down the trees was necessary to the purposes for which the Property was leased, the government's motion for

summary judgment is GRANTED with regard to the duty to pay the cost of re-planting trees on the Property.  The Lease does not require the government to pay the cost of planting new trees.

C.     Conditions on Property Not Within Leased Property

The second argument advanced by the government is that the Restoration Clause does not obligate the government to pay the cost of "(a) filling a ditch upon the non-leased property; [or] (b) removing silt from a bayou near the non-leased property." Def.'s Mot. 8 (citation omitted).  The government asks the court to find it "has no contractual duty to underline restore these off-site conditions because they are not located on the 'premises' of the leased property."[17]  Id. (emphasis added).

1.     Portions of the South Ditch on Non-Leased Areas of Grand Acadian's Land

The parties agree that the South Ditch continued along the southern boundary of land Grand Acadian owned but did not lease to the government, Pl.'s Resp. to Def.'s Facts ¶ 26, and that the government did not fill the portion of the South Ditch that was on non-leased property, id. ¶ 28.

The government argues that even though "[t]he lease requires the Government to 'restore the premises to the condition existing at the lease commencement date,'" the portion of Grand Acadian's property that it did not lease was not part of the "premises." Def.'s Mot. 7-8 (quoting Lease Rider ¶ 6).  According to the government, "The 'premises' are defined in the lease as 'the space described on the [Standard Form Lease].'"  Id. at 7 (quoting General Clauses ¶ 1).  The Standard Form Lease, the government argues, "identifies the 'premises' as 'approximately 30 acres of land located in Grand Acadian RV Park . . . .'"  Id. at 7-8 (quoting Standard Form Lease ¶ 1). Because the unfilled portion of the South Ditch and any silt that has accumulated in the

_____

[17]In its Motion, the government refers to the leased Property as "the premises."  See, e.g., Def.'s Mot. 8.  The Lease assigns the same definition to the terms "Property" and "Premises," see General Clauses ¶ 1(j) (defining the term "Premises" by reference to the definition of the term "Property"), and uses the terms interchangeably, see, e.g., Lease Rider ¶ 3 (using the term "Property"); Lease Rider  ¶ 6 (using the term "Premises").  Although the Lease defines the term "Premises," it is inconsistent in its capitalization of the word.  See, e.g., Lease Rider ¶ 6 ("Any physical additions or improvements to the Premises made by the Government will become the property of Lessor.  Lessor may require that the Government . . . restore the premises to the condition existing at the lease commencement date, normal wear excepted.").

Additionally, both the government, Def.'s Mot. 8, and Grand Acadian, Pl.'s Resp. 9, use the verb "to restore" in a generic sense to refer to the three separate obligations set out in the relevant portion of the Restoration Clause in the Lease.  However, distinctions between the scope of the three separate obligations in the Restoration Clause to "remove  . . . repair . . . and restore" are in dispute.

bayou are not on the leased Property, the government argues, "[t]he Government has no contractual duty to restore these off-site conditions." Id. at 8.

Grand Acadian responds that although the Lease authorized the government to undertake construction activities on the leased area, "The Lease does not draw any distinction between the property available to be used for construction and that which must be restored." Pl.'s Resp. 9.  Instead, "the Lease authorizes [Grand Acadian] to require the Government to 'remove any physical additions and improvements, repair any alterations, and restore the premises to the condition existing at the Lease Commencement date.'" Id. (quoting Lease Rider ¶ 6) (emphasis in original).  Grand Acadian contends that the absence of the words "to the premises" requires that the "remove" and "repair" obligations are not limited to the Property and apply as well to additions, improvements and alterations on the portion of Grand Acadian's land that was not leased to the government.  See id.  The Lease, Grand Acadian argues, "does not support the Government's manufactured distinction between property available to be used for construction and that which must be restored."  Id.

The relevant portion of the Restoration Clause states:

> Lessor may require that the Government, at the end of the Term and at the Government's expense, remove any physical additions and improvements, repair any alterations, and restore the premises to the condition existing at the lease commencement date, normal wear excepted.

Lease Rider ¶ 6.

The government's reading--in effect--inserts the words "to the premises" after the phrases "remove any physical additions and improvements" and "repair any alterations." The resulting sentence, with the words "to the premises" inserted in brackets, reads: "Lessor may require that the Government . . . remove any physical additions and improvements [to the premises], repair any alterations [to the premises], and restore the premises to the condition existing at the lease commencement date, normal wear excepted."

Grand Acadian's interpretation is consistent with the "rule of the last antecedent," which provides that "[r]eferential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent."  2A Norman J. Singer & J.D. Shambie Singer, Sutherland Statutory Construction § 47:33 (7th ed. 2007); see also Barnhart v. Thomas, 540 U.S. 20, 26 (2003) ("[A] limiting clause or phrase . . . should ordinarily be read as modifying that noun or phrase that it immediately follows.").  When the Restoration Clause is interpreted pursuant to the rule of the last antecedent, the qualifying words "the premises" limit the government's obligation to "restore," but not the government's obligation to "remove any physical additions and improvements" and to "repair any alterations."  See Lease Rider ¶ 6.  Under the rule of the last antecedent,

the government is required by the Restoration Clause to "restore" only the Property, but must remove physical additions and improvements and repair alterations, regardless of where they are situated.  However, the rule of the last antecedent "is not an absolute" and can be "overcome by other indicia of meaning."  Barnhart, 540 U.S. at 26.

Grand Acadian's view of the correct interpretation of the Restoration Clause is supported not only by the rule of the last antecedent but also by reading the Lease as a whole.  "It is well settled that a contract must be interpreted when possible as a whole in a manner which gives reasonable meaning to all its parts and avoids conflict or surplusage of its provisions."  Granite Constr. Co., 962 F.2d at 1003.  The Lease contemplates that construction activities would require use of property owned by Grand Acadian but not leased to the government.  A section of the Lease Rider titled "Lessor's Covenant to Grant Easements and to Cooperate" explains Grand Acadian's duty to cooperate in the establishment of the temporary housing facilities and in the installation of utilities and other amenities:

> The parties acknowledge that the Government's use of the Property shall require construction and placement of improvements on the Property to permit residential occupancy thereon by disaster assistance recipients . . . . Lessor agrees to reasonably cooperate with the Government in order to accomplish the establishment and operation of the temporary housing facilities, including, where required, securing permits, sign-offs and/or other approvals and government entitlements.  Lessor further agrees to grant such easements, rights of way, and other rights of use and or access in and to any portion(s) of Lessor's property (including property not included within the demised premises leased to the Government under this Lease) as may be necessary and/or convenient to accomplish the installation and operation of utilities, roadways for ingress and egress, and other amenities related to the temporary housing facilities, including but not limited to the grant of a blanket-easement to utility providers and or other service providers.  Lessor also agrees to execute such other and further documents, or perform such other acts, as may be necessary to carry out the provisions of this section.

Lease Rider ¶ 3 (emphasis added).  The record includes no indication that Grand Acadian granted an easement in writing to the government for the drainage ditch.  However, by allowing its construction, Grand Acadian appears to have carried out to some extent its obligation under the Lease to grant "rights of use" and to "reasonably cooperate with the Government in order to accomplish the establishment and operation of the temporary housing facilities."  Id.

An interpretation of the Lease that affords the government the right to dig a drainage ditch on Grand Acadian's property, but places no obligation on the government to fill the portion of the ditch that is not on the leased Property, would not be the most

reasonable interpretation of the Lease as a whole.  Cf. Granite Constr. Co., 962 F.2d at
1003 (stating that "a contract must be interpreted when possible as a whole in a manner
which gives reasonable meaning to all its parts and avoids conflict or surplusage of its
provisions").  Because the government's right to engage in construction activities
extended beyond the edge of the Property to "property not included within the demised
premises leased to the Government," Lease Rider ¶ 3, it is reasonable to interpret as
extending beyond the edge of the Property the government's duties to "remove any
physical additions and improvements" and to "repair any alterations" under the
Restoration Clause as well.

The case cited by the government for the proposition that its duties under the
Restoration Clause extend only to the leased Property is inapposite.  See Def.'s Reply 8
(citing Affiliated FM Ins. Co. v. United States (Affiliated), No. 554-78, 1980 U.S. Ct. Cl.
LEXIS 1144, *22-23 (Aug. 6, 1980) (trial judge's findings of fact and recommended
conclusions of law), aff'd, 225 Ct. Cl. 702, 650 F.2d 290 (1980) (table) (adopting the
recommended decision of the trial judge)).  In Affiliated, the government had leased an
apartment to house military personnel.  Affiliated, 1980 Ct. Cl. LEXIS 1144 at *1.  The
lease contained a restoration clause that required the government either to "restore the
premises" or to pay the lessor the cost of restoration or the diminution in the property
value owing to its failure to restore.  Id. at *5-6.  A fire broke out in the leased apartment
and damaged other apartments in the building.  Id. at *2.  The court determined that
"[t]he wording in [the lease] specifically limits the Government's obligation to restore to
'the leased premises,' i.e., Apartment 101."  Id. at *22.

The lease at issue in Affiliated, however, differs materially from the Lease in this
case, both in the wording of the restoration clause and in the government's right to use
areas not within the demised property.  The restoration clause at issue in Affiliated
required the government to "restore the premises," id. at *5-6, as does the Restoration
Clause in this case, Lease Rider ¶ 6.  Unlike the restoration clause in Affiliated, however,
the Restoration Clause in this case goes further, also requiring the government--at Grand
Acadian's election--to "remove any physical additions and improvements [and] repair
any alterations."  Lease Rider ¶ 6.  The Lease also contemplates that the government will
engage in construction activities outside of the leased Property, see id. ¶ 3, which the
government did by building a drainage ditch across a portion of Grand Acadian's
property that the government had not leased, see Pl.'s Resp. to Def.'s Facts ¶ 26.  The
government had no right in Affiliated to use the apartments it had not rented.[18]  The court

_____

[18]The Affiliated court also noted that an interpretation that made the government liable
for fire damage to other apartments was "unacceptable because it would require each tenant to
act as an insurer for the entire apartment complex, resulting in considerable redundant insurance
coverage."  Affiliated FM Ins. Co. v. United States, No. 554-78, 1980 U.S. Ct. Cl. LEXIS 1144,
*23 (Aug. 6, 1980) (trial judge's findings of fact and recommended conclusions of law), aff'd,
225 Ct. Cl. 702, 650 F.2d 290 (1980) (table) (adopting the recommended decision of the trial
judge).  The issue in this case is not whether the government must act as an insurer of areas

concludes that in this case, unlike in <u>Affiliated</u>, the government's obligations under the Lease to "remove any physical additions and improvements" and to "repair any alterations," <u>see</u> Lease Rider ¶ 6, are not limited to the Property.

With regard to the government's obligation to fill the portion of the South Ditch that lies on a portion of Grand Acadian's property not leased to the government, the government's motion is DENIED.

2.    Runoff of Silt

Grand Acadian claims that the government's "failure to follow appropriate procedure" during construction caused run-off of silt into a bayou that borders on Grand Acadian's land.  Compl. ¶ 178.  Grand Acadian claims damages of $1,000,000 to pay for remediation of the silt.  <u>Id.</u>; Pl.'s Resp. to Def.'s Facts ¶ 31 (agreeing that in the certified claims filed before this action, Grand Acadian included $1,000,000 for remediation of silt run-off into the adjacent bayou).  The government replies that it is not liable for remediation of the silt because it has no duty to repair off-site conditions.  Def.'s Mot. 8.

The court concludes that the government's duties under the Lease, like the government's rights under the Lease, did not end at the edge of the Property it rented from Grand Acadian.  However, genuine issues of material fact remain as to whether runoff of silt from the Property into the neighboring bayou caused a breach of the Lease. The government agreed in the Lease to "comply with all Federal, State and local laws applicable to and enforceable against it as a tenant under this lease."  General Clauses ¶ 15; <u>see also</u> <u>Colton</u>, 71 Ct. Cl. at 144-45, 152 (finding the government had committed waste by diverting runoff in such a way that it created "ditches and gullies" on the rented property).  Grand Acadian refers generally to federal, state and local permits required for construction and introduces evidence of potential civil and criminal penalties that could be levied against Grand Acadian under those permits for failure to contain erosion. Compl. ¶¶ 11, 16, 149 (mentioning a wetlands permit issued by the United States Army Corps of Engineers and a storm water runoff permit issued by the Louisiana Department of Environmental Quality); PX 2 (Nov. 10, 2010 Decl. of Pat McConnaughhay) ¶ 7 (mentioning state and local permits related to storm water runoff and the potential penalties for violation).  Notably, Grand Acadian does not address its performance of (or failure to perform) its own obligation "to reasonably cooperate with the Government in order to accomplish the establishment and operation of the temporary housing facilities, including, where required, securing permits, sign-offs and/or other approvals and government entitlements."  Lease Rider ¶ 3.

---

outside of the Property, but rather whether the government is obligated by the Lease to "remove any physical additions and improvements [and] repair any alterations" that it created, pursuant to the Lease, outside of the leased Property.  <u>See</u> Lease Rider ¶ 6.

The government contends that Grand Acadian "has not incurred any of the claimed costs," Def.'s Mot. 6, and argues that "Grand Acadian did not obtain any estimates for the $1 million figure . . . and, instead, made the figure up based upon discussions with its lawyer," id. at 5 n.2. The court discussed Grand Acadian's claims for runoff of silt in its 2009 Opinion, concluding that, "[b]ecause there is inadequate briefing on the issue of causation, beyond mere conclusory statements, and because the court will decide the . . . damages issues in further proceedings, the court does not address the issue of consequential damages at this time." Grand Acadian I, 87 Fed. Cl. at 214 n.9. No additional briefing has been submitted on the issue of causation, and issues of law and material fact remain as to whether the government has breached the Lease and whether Grand Acadian has suffered any injury as a result of such a breach. With regard to the runoff of silt, the government's motion for summary judgment is DENIED. See Crater, 255 F.3d at 1366 (stating that the party moving for summary judgment has the initial burden of demonstrating "the absence of any genuine issue of material fact and entitlement to judgment as a matter of law") (citing Celotex Corp., 477 U.S. at 323-24).

D.     Repairs that Would Leave the Property in "Better" Condition

The third argument the government advances to limit its liability is that Grand Acadian's restoration claim fails because restoring the Property as Grand Acadian requires would put the Property in "better" condition than at the beginning of the Lease term. See, e.g., Def.'s Mot. 7. The government argues that "Grand Acadian's claims relating to the soil closely mirror development work that it performed upon the adjacent non-leased property." Id. Specifically, the government argues that it has no obligation to pay the cost of "(a) replacing . . . existing soil with new compacted material across the upper four feet of the leased property; (b) installing . . . new compacted material in two drainage ditches and a pond; (c) planting grass on the site; and (d) drying out the soil." Def.'s Mot. 6-7.

The Court of Claims rejected a similar argument in Vinoy Park Hotel Co. v. United States (Vinoy), 125 Ct. Cl. 336, 337-39 (1953). In Vinoy, the government had leased a hotel to serve as a barracks during the second World War. Id. at 336-37. The lease required the government to restore the hotel to the condition it was in at the beginning of the lease, normal wear and tear excepted. Id. at 337. In repairing the damage it had done to the building, the government "of necessity" offset normal wear for which it was not liable. Id. at 338. The court noted that if a wall needed painting due to normal wear, but was also damaged during the tenancy, "obviously defendant could not repair the damage without at the same time offsetting previous wear and tear." Id. at 338-39. The court determined that the government was "clearly not entitled to offset this advantage," id. at 339, which, as here, was incidental to the repairs the government was required to undertake, see WDC W. Carthage Assocs. v. United States, 324 F.3d 1359, 1363-64 (Fed. Cir. 2003) (concluding that the government was required, despite a potential windfall to the lessor, to replace carpet that was damaged beyond normal wear).

The government is not relieved from its obligation to repair damage it caused during the Lease term by the fact that repairs required by the Lease may leave the Property in a better condition than the government would otherwise be obligated to leave it.[19]

The government's Motion is therefore DENIED as to its argument that the government is not liable for repairs to the Property that leave the Property in a better condition than at the beginning of the Lease term.

IV.   Conclusion

For the foregoing reasons, the government's Motion is GRANTED-IN-PART as to the replacement of trees.  The government has no obligation to replace the trees standing on the Property at the beginning of the Lease term.  The Motion is otherwise DENIED.

Specifically, the Motion is DENIED as to the following requests:

that the court find as a matter of law that planned additions, improvements and alterations to the Property that were executed in a non-negligent fashion constitute normal wear, which the government is not required to remedy, see Def.'s Mot. 10; Def.'s Reply 9;

that the court find as a matter of law that the government owed no duty under the Restoration Clause outside of the thirty-acre leased Property, see Def.'s Mot. 7-8; Def.'s Reply 8-9; and

that the court find as a matter of law that the government had no duty to undertake restoration of the Property that leaves it in a better condition than at the beginning of the Lease term, see Def.'s Mot. 6-7; Def.'s Reply 7-8.

---

[19]The government argues that "Grand Acadian also cites unsworn hearsay opinions by Freese & Nichols that are not admissible summary judgment evidence."  Def.'s Reply 6 n.4 (citing RCFC 56(e)).  Grand Acadian's use of the Freese & Nichols reports, however, is immaterial to the conclusions reached by the court.  Grand Acadian cites the reports while summarizing its claims and the conclusions previously reached by the court.  See Pl.'s Resp. 6. Grand Acadian again cites the reports for the proposition that the Property was in a different condition at the beginning and end of the Lease term.  Pl.'s Resp. to Def.'s Facts ¶ 19.  The court concluded in its 2009 Opinion that genuine issues of material fact remain with respect to this issue, Grand Acadian I, 87 Fed. Cl. at 212-13, a conclusion that the court does not reconsider in this opinion.  Grand Acadian cites the reports for the proposition that restoration of the Property will not leave the Property "better" than it was at the beginning of the Lease term.  Pl.'s Resp. to Def.'s Facts ¶ 34.  As the court has determined, however, the government's potential liability for repair is not affected by the possibility that the repairs will leave the Property in a better condition.

The issues remaining for trial include the condition of the Property both at the commencement of the Lease and the termination of the Lease and the cost to remove any additions and improvements, repair any alterations and restore the Property to its pre-Lease condition, "normal wear excepted."  Also remaining for trial are all issues of liability and damages for Grand Acadian's claims for erosion, runoff of silt and violations of federal, state and local permits.

IT IS SO ORDERED.

s/ Emily C. Hewitt
EMILY C. HEWITT
Chief Judge